# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____

| | | |
|---|---|---|
| **PAUL EDWARDS** | : | **CASE NO. 3:17-cv-0466 (SRU)** |
| **PLAINTIFF** | : | |
| **V.** | : | |
| **CBD & SONS LTD AND TWERSKY PLLC,** | : | |
| **DEFENDANTS** | : | **SEPTEMBER 25, 2017** |

_____ :


### MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, Plaintiff, moves for leave to amend its complaint. As grounds therefore, Plaintiff provides as follows:

**I.** The Plaintiff filed its [34] Amended Complaint, on April 10, 2017. The Plaintiffs' proposed Amendment dated September 21, 2017 seeks to cure any misstep by the Plaintiff in his [34] Amended Complaint, dated April 10, 2017, in order to facilitate a proper decision on the merits. The proposed amendment would a) properly state legal cognizable claims or causes of action, upon which relief can be granted b) clarify the Plaintiff's underlying claims and circumstances alleged against the Defendants, so that the underlying claims and circumstances alleged against the Defendants, which the Plaintiff relies upon, may be a proper subject of relief. The Plaintiff ought to be afforded an opportunity to test his claim on the merits. c) properly allege that  former Vice President of the First Defendant, Gary Escandon, had motive and means and opportunity to commit fraud and had conscious behavior of recklessness. On or around January 2016 (years after the execution of the loan documents) the Plaintiff discovered that, $23,000 of the $112,500 (of what the First Defendant former VP Gary Escandon represented to the Plaintiff as interest due during the initial one year period of the loan) was not interest but was instead a commission paid by the First Defendant to its Vice President Escandon and said commission (in violation of public policy and industry practices) was not disclosed to the Plaintiff or in the loan closing documents. The Plaintiff alleges that he suffered injury of at least $23,000, as he discovered that the actual amount that allegedly went to interest

and that he allegedly should have paid was $89,500, not $112,500. The Plaintiff alleges that as a result of the aforementioned facts, he suffered injury in the amount of at least $23,000. d) properly allege in the Plaintiff's Causes of Action that the First Defendant and its former VP Gary Escandon, interfered with the Plaintiff's ability to perform under the note. e) Properly allege that the First Defendant and the Vice President of the First Defendant Aaron Twersky, had motive, means opportunity and to commit fraud and to wrongfully and or unlawfully circumvent the foreclosure process and he had conscious behavior of recklessness. VP Aaron Twersky told the NY Court (in a law suit filed in March 2015, against its former Vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and **impossible** to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss. The Plaintiff alleges that VP Aaron Twersky (acting in his capacity of Vice President of the First Defendant) then plotted to allegedly wrongfully and unlawfully circumvent the foreclosure process, in order to get the Plaintiff's  DEED to his properties, without going through the foreclosure process. f) clarify the allegations regarding the January 25, 2017, phone conversations between the Plaintiff and the Defendants and the allegations surrounding the January 25, 2017 payoff/demand  letter, which was sent to the Plaintiff by the Defendants and addressed to Riverdale Funding. The Plaintiff [34] Amended Complaint, dated April 10, 2017 at times alleges that said January 25, 2017 verbal promise made by the Defendant to him by phone and the January 25, 2017 Payoff/demand letter, as an agreement/contract. The Plaintiff in his proposed Amendment seeks to properly allege the aforementioned January 25, 2017 verbal communication between the parties and the January 25, 2017 Payoff/demand letter as representations, promises, and written misstatements of material facts and omissions, which induced the Plaintiff to rely upon them and the Plaintiff did so rely upon them and acted upon them, to his injury.  g) Properly allege in the Plaintiff's Causes of Action (pursuant to the escrow agreement) that the First Defendant agreed to accept $272,751.07 (on or before March 22, 2017) to satisfy the subject note in full. The Deed to the subject properties was put in escrow as security for the note. The Defendant freely agreed to accept $272,751.07 to satisfy the note, pursuant to the escrow agreement. The Deed in escrow secured the note. The First Defendant filed the DEED (which was held in escrow as security for the

2

$272,751.107 amount to satisfy the note in full) during the term of the escrow agreement. The Plaintiff alleges that the language is unambiguous and the Plaintiff expectation was that the $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full. The value of the properties was at least $672,300, evidenced by the City of Meriden 2016 appraisal value shown on its property cards, the value of the DEED was said to be $672,300 and at that time there was a $100,000 second mortgage lien on the property. Therefore the value of the property less the second mortgage was $572,300, which exceeded the agreed upon amount of $272,751.07 to satisfy the note in full during the period of the escrow agreement. The Defendant allegedly breached the escrow agreement by its failure to issue the Plaintiff the satisfaction of note in full and the releases of the mortgage and the guarantor, despite filing the DEED during the escrow agreement period (before the expiration of the escrow agreement) h) properly allege in the Plaintiff's Causes of Action, that provision # 4 of the escrow agreement allegedly violates Public Policy and his constitutional rights. Courts have generally refused to enforce provisions in contracts where said provisions prohibits and restrict a party from filing bankruptcy in whole or in part. Courts have also refused to enforce any provisions (not just provisions that prohibits and restrict a party from filing bankruptcy in whole or in part) in a contract that violates Public Policy and prohibits and restricts the person's right to petition the government for redress of grievances by exercising their right to file a law suit. i) Properly allege in the Plaintiff's Causes of Action that provision # 4 the escrow agreement, which prohibits and restricts the Plaintiff from any court filing, also violates public policy. j) Properly allege in the Plaintiff's Causes of Action, that as a result of the First Defendant's failure to issue the releases, Plaintiff has suffered damages, which include compensatory damages. The First Defendant has filed a counterclaim to collect $842,000+ plus from the Plaintiff. The Plaintiff alleges that had the First Defendant not allegedly breached the escrow agreement, by its failure to issue the releases of the note, mortgage and guarantor, he would have no basis to file a counterclaim to collect $842,000 + under the aforementioned note. The Plaintiff alleges that the First Defendant is not entitled to the relief of $842,000 + on its counterclaim. k) properly allege in the Plaintiff's Causes of Action that the First Defendant allegedly wrongfully and unlawfully attempted to avoid the foreclosure process and deprive the Plaintiff of his foreclosure rights. l) properly allege in the Plaintiff's CUTPA Causes of Action against the First and Second Defendant, that the both Defendant allegedly conspired

3

with the First Defendant in wrongfully and unlawfully attempting circumventing the foreclosure process and to violate The Connecticut Unfair Trade Practices Act (CUTPA).  The aforementioned was the both Defendant's alleged motive, to communicate the winning tax sale bidder during the tax sale redemption period. The Second Defendant asked the plaintiff to give full access to the Plaintiff properties to the winning tax sale bidder during the tax sale redemption period (which was allegedly in violation of the tax sale rules, public policy and allegedly an immoral, unethical, oppressive, or unscrupulous act) in order assist the first defendant in avoiding the foreclosure process, by selling the note to the winning tax sale bidder. The Plaintiff alleges that selling a note doesn't violate public policy but the Defendants aforementioned communication and request of the Plaintiff to give full access to his properties  to the winning tax sale bidder during the tax sale redemption period does violate public policy and is allegedly immoral, unethical, oppressive, or unscrupulous act. Twersky PLLC had the means and opportunity to wrongfully and unlawfully assist the first defendant in avoiding the foreclosure process. The Second defendant so acted by communicating the winning tax sale bidder during the six months redemption period, in an effort to sell him the note to the subject properties. This act allegedly violates public policy, Statuary Law and or Common Law and local property tax sales rules.  The Plaintiff alleges that he discovered on or around January 2016 that the First Defendant (through their attorney Twersky PLLC who represented the First Defendant in their law suit against their former Vice President Gary Escandon) told the NY Court (in that law suit filed in March 2015, against its former vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and **impossible** to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss. The Plaintiff has alleged that the First Defendant had motive, means and opportunity to plot to wrongfully and unlawfully avoid the foreclosure process. Their alleged motive to avoid the foreclosure process is evidenced

by what the First Defendant (who was represented by the second Defendant) told the NY Court about foreclosure being costly, unfulfilling and **impossible** for the First Defendant to recoup their loss through foreclosure. The Plaintiff alleges that both Defendants had motive, means and opportunity to attempt to allegedly wrongfully and unlawfully avoid the foreclosure process. The Plaintiff has alleged that in at least one instance the Second Defendant tried to conspired with the First Defendant in an allegedly wrongfully and unlawfully attempt to avoid the foreclosure process. In that instance the Second Defendant on or around January 25, 2017 allegedly violated public policy and the rules of the property tax sale. The Second Defendant allegedly conspired with the First Defendant in their efforts to allegedly wrongfully and allegedly unlawfully circumvent the foreclosure process, by allegedly wrongfully and allegedly, in violation of public policy and the rules of the tax sale, communicated with the winning tax sale bidder of the aforementioned supra properties. The Second Defendant also allegedly, in violation of public policy and the property tax sale rules, told the Plaintiff in this case to give the winning tax sale bidder Ross Gulino full access to the properties during the tax sale redemption period. All of this was allegedly done (by the Second Defendant) during the tax sale redemption period (which allegedly violates public policy and the rules of the property tax sale) and on behalf of the First Defendant, in an effort to sell the winning tax sale bidder the Plaintiff's note, in an attempt to wrongfully and unlawfully avoid the foreclosure process. The Plaintiff alleges that an attempt to sell a note doesn't constitute a violation of public policy, but communicating the winning tax sale bidder on the subject properties during the tax sale redemption period in an effort to sell the note to the winning tax sale bidder, and allegedly attempting to allow the winning tax sale bidder access to the properties during the tax sales redemption period and allegedly allowing the winning tax sale bidder to interfere with the Plaintiff's ownership and contractual relationship with the First Defendant of his properties, during the tax sale redemption period, allegedly does violate public policy, Connecticut General

---

1 Plaintiff consulted with Defendants' counsel regarding this motion and Defendants' counsel has not consented.

2 A copy of the amended complaint, Plaintiff seeks to file is attached hereto.

Statute and or common Law, the rules of the property tax sale and is allegedly immoral, unethical, oppressive, or unscrupulous. The Plaintiff alleges in his CUTPA Cause of Action against the Second Defendant, that the Second Defendant is not indemnified from this claim made against it. m) add new causes of action against the First Defendant, however the underlying facts are basically the same. n) Delete the Fraudulent Concealment cause of action against the Second Defendant.

**II.** Plaintiff is entitled to amend its complaint because there has not been undue delay.

Plaintiff has not unduly delayed in bringing this motion to amend. The United States Court of Appeals for the District of Columbia has held that "[w]here an amendment would do no more than clarify legal theories or make technical corrections . . . delay, without a showing of prejudice, is not a sufficient ground for denying the motion." *Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999); *see also Atchinson v. District of Columbia*, 73 F.3d 418, 426 (D.C. Cir. 1996) (holding that in order to determine the severity of the delay, the court considers any resulting prejudice the delay may cause); *Estate of Gaither v. District of Columbia*, 272 F.R.D. 248, 252 (D.D.C. 2011) ("[T]he mere passage of time does not preclude amendment—the delay must result in some prejudice to the judicial system or the opposing party."). Plaintiff's proposed amendment would merely clarify and properly state legal cognizable claims or causes of action, upon which relief can be granted and upon which they rely without significantly expanding or altering the scope of this action. Even should Defendants claim that there was undue delay in Plaintiff's attempt to amend his complaint, any alleged delay has been slight, particularly since this case is still at an early stage in litigation. Thus, there is no risk or unduly increasing discovery or delaying trial. *N. Am. Catholic Educ. Programming Found., Inc v. Womble, Carlyle, Sandridge & Rice, PLLC*, 887 F. Supp. 2d 78, 83 (D.D.C. 2012); *Heller v. District of Columbia*, No. 08-1289, 2013 U.S. Dist. LEXIS 38833, at *8 (D.D.C. Mar. 20, 2013) ("A case's position along the litigation path proves particularly important in that [hardship] inquiry: the further the case has progressed, the more likely the opposing party is to have relied on the unamended pleadings."); *Harrison*, 174 F.3d at 253. In fact, courts have granted leave to amend even after Plaintiffs had "five previous attempts to state [a] cognizable claim . . . because [the] Federal Rules suggest [that the] 'artless drafting of a complaint should not allow for the artful dodging of a claim.'" *Driscoll v. George Washington Univ.*, No. 12-0690, 2012 U.S. Dist. LEXIS 127870,

at *7 (D.D.C. Sept. 10, 2012) (alteration in original) (quoting *Poloron Prods., Inc. v. Lybrand Ross Bros. & Montgomery*, 72 F.R.D. 556, 561 (S.D.N.Y. 1976)). There is thus no undue delay, and Plaintiff should be allowed to file his amended complaint.

**III**. Plaintiff is entitled to amend its complaint because Defendants will not be prejudiced by Plaintiff's amended complaint. The "'liberal concepts of notice pleading" is to make the Defendant aware of the *facts*." *Harrison*, 174 F.3d at 253 (emphasis added) (quoting *Hanson v. Hoffman*, 628 F.2d 42, 53 (D.C. Cir. 1980)). Accordingly, a Plaintiff is not bound by the legal theories originally alleged unless a Defendant is prejudiced on the merits. *Id.* The addition in the proposed amendment does not substantially change the theory on which the case has been proceeding since the amended complaint will continue to allege violations based on the behavior allege in the original complaint. *See Djourabchi v. Self*, 240 F.R.D. 5, 13 (D.D.C. 2006) ("Where 'the amendment substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation the court may deem it prejudicial.'") (quoting *Zenit Radio Corp v. Hazeltine Research Inc.*, 401 U.S. 321 (1971)); *Heller*, 2013 U.S. Dist. LEXIS 38833, at *8. Neither the facts and claim allege an issue "remote from the other issues in the case". *Djourabchi*, 240 F.R.D. at 13. Therefore, Defendants will not be "required to engage in significant new preparation" in responding to Plaintiffs' new claims. *Id.*

**IV**. Plaintiff is entitled to amend its complaint because the amendments would not be futile

"A district court may deny a motion to amend a complaint as futile if the proposed claim would not survive a motion to dismiss." *Hettinga v. United States*, 677 F.3d 471, 480 (D.C. Cir. 2012) (citing *James Madison Ltd by Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996)). In order to survive a motion to dismiss, a complaint must have facial plausibility allowing the court to draw a reasonable inference that the Defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The court must construe the complaint in favor of the Plaintiff and grant Plaintiff the benefit of all inferences derived from the facts. *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979). The function of a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Ryder Energy Distribution v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir.1984). When deciding a motion to dismiss, the Court must accept all well-pleaded allegations as true and draw all reasonable

8

inferences in favor of the pleader. Hishon v. King, 467 U.S. 69, 73 (1984). The complaint must contain the grounds upon which the claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." Bell Atl. Corp. v.Twombly, 550 U.S. 544, 556 (2007). A Plaintiff is obliged to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Plaintiff alleges that the allegations, claims and causes of actions in the Plaintiff's proposed amendments are not futile, as they contain the grounds upon which the claim rests through factual allegations sufficient "to raise a right to relief above the speculative level and they amplify a claims with some factual allegations in those contexts where such amplification is needed to render the claim plausible.

PLAINTIFF'S CAUSES OF ACTION AS TO THE FIRST DEFENDANT

**1)** Under Connecticut law, the elements of a breach of contract action are (1) formation of an agreement, (2) performance by one party, (3) breach of the agreement by the opposing party, and (4) damages. McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.,93 Conn. App. 486, 503 (2006). The Plaintiff has alleged:

a) The formation of the escrow agreement.

b) The Plaintiff performed under the escrow agreement in so far as the Plaintiff put the DEED in escrow, as the escrow agreement required him to do, to secure the $272,751.07 amount to satisfy the note in full on or before March 22, 2017. The Defendant filed the DEED in escrow, before the March 22, 2017 expiration date of the escrow agreement. The First Defendant agreed to accept $272,751.07 on or before March 22, 2017 to satisfy the note in full. The Deed in escrow provided security for the note. The First Defendant filed the DEED, on March 21, 2017, which was during the period of the escrow agreement. The Plaintiff alleges that the language is unambiguous and the Plaintiff expectation was that the $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full. The Plaintiff alleges that the value of the DEED was at least $672,300. The value of the properties was at least $672,300, evidenced by the City of Meriden 2016 appraisal value shown on its property cards.  At the time of the filing of the DEED in escrow, there was a $100,000 second position mortgage lien on the subject

9

properties. Therefore the value of the property less the second position mortgage lien was $572,300, which exceeded the agreed upon amount of $272,751.07 to satisfied the note in full. The agreed upon amount to satisfy the note in full during the escrow agreement period was $272,751.07. The First Defendant allegedly filed the DEED on March 21, 2017, then allegedly breached the escrow agreement as the First Defendant failed to issue the Plaintiff the satisfaction of note and to issue the mortgage and guarantor releases. The Defendant also failed to issue the Plaintiff $299,548.93, which is the difference between the $272,751.07 and the net value of the properties ($572,300). The net value of the properties is alleged to be at least $572,300. The Plaintiff has also alleged that provision # 4 violates his constitutional rights, public policy, and therefore this provision is allegedly unenforceable, as Courts have generally refused to enforce a provisions in a contract that violates public policy, prohibits and or restricts in whole or in part a person Constitutional right to file Bankruptcy or Constitute right to petition the government for redress of grievances by filing a action in Court.

**2)** <u>Under Connecticut law a violation of CUTPA</u> may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy. Web Press Services Corp. v. New London Motors, Inc., 525 A.2d 57, 64, 203 Conn. 342, 355 (1987). Misleading representations can constitute deceptive acts or practices under CUTPA. See Southington Sav. Bank v. Rodgers, 668 A.2d 733, 736, 40 Conn. App. 23 (Conn. App. Ct. 1995). The standards for determining CUTPA liability do not depend on federal law. The factors to be considered in determining whether an act or practice violates CUTPA are: (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers, competitors, or other businesspersons. Hartford Elec. Supply Co. v. Allen-Bradley Co., Inc., 736 A.2d 824, 843, 250 Conn. 334, 368 (1999). All three criteria need not be met to support a finding of unfairness. See id. A violation of CUTPA may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy. Web Press Services Corp. v. New London Motors, Inc., 525 A.2d 57, 64, 203 Conn. 342, 355 (1987).

a) On its face, Plaintiffs' proposed amendment (which includes the alleged facts) alleges that the First Defendant knew and had awareness of the VP Escandon $23,000 commission, that it failed to disclose it to the

Plaintiff, that they intentionally fraudulently concealed a cause of action from the Plaintiff. The First Defendant allegedly knew that it misrepresented and omitted to disclose the alleged $23, 000 commission it paid to its Vice President Escandon, in connection with the loan to the Plaintiff and allegedly concealed a cause of action for the purpose of delaying the Plaintiff from filing a law suit in connection with the $23,000 commission the First Defendant paid to its VP Escandon without disclosing it and concealing said $23,000 commission paid to its VP Escandon. The Plaintiff alleges that the First Defendant (1) had actual awareness, rather than imputed knowledge, of the facts necessary to establish the [Plaintiff's] cause of action; (2) intentionally concealed these facts from the Plaintiff; and (3) concealed the facts for the purpose of obtaining delay on the Plaintiff's part in filing a complaint on [his or her] cause of action. The Plaintiff alleges that he suffered injury as a result of the First Defendant's aforementioned alleged concealment of the Escandon $23,000 commission. The Plaintiff alleges that the First Defendant disclosed to him and in the loan documents that he would have to pay $112,000 in interest payment over the one year term of the note. However, once the Plaintiff discovered that the First Defendant paid a $23,000 commission to its VP Escandon, the Plaintiff alleges rational minds could reasonably and logically draw the necessary inferences to determine that the $23,000, of the $112,500 that was disguised as interest payments was in fact allegedly a commission paid by the First Defendant to Escandon. Therefore the actual amount of interest that the Plaintiff should have paid was $89,500 and not $112,500. The Plaintiff has alleged that he would not have agreed to the VP Escandon commission. The Plaintiff alleges that he suffered injury of at least $23,000.

b) The First Defendant had a duty to use reasonable care and breached that duty by its failure to refrain from interfering with the Plaintiff's ability to perform his obligations under the one year term of the note. After the execution by the parties of the note, mortgage and loan documents, the First Defendant made new demands upon the Plaintiff, during the term of the note and said new demands were not included in the express terms of the note and or mortgage. The Plaintiff alleges the formation of the note and mortgage agreements n or around June 6, 2012. The Plaintiff has alleged that the First Defendant's former VP Gary Escandon allegedly interfered with and hindered his ability to perform under the term of the note. VP Escandon demanded that the Plaintiff not open the first floor of this property without opening the second floor at the same time, which was not a condition of the note or mortgage. VP Escandon's new demands interfered with

and hindered the Plaintiff's ability to open his restaurant and generate enough income to pay back the loan within one year or refinance within one year and payoff the loan. To open the second floor a sprinkler system is required by The City of Meriden building and fire code. The Plaintiff discovered after the loan closing that there was no fire protecint water main coming into the properties from the street. Therefore he could not install a sprinkler system, which was a City of Meriden Building and Fire Department condition to opening the second floor. After the Plaintiff discovered this he told VP Escandon that (in light of the fact that the loan term was one year) the Plaintiff would move forward and open the first floor. VP Escandon told the Plaintiff no and if the Plaintiff opened the First floor without opening the second floor he would call the note and sue him for the money back. The Plaintiff followed his instructions and suffered injury as he could not open and generate any income from his restaurant within one year as a result of the VP Escandon new demands and as a result the Plaintiff defaulted on the loan.

c) The Plaintiff alleges that Vice President of the First Defendant Aaron Twersky, had motive and opportunity to commit fraud and to wrongfully and or unlawfully circumvent the foreclosure process and he had conscious behavior of recklessness. VP Aaron Twersky told the NY Court (in a law suit filed in March 2015, against its former vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and **impossible** to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss. The Plaintiff alleges that Aaron Twersky ( acting in his capacity as Vice President of the First Defendant) then plotted to allegedly wrongfully and unlawfully circumvent the foreclosure process, in order to get the Plaintiff's  DEED to his properties, without going through the foreclosure process.

d) The Plaintiff in his proposed Amendment, has alleged with particularity. The Plaintiff has specified that the Defendant's representative and Vice President Aaron Twersky (acting in his capacity as Vice President of the First Defendant) Intentionally made the aforementioned supra January 25, 2017 verbal and written representations, promises and written misstatement of material facts and omission to the Plaintiff by phone

on January 25, 2017 and in the Defendants January 25, 2017 payoff/demand letter, executed by Aaron Twersky on January 25, 2017. The Plaintiff alleges that Aaron Twersky, had motive and opportunity to commit fraud and to wrongfully and or unlawfully circumvent the foreclosure process and he had conscious behavior of recklessness. VP Aaron Twersky told the NY Court (in a law suit filed in March 2015, against its former vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and impossible to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss. The Plaintiff alleges that Aaron Twersky knew that he was not going to act upon his January 25, 2017 representations, promises and written misstatement of material facts and omission, which didn't include an escrow agreement precondition to the Defendant paying the arrears tax before the end of the tax sale redemption period. The Plaintiff alleges that Vice President Aaron Twersky intentionally waited until days before the end of the redemption period to disclose this new precondition to his January 25, 2017 representations, promises and written misstatement of material facts omission. The Plaintiff alleges that Aaron Twersky Intentionally made those January 25, 2017, representations, promises and written misstatement of material facts omission to induce the Plaintiff to rely upon his representations, promises and written misstatement of material facts omission, without an escrow agreement precondition. The Plaintiff did so act upon that false representation to his injury. The Plaintiff alleges he relied upon Aaron Twersky's (VP of the First Defendant) January 25, 2017 representations, promises and written misstatement of material facts omission, and as a result of such reliance, the Plaintiff lost valuable time to seek money to pay the tax and or to seek bankruptcy counseling. As a result of Aaron Twersky's alleged actions, the Plaintiff felt he had no choice but to put the DEED in escrow pursuant to an escrow agreement, and suffered injury as he lost his properties and the equity in his properties. The Plaintiff also alleges that Aaron Twersky Vice President of the First Defendant made representations, written misstatement of material facts in the escrow agreement on February 2, 2017.

e) The Plaintiff's alleges that the First Defendant allegedly conspired with the Second Defendant in wrongfully and unlawfully circumventing the foreclosure process and to violate The Connecticut Unfair Trade Practices Act (CUTPA). The Plaintiff alleges that The First and Second Defendants "entered into a combination, agreement or conspiracy" to allegedly wrongfully and unlawfully circumvent the foreclosure process and to Violated Connecticut Unfair Trade Practices Act (CUTPA). The Second defendant had knowledge that the first Defendant was allegedly attempting to wrongfully and unlawfully avoid the foreclosure process.  Aaron Twersky ( Principal of Twersky PLLC) knew that the both defendants alleged in a NY  law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss. Aaron Twersky ( Principal of Twersky PLLC) knew that the first Defendant allegedly wanted to  attempt to avoid the foreclosure process. He knew this because Aaron Twersky ( Principal of Twersky PLLC) is also the Vice President of the first Defendant and Aaron Twersky Vice President of the first Defendant was the one attempting to collect on the loan made to the Plaintiff by the Defendant. Aaron Twersky (Vice President of the first Defendant) made all of the first defendant's communication with the Plaintiff.

The Aforementioned alleged conspiracy to allegedly wrongfully and unlawfully avoid the foreclosure process, was the First and Second Defendant's motive (they had means and opportunity) to communicate with the winning tax sale bidder during the tax redemption period, in an effort to sell him the note to the subject properties. This act allegedly violates public policy. The Plaintiff alleges that he discovered on or around January 2016 that the First Defendant and VP Aaron Twersky (through their attorney Twersky PLLC who represented the First Defendant in their law suit against their former Vice President Gary Escandon) told the NY Court (in a law suit filed in March 2015, against its former vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and **impossible** to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss. They alleged in that law suit that the properties'

values decreased, and they could not recoup the money loaned to the Plaintiff in this case through foreclosure. The Plaintiff has alleged that the First Defendant had motive and means to plot to wrongfully and unlawfully avoid the foreclosure process and the Plaintiff has alleged that in at least one instance the Second Defendant who allegedly conspired with the First Defendant to allegedly wrongfully and unlawfully circumvent the foreclosure process allegedly assisted the First Defendant in an allegedly wrongfully and unlawfully attempt to avoid the foreclosure process. In that instance the Second Defendant on or around January 25, 2017  allegedly violated public policy when he allegedly assisted and conspired with the First Defendant in their efforts to allegedly wrongfully and allegedly unlawfully circumvent the foreclosure process, by allegedly wrongfully and allegedly in violation of public policy, and allegedly committing an immoral, unethical, oppressive, or unscrupulous act  by communicating with the winning tax sale bidder of the aforementioned supra properties during the tax sales redemption period, asked the Plaintiff to give the winning tax sale bidder full access to the Plaintiff's property, all while allegedly knowing that such acts are allegedly directly in violation of the rules of the tax sale. The Second Defendant also allegedly in violation of public policy, told the Plaintiff in this case give the winning tax sale bidder Ross Gulino full access to the properties. All of this was allegedly done (by the Second Defendant) during the tax sale redemption period (which allegedly violates public policy) and on behalf of the First Defendant, in an effort to sell the winning tax sale bidder the Plaintiff's note in an attempt to wrongfully and unlawfully avoid the foreclosure process.

The Plaintiff alleges that when he told the Second Defendant that his aforementioned act, allegedly violated the rules of the tax sale and public policy, Aaron Twersky of the Second Defendant, responded by saying to the Plaintiff, "let he worry about that". The Plaintiff alleges that an attempt to sell a note doesn't constitute a violation of public policy, but  communicating with the winning tax sales bidder on the subject properties during the tax sale redemption period in an effort to sell the note to the winning tax sale bidder, and allegedly attempting to allow the winner tax sale bidder access to the properties during the tax sales redemption period and allegedly allowing the winning tax sale bidder to interfere with the Plaintiff's ownership and contractual relationship with the First Defendant of his properties, during the tax sale redemption period,  allegedly does violate Public Policy, Connecticut General Statute, the rules of the

property tax sale and is allegedly is immoral, unethical, oppressive, or unscrupulous. The Plaintiff alleges in his CUTPA cause of Action against the Second Defendant, that the Second Defendant is not indemnified from this claim, made against it. The Plaintiff alleges that as a result of this alleged conspiracy he suffered injury, as he lost his properties to the first Defendant and he had to file and law against both defendants and defendant a counterclaim from the both Defendants.

f) The Plaintiff alleges that Aaron Twersky (acting in his capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness.  Aaron Twersky on February 2, 2017 Intentionally made a written misstatement of material fact and in the escrow agreement. The Defendant made these Intentional written misstatements of material fact in order to allegedly Intentionally induce the Plaintiff to rely upon the Defendant's written misstatement of material fact. The Defendant stated in the escrow agreement that they agreed to accept (on or before March 22, 2017) $272,751.07 from the Plaintiff to satisfy the note in full and the DEED in escrow would provide additional security for the note. The Plaintiff alleges that the language is unambiguous and the Plaintiff expectation was that the $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full. The Value of the subject properties was allegedly at least $672,300 (evidenced by the City of Meriden 2016 appraisal value shown on its property cards) which exceeded $272,751.07. There was a second mortgage lien of $100,000 on the subject properties. Therefore, the net value was at least $572,300 and the Plaintiff alleges that the note was satisfied in full, as a result of the March 21, 2017 filing of the DEED held in Escrow. The Defendant has failed to issue the releases of the note, mortgage, and guarantor. The Plaintiff so acted on Defendant's alleged Intentional written misstatement of material fact and the Defendant alleges that he would not have executed the escrow agreement had the Defendant not agree to accept $272,751.07 to satisfy the note in full, and not agree that the DEED secured the note and $272,715.07 to satisfy the note in full. As a result of the aforementioned written misstatement of material fact, the Plaintiff so acted and the Plaintiff suffered injury as a result of his reliance on the Defendants written misstatement of material fact. The Plaintiff alleges that Aaron Twersky ( Acting in his capacity as Vice President of the First Defendant) knew on February 2, 2017, that his

aforementioned supra written misrepresentations of fact representation in the escrow agreement were false.

He also knew that if his February 2, 2017, aforementioned supra written misrepresentations of fact in the escrow agreement were true, he had an obligation and a Duty ( pursuant to the escrow agreement) to issue the Plaintiff the satisfaction of the note and the releases for the note, mortgage and guarantor. He allegedly knew that provision # 4 of the escrow agreement allegedly violated public policy and that the Courts have refused to enforce provisions in contracts that violate public policy, and provisions in contracts that restrict a person's Constitutional Right to file bankruptcy in whole or in part, or that matter, a restriction of a person's right to due process, by restricting that person from its right to petition the government for redress and grievances, by filing a law suit. The Plaintiff alleges that if VP Aaron Twersky knew that provision # 4 allegedly violated public policy and was allegedly unenforceable, he also had to know that he had an obligation and a duty pursuant to the escrow agreement to issue to the Plaintiff the satisfaction of the note, the releases of the note, mortgage and guarantor, if he filed the DEED in escrow before March 22, 2017.

He knowingly failed to do so and he admitted that he failed to do so.  The First Defendant also failed to compensate the Plaintiff for his alleged lost of equity in his properties. The Value of the subject properties was allegedly at least $672,300, which exceeded $272,751.07. There was a second mortgage lien of $100,000 on the subject properties. Therefore, the net value was at least $572,300 and the Plaintiff alleges that the note was satisfied in full, as a result of the March 21, 2017 filing of the DEED held in Escrow and the Plaintiff alleges that the First Defendant owed him at least $299,548.93, which is the difference between the net value of the properties ($572,300) and the ($272,751.07) amount to satisfy the note in full. The Plaintiff alleges that Aaron Twersky VP of the First Defendant had motive and opportunity to not issue the releases and to include provision # 4 in the escrow agreement. VP Aaron Twersky had motive and opportunity to try to keep the Plaintiff out of Court, therefore he allegedly wrongfully included provision # 4 in the escrow agreement.  VP Aaron Twersky told the NY Court (in a law suit filed in March 2015, against its former vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and **impossible** to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was

made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss. Then allegedly with motive and opportunity to commit fraud, consciously behaved recklessly, to gain the DEED from the Plaintiff and then failed to issue the satisfaction of the note and the aforementioned supra releases, after filing the DEED which allegedly satisfied the note in full. All because Aaron Twersky VP of the First Defendant, allegedly felt that he couldn't recoup the First Defendant's money from foreclosure or from selling the DEED.  Therefore he had motive and created an opportunity to get the DEED placed in escrow, file the DEED before March 22, 2017, try to sell the properties. His Motive for his failure to issue the releases, was to create an opportunity for the First Defendant to try to recoup additional monies from the Plaintiff. VP Aaron Twersky knew that had he not failed to issue the satisfaction of the note and the releases of the note and mortgage, the First Defendant could not  have filed a counterclaim against the Defendant for $842,000 +.

The Plaintiff makes his allegations in all counts and causes of action a part of the Cause of action.

**3)** <u>Intentional infliction of Emotional distress.</u> A Plaintiff alleging IIED must establish "(1) that the actor intended to inflict Emotional distress; or that he knew or should have known that Emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the Defendant's conduct was the cause of the Plaintiff's distress and (4) that the Emotional distress sustained by the Plaintiff was severe."Petyan v. Ellis, 200 Conn. 243, 253 (1986)(quoting Murray v. Bridgeport Hosp., 40 Conn. Sup. 56, 62 (1984)) (internal quotation marks omitted)**.**

The Plaintiff alleges in his proposed Amendment the first Defendant intended to Inflict Emotional Distress and  they knew or should have known was a likely result of their conduct and that the Defendants conduct was outrageous. The Plaintiff alleges that Aaron Twersky, had motive and opportunity to commit fraud and to wrongfully and unlawfully circumvent the foreclosure process and he had conscious behavior of recklessness. VP Aaron Twersky told the NY Court (in a law suit filed in March 2015, against its former vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and **impossible** to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making

the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss. The Plaintiff alleges that Aaron Twersky (acting in his capacity of Vice President of the First Defendant) then plotted to allegedly wrongfully and unlawfully circumvent the foreclosure process, in order to get the Plaintiff's DEED to his properties, without going through the foreclosure process, which included alleged Intentional Infliction of Emotional Distress on the Plaintiff.

a) The first Defendant abused his position of power, had superior knowledge over the Plaintiff.

b) Made January 25, 2017 representations, promises and written misstatement of material facts and omissions, and omitted to condition said representations, promises and written misstatement of material facts, on the Plaintiff executing an escrow agreement. The Defendant allegedly Intentionally and Negligently Misrepresented by Nondisclosure. On January 30, 2017, the Defendant conditioned his acting upon its representations, promises and written misstatement of material facts on the Plaintiff executing an escrow agreement. Even after knowing that the Plaintiff told him on January 24, 2017, no to executing any escrow agreement, he induced the Plaintiff to rely upon his January 25, 2017 representations, promises and written misstatement of material facts and even after knowing that the Plaintiff so acted and relied upon the Defendant's January representations, promises and written misstatement of material facts.

c) On January 30, 2017 days before the end of the tax sale redemption period the Defendant conditioned its acting upon its representations, promises and written misstatement of material facts, upon the Plaintiff executing an escrow agreement, knowing that the Plaintiff would be put under Emotional distress out of fear of losing his properties, if the Defendant failed to act upon its January 25, 2017 representations, promises and written misstatement of material facts.

d) The Defendant allegedly further Intentionally Inflicted Emotional Distress on the Plaintiff by its failure to issue the releases of the note, mortgage and guarantor, after filing the DEED which allegedly satisfied the note in full, pursuant to the escrow agreement, that the Defendant freely entered into.

e) The Defendant allegedly further Intentionally Inflicted Emotional Distress on the Plaintiff by its filling of a counterclaim (in the amount of $842,000 +) to collect on a note that is allegedly already satisfied in full.

f) The Defendant allegedly further Intentionally Inflicted Emotional Distress on the Plaintiff by its failure to issue the Plaintiff the satisfaction of the note and the releases of the note, mortgage and guarantor and to compensate the Plaintiff for his lost equity. The First Defendant's aforementioned supra failure, is in large part the subject of this law suit.

g) The Plaintiff alleges that the Defendant's conduct was the cause of his Emotional distress and the Emotional distress sustained by the Plaintiff was severe.

The Plaintiff makes his allegations in all counts and causes of action a part of the Cause of action.

**4)** <u>Negligent infliction of Emotional Distress</u> . To prevail generally on a claim for NIED, a Plaintiff must establish that: "(1) the Defendant's conduct created an unreasonable risk of causing the Plaintiff Emotional distress; (2) the Plaintiff's distress was foreseeable; (3) the Emotional distress was severe enough that it might result in illness or bodily harm; and (4) the Defendant's conduct was the cause of the Plaintiff's distress." Carrol v. Allstate Ins. Co., 262 Conn. 433, 444 (2003).

a) The Plaintiff in his proposed Amendment alleges that the Defendant's aforementioned supra conduct created an unreasonable risk of causing the Plaintiff Emotional Distress and its was foreseeable by the Defendant that its conduct created an unreasonable risk of causing the Plaintiff Emotional Distress. The Defendant should have known that its aforementioned supra conduct in IIED and in all causes of action in his proposed Amendment created an unreasonable risk of causing the Plaintiff Emotional Distress.

The Plaintiff makes his allegations in all counts and causes of action a part of the Cause of action.

**5)** <u>Negligence: Under Connecticut law,</u> "[t]he essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. Duty is a legal conclusion about relationships between individuals made after the fact, and [is] imperative to a negligence cause of action. Thus, there can be no actionable negligence unless there exists a cognizable duty of care." *Murdock v. Croughwell,* 268 Conn. 559, 566 (2004) (quoting *Fraser v. United States,* 236 Conn. 625, 632 (1996) (ellipses omitted)); *see also Seguro v. Cummiskey,* 82 Conn. App. 186, 192 (2004) (citing *Stokes v. Lyddy,* 75 Conn. App. 252, 257 (2003).

The Plaintiff in his proposed Amendment alleges that the Defendant had a cognizable duty of Care owed to the Plaintiff and Breached it. The Plaintiff alleges that Aaron Twersky, had motive and opportunity to commit fraud and to wrongfully and or unlawfully circumvent the foreclosure process and he had conscious behavior of recklessness. VP Aaron Twersky told the NY Court (in a law suit filed in March 2015, against its former vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and impossible to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss. The Plaintiff alleges that Aaron Twersky ( acting in his capacity of vice President of the First Defendant) then plotted to allegedly wrongfully and unlawfully circumvent the foreclosure process, in order to get the Plaintiff's  DEED to his properties, without going through the foreclosure process.

a) The First Defendant had a duty to use reasonable care and breached that duty by its failure to act upon its January 25, 2017 representations, promises and written misstatement of material facts and omission, without adding new preconditions at the eleventh hour on January 30, 2017. The First Defendant knew that the Plaintiff relied upon the First Defendant's representations, promises and written misstatement of material facts and omissions and the First Defendant also knew that its failure to act on its January 25, 2017 representations, promises and written misstatement of material facts and omission, without adding new preconditions at the eleventh hour on January 30, 2017 could and would cause injury to the Defendant. The Plaintiff suffered injury as The Plaintiff felt under extreme emotional distress and felt that his choices were limited, therefore the Plaintiff executed the escrow agreement and the Deed, he did so and lost his properties, as a result of the Defendant's alleged breach. The injury was foreseeable. The first Defendant knew or should have known that the Plaintiff could lose his properties as a result of the first defendant alleged breach of its duty to use reasonable care.

b) The First Defendant had a duty to use reasonable care and breached that duty by its failure to use reasonable care and issue the satisfaction of the note, and the releases for the note, mortgage and guarantor, pursuant to the escrow agreement and it was foreseeable that its failure could and would cause injury to the

Defendant. The Plaintiff suffered injury as a result of the First Defendant's alleged breach of it Duty. The First Defendant's failure to issue the aforementioned satisfaction of the note and the releases of the note, mortgage and guarantor would have barred the First Defendant from filing a counterclaim to collect $842,000+ on a note that is allegedly already satisfied.

c) The First Defendant had a duty to use reasonable care and breached that duty by its failure to disclose the commissions paid to its Vice President Escandon, in any of the loan closing documents or any related documents, and such failure cased foreseeable injury to the Plaintiff, as the Plaintiff should have only paid $89,500 in interest, instead of $112,500. Plaintiff alleges that if it knew that the $23,000 difference was a commission paid to Escandon from the loan proceeds, he would not have agreed to it.

d) The First Defendant had a duty to use reasonable care and breached that duty by its failure to issue the releases and satisfaction of the note and mortgage and release of guarantor,. The Plaintiff suffered foreseeable injury as a result of the Defendant's failure to issue the satisfaction of the note and the releases. As a result of the Defendant's failure, the Plaintiff suffered injury that was foreseeable by the Defendant. The Plaintiff now has to defend a counterclaim to collect $842,00+ on a note that is already allegedly satisfied.

e) The First Defendant had a duty to use reasonable care and breached that duty by including at least one or more provisions in the escrow agreement that allegedly violates public policy, Statutory and or Common Law. The Defendant included provision #4 prohibits and restricts Bankruptcy and court filings and it was foreseeable by the Defendant that the inclusion of these provisions in #4 could and did cause injury to the Plaintiff. The Defendant admitted that it filed the DEED pursuant to provision #4, a provision that allegedly violates public policy. The Plaintiff suffered injury as a result of the Defendant's action, as he lost his Properties, lost his equity in his properties, received no satisfaction of note, and the aforementioned releases of the note, mortgage and guarantor. Now the Plaintiff has to defend a counterclaim filed by the Defendant.

f) The First Defendant had a duty to use reasonable care and breached that duty by its failure to refrain from interfering with the Plaintiff's ability to perform his obligations under the one year term of the note. After the execution by the parties of the note, mortgage and loan documents, the First Defendant made new demands upon the Plaintiff, during the term of the note and said new demands were not included in the express terms of the note and or mortgage. The Plaintiff alleges the formation of the note and mortgage agreements on or

around June 6, 2012. The Plaintiff has alleged that the First Defendant former VP Gary Escandon allegedly interfered with and hindered  his ability to perform under the term of the note. VP Escandon demanded that the Plaintiff not open the first floor of this property without opening the second floor at the same time, which was not a condition of the note or mortgage. VP Escandon's new demands interfered with and hindered the Plaintiff's ability to open his restaurant and generate enough income to pay back the loan within one year or refinance within one year and payoff the loan. To open the second floor a sprinkler system is required by The City of Meriden building and fire Code. The Plaintiff discovered after the loan closing that there was no fire protection water main coming into the properties from the street. Therefore he could not install a sprinkler system, which was a City of Meriden Building and Fire Department condition to opening the second floor. After the Plaintiff discovered this he told VP Escandon that (in light of the fact that the loan term was one year) the Plaintiff would move forward and open the first floor. VP Escandon told the Plaintiff no and if the Plaintiff open the First floor without opening the second floor he would call the note and sue him for the money back. The Plaintiff followed his instruction and suffered injury as he could not open and generate any income from his restaurant within one year as a result of the VP Escandon new demands and as a result the Plaintiff defaulted on the loan.

The Plaintiff makes his allegations in all counts and causes of action a part of the Cause of action.

**6)** Fraudulent Misrepresentation. The elements of fraudulent misrepresentation are as follows: (1) a false representation was made as to a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury. *S tatewide Grievance Committee v. Egbarin,* 61 Conn.App. 445, 454, 767 A.2d 732 (2001). When a Plaintiff alleges fraud in the complaint, Rule 9(b) contains an additional requirement: "In all averments of fraud or mistake, the circumstances constituting fraud **\*125** or mistake shall be stated with particularity."

The Plaintiff alleges that Aaron Twersky and Gary Escandon (acting in their capacity as VP of the First Defendant) had motive and opportunity to commit fraud and both had conscious behavior of recklessness.

a) The Plaintiff, alleges that Gary Escandon on or around June 6, 2012 (acting in his capacity as Vice President of the First Defendant) Intentionally made written misstatement of material facts and omission in the loan closing documents, where he correctly stated that the loan origination fee , which was the mortgage brokers commission, was $37,500 and made a written misstatement of material facts and omission by stating the interest payments that the Plaintiff had to pay during the one year term of the note was $112,500. They Plaintiff alleged that he discovered that these statements were known to be untrue by the First Defendants VP Gary Escandon and he made these written misstatements of material fact to induce the Plaintiff to execute the loan documents. The Plaintiff did so execute the loan documents and suffered injury, as he paid $112,500 in interest and the Plaintiff alleges that he discovered that the amount of interest was $89,500. The Plaintiff alleges that the First Defendant disclosed to him and in the loan documents that he would have to pay $112,000 in interest payment over the one year term of the note and that the loan origination fee which was the mortgage brokers commission was $37,500. However, the Plaintiff discovered that the First Defendant paid a $23,000 commission to its VP Escandon and the Plaintiff alleges rational minds could reasonably and logically draw the necessary inferences to determine that the $23,000, of the $112,500 that was disguised as interest payments was in fact allegedly a commission paid by the First Defendant to Escandon. Therefore the actual amount of interest that the Plaintiff should have paid was $89,500 and not $112,500. The Plaintiff has alleged that he would not have agreed to the VP Escandon commission.  The Plaintiff alleges that he suffered  injury of at least $23,000.

b) The Plaintiff in his proposed Amendment, has alleged with particularity. The Plaintiff has specified that the Defendant's representative and Vice President Aaron Twersky (acting in his capacity of Vice President of the First Defendant) Intentionally made the aforementioned supra January 25, 2017 verbal and written representations, promises and written misstatement of material facts and omission to the Plaintiff by phone on January 25, 2017 and in the Defendants January 25, 2017 payoff/demand letter, executed by Aaron Twersky on January 25, 2017. The Plaintiff alleges that Aaron Twersky had motive and opportunity to commit fraud and to wrongfully and or unlawfully circumvent the foreclosure process and he had conscious behavior of recklessness. VP Aaron Twersky told the NY Court (in a law suit filed in March

24

2015, against its former Vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and **impossible** to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and impossible for the first Defendant to recoup their loss. The Plaintiff alleges that Aaron Twersky knew that he was not going to act upon his January 25, 2017 representations, promises and written misstatement of material facts and omission, which didn't include an escrow agreement precondition to the Defendant paying the arrears tax before the end of the tax sale redemption period. The Plaintiff alleges that Vice President Aaron Twersky intentionally waited until days before the end of the redemption period to disclose this precondition to his January 25, 2017 representations, promises and written misstatement of material facts omission. The Plaintiff alleged that Aaron Twersky Intentionally made those January 25, 2017, representations, promises and written misstatement of material facts omission to induce the Plaintiff to rely upon his representations, promises and written misstatement of material facts omission, without an escrow agreement precondition. The Plaintiff did so act upon that false representation to his injury. The Plaintiff alleges he relied upon Aaron Twersky's (VP of the First Defendant) January 25, 2017 representations, promises and written misstatement of material facts omission, and as a result of such reliance, the Plaintiff lost valuable time to seek money to pay the tax and or to seek bankruptcy counseling. As a result of Aaron Twersky alleged actions, the Plaintiff felt he had no choice but to put the DEED in escrow pursuant to an escrow agreement, and suffered injury as he lost his properties and the equity in his properties. The Plaintiff also alleged that Aaron Twersky Vice President of the First Defendant made representations, written misstatement of material facts in the escrow agreement on February 2, 2017.

c)  The Plaintiff alleges that Aaron Twersky (acting in his capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness.  Aaron Twersky on February 2, 2017 Intentionally made a written misstatement of material fact in the escrow agreement. The Defendant made these Intentional written misstatements of material fact in order to allegedly Intentionally induce the Plaintiff to rely upon the Defendant's written misstatement of material fact. The Defendant stated

in the escrow agreement that they agreed to accept (on or before March 22, 2017) $272,751.07 from the Plaintiff to satisfy the note in full and as additional security for the note. The $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full. The Plaintiff alleges that the language is unambiguous and the Plaintiff expectation was that the $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full. The Value of the subject properties was allegedly at least $672,300, (evidenced by the City of Meriden 2016 appraisal value shown on its property cards) which exceeded $272,751.07. There was a second mortgage lien of $100,000 on the subject properties. Therefore, the net value was at least $572,300 and the Plaintiff alleges that the note was satisfied in full, as a result of the March 21, 2017 filing of the DEED held in Escrow. The Defendant has failed to issue the releases of the note, mortgage, and guarantor. The Plaintiff so acted on Defendant's alleged Intentional written misstatement of material fact and the Defendant alleges that he would not have executed the escrow agreement had the Defendant not agree to accept $272,751.07 to satisfy the note in full, and not agree that the DEED secured the note and $272,715.07 to satisfy the note in full. As a result of the aforementioned written misstatement of material fact, the Plaintiff so acted and the Plaintiff suffered injury as a result of his reliance on the Defendants written misstatement of material fact. The Plaintiff alleges that Aaron Twersky ( Acting in his capacity as Vice President of the First Defendant) knew on February 2, 2017, that his aforementioned supra written misstatement of material fact in the escrow agreement were false. He also knew that if his February 2, 2017, aforementioned supra written misrepresentations of fact in the escrow agreement were true, he had an obligation and a Duty ( pursuant to the escrow agreement) to issue the Plaintiff the satisfaction of the note and the releases for the note, mortgage and guarantor. He allegedly knew that provision # 4 of the escrow agreement allegedly violated public policy and that the Courts have refused to enforce provisions in contracts that violate public policy, and provisions in contracts that prohibit and or restrict a person's Constitutional Right to file bankruptcy in whole or in part, or that matter, a restriction of a person's right to due process, by restricting or prohibiting that person from its right to petition the government for redress and grievances, by filing a law suit. The Plaintiff alleges that if VP Aaron Twersky knew that provision # 4 allegedly violated public policy and was

allegedly unenforceable, he also had to know that he had an obligation and a duty pursuant to the escrow agreement to issue to the Plaintiff the satisfaction of the note, the releases of the note, mortgage and guarantor, if he filed the DEED in escrow before March 22, 2017. He knowingly failed to do so and he admitted that he failed to do so.  The First Defendant also failed to compensate the Plaintiff for his alleged lost of equity in his properties. The Value of the subject properties was allegedly at least $672,300, which exceeded $272,751.07. There was a second mortgage lien of $100,000 on the subject properties. Therefore, the net value was at least $572,300. The Plaintiff alleges that the note was satisfied in full, as a result of the March 21, 2017 filing of the DEED held in Escrow and the Plaintiff alleges that the First Defendant owed him at least $299,548.93, which is the difference between the net value of the properties ($572,300) and the ($272,751.07) amount to satisfy the note in full. The Plaintiff alleges that Aaron Twersky VP of the First Defendant had motive and opportunity to not issue the releases and to include provision # 4 in the escrow agreement. VP Aaron Twersky had motive and opportunity to try to keep the Plaintiff out of Court, therefore he allegedly wrongfully and unlawfully included provision # 4 in the escrow agreement.  VP Aaron Twersky told the NY Court (in a law suit filed in March 2015, against its former vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and **impossible** to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss. Then allegedly with motive and opportunity to commit fraud, consciously behaved recklessly, to gain the DEED from the Plaintiff and then failed to issue the satisfaction of the note and the aforementioned supra releases, after filing the DEED which allegedly satisfied the note in full. All because Aaron Twersky VP of the First Defendant, allegedly felt it was **impossible** for the First Defendant to recoup its money from foreclosure or from selling the DEED.  Therefore he had motive and created an opportunity to get the DEED placed in escrow, filed the DEED before March 22, 2017, try to sell the properties. His Motive for his failure to issue the releases, was to create an opportunity for the First Defendant to try to recoup additional monies from the Plaintiff. VP Aaron Twersky knew that had he not failed to issued the satisfaction of the note and the

27

releases of the note and mortgage, the First Defendant could not "have filed a counterclaim against the Defendant for $842,000 +.

The Plaintiff makes his allegations in all counts and causes of action a part of the Cause of action.

7) <u>Intentional Misrepresentation</u>; A claim of intentional misrepresentation sounds in fraud and is subject to Federal Rule of Civil Procedure Rule 9(b). James F. Canning Agency v. Nationwide Ins. Co. of America, 2010 WL 2698292 (D. Conn. 2010). To plead with particularity in accordance with Rule 9(b), the complaint must: (1) specify the statements alleged to be fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004). Rule 9(b) provides that"[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally." However, to safeguard a Defendant's reputation from unsubstantiated charges of wrongdoing or a strike suit, the Second Circuit has instructed that Plaintiffs

must allege facts that give rise to a strong inference of fraudulent intent. Shields v. City trust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). The "strong inference of fraud" may be established by either alleging facts to show that a Defendant had both motive and opportunity to commit fraud, or facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. James F. Canning Agency, 2010

WL 2698292 at *2.

The Plaintiff alleges that Aaron Twersky and Gary Escandon (acting in their capacity as VP of the First Defendant) had motive and opportunity to commit fraud and both had conscious behavior of recklessness.

a) The Plaintiff alleges that Gary Escandon On or around June 6, 2012 (acting in his capacity as Vice President of the First Defendant) Intentionally made written misstatement of material facts and omission in the loan closing documents, where he correctly stated that the loan origination fee, which was the mortgage brokers commission, was $37,500 and made a written misstatement of material facts and omission by stating that the interest payments that the Plaintiff had to pay during the one year term of the note was $112,500. They Plaintiff alleged that he discovered that these statements were known to be untrue by the

First Defendant's VP Gary Escandon and he made these written misstatements of material fact to induce the Plaintiff to execute the loan documents. The Plaintiff did so execute the loan documents and suffered injury, as he paid $112,500 in interest and the Plaintiff alleges that he discovered that the amount of interest was $89,500. The Plaintiff alleges that the First Defendant disclosed to him and in the loan documents that he would have to pay $112,000 in interest payments over the one year term of the note and that the loan origination fee which was the mortgage broker's commission was $37,500. However, the Plaintiff discovered that the First Defendant paid a $23,000 commission to its VP Escandon and the Plaintiff alleges rational minds could reasonably and logically draw the necessary inferences to determine that the $23,000, of the $112,500 that was disguised as interest payments was in fact allegedly a commission paid by the First Defendant to Escandon. Therefore the actual amount of interest that the Plaintiff should have paid was $89,500 and not $112,500. The Plaintiff has alleged that he would not have agreed to the VP Escandon commission.  The Plaintiff alleges that he suffered  injury of at least $23,000.

b) The Plaintiff restates his allegation in Fraudulent Misrepresentations. The Plaintiff alleges that Aaron Twersky  (acting in his capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness.  Aaron Twersky (acting in his capacity of Vice President of the First Defendant)  made Intentional written misstatements of material fact to the Plaintiff. These alleged Intentional written misstatements of material fact were made on January 25, 2017 verbally and in the January 25, 2017 payoff/demand letter, and on February 2, 2017 in the escrow agreement, in order to allegedly Intentionally induce the Plaintiff to rely upon the said written misstatement of material fact.

c)  The Plaintiff restates his allegation in Fraudulent Misrepresentations. The Plaintiff alleges that

Aaron Twersky (acting in his capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness.  Aaron Twersky on February 2, 2017 Intentionally made a written misstatement of material fact and in the escrow agreement. The Defendant made these Intentional written misstatements of material fact in order to allegedly Intentionally induce the Plaintiff to

rely upon the Defendant's written misstatement of material fact, the Plaintiff did so act to his injury. VP Aaron filed the DEED to the subject properties on March 21, 2017. The filing of the DEED on March 21, 2017, pursuant to the escrow agreement, allegedly satisfied the note. VP Aaron Twersky failed to issue the satisfaction of the note and the releases of the note, mortgage and guarantor and has now filed a counterclaim to collect $842,000+ from the Plaintiff, on a note that is allegedly already satisfied.

The Plaintiff makes his allegations in all counts and causes of action a part of the Cause of action.

**8)** <u>Neligent Misrepresentation by Nondisclosure</u> :

"[Our Supreme Court] has long recognized liability for negligent misrepresentation . The governing principles [of negligent 552 of the misrepresentation] are set forth in similar terms in § Restatement (Second) of Torts (1977):  One who, in the course of his business, profession or employment . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information . As a result, [the court has] held that even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought (Citation omitted;  to know, or has the duty of knowing the truth." Sturm v. Harb Development, LLC, 298 internal quotation marks omitted.)    "The tort of innocent Conn. 124, 143–44, 2 A.3d 859 (2010). misrepresentation is grounded in the theory that the Defendant is chargeable with deceit when he makes an unqualified assertion of a fact that is susceptible of knowledge, and the assertion turns out to be  untrue." Bassetti v. East Haven (Internal quotation marks omitted.)    Board of Education, Superior Court, judicial district of New Haven, Docket Nos. CV–410872, CV–410873, CV–410874 (June 19, 2001, Blue, J.) (30 Conn. L. Rptr. 69, 72).

"Traditionally, an action for negligent misrepresentation requires the Plaintiff to establish (1) that the Defendant made a misrepresentation of fact (2) that the Defendant knew or should have known was false, and (3) that the Plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a

result."  Nazami v. Patrons Mutual Insurance Co., 280 Conn.    "It must be established that there was a  619, 626, 910 A.2d 209 (2006).   false representation in order for a Plaintiff to prevail on a negligent misrepresentation claim .   A Plaintiff also is required to show that he  Biro  (Citation omitted.)   reasonably relied on the misrepresentation."  v. Matz, 132 Conn.App. 272, 284–85, 33 A.3d 742 (2011).  "Liability for negligent misrepresentation may be placed on an individual when there has been a failure to disclose known facts and, in addition thereto, a request or an occasion or a circumstance when imposes a duty Johnnycake Mountain  (Internal quotation marks omitted.)  to speak."   Associates v. Ochs, 104 Conn.App. 194, 206, 932 A.2d 472 (2007), cert.   Thus, "[n]ondisclosure can denied, 286 Conn. 906, 944 A.2d 978 (2008). Weingarden v.  form the basis of a negligent misrepresentation claim."   Milford Anesthesia Associates, P.C., Superior Court, judicial district of New Haven, Docket No. CV–11–6016353–S (May 30, 2013, Wilson, J.).

The Plaintiff alleges that Aaron Twersky and Gary Escandon (acting in their capacity as VP of the First Defendant) had motive and opportunity to commit fraud and both had conscious behavior of recklessness.

a) The Plaintiff, alleges that Gary Escandon On or around June 6, 2012 acting in his capacity as Vice President of the First Defendant made written misstatement of material facts and omission in the loan closing documents, where he correctly stated that the loan origination fee, which was the mortgage broker's commission, was $37,500 and he made a written misstatement of material facts and omission by stating that the interest payments that the Plaintiff had to pay during the one year term of the note was $112,500. The Plaintiff alleged that he discovered that these statements were known to be untrue by the First Defendant's VP Gary Escandon and he made these written misstatements of material fact to induce the Plaintiff to execute the loan documents. The Plaintiff did so execute the loan documents and suffered injury, as he paid $112,500 in interest and the Plaintiff alleges that he discovered that the amount of interest was $89,500. The Plaintiff reasonably relied upon VP Gary Escandon's aforementioned supra, written misstatements of material facts and omission. The Plaintiff alleges that  the First Defendant disclosed to him and in the loan documents that he would have to pay $112,000 in interest payment over the one year term of the note and that the loan origination fee which was the mortgage broker's commission was $37,500. However, the

Plaintiff discovered that the First Defendant paid a $23,000 commission to its VP Escandon and the Plaintiff alleges rational minds could reasonably and logically draw the necessary inferences to determine that the $23,000, of the $112,500 that was disguised as interest payments was in fact allegedly a commission paid by the First Defendant to Escandon. Therefore the actual amount of interest that the Plaintiff should have paid was $89,500 and not $112,500. The Plaintiff has alleged that he would not have agreed to the VP Escandon commission.  The Plaintiff alleges that he suffered  injury of at least $23,000.

The Plaintiff alleges that the First Defendant owed the Plaintiff a Duty of Care to make full disclosure to the Plaintiff of the $23,000 commission it paid to its VP Gary Escandon.

b) The Plaintiff restates his allegation in Fraudulent Misrepresentations. The Plaintiff alleges that Aaron Twersky (acting in his capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness.  Aaron Twersky (acting in his capacity of Vice President of the First Defendant) made written misstatements of material facts to the Plaintiff. These alleged written misstatements of material fact were made on January 25, 2017 verbally and in the January 25, 2017 payoff/demand letter.

c) Aaron Twersky ( acting in his capacity of VP of the First Defendant) represented that the First Defendant would  pay the arrears tax before the end of the tax sale redemption period, but failed to disclose to the Plaintiff ( in his January 25, 2017 verbal representation to the Plaintiff by phone and also failed to disclose in his written misstatement of material fact in the January 25, 2017 payoff/demand letter) that he would only pay the arrears tax if the Plaintiff executed an escrow agreement and put the DEED to the subject properties in escrow.

d) On January 25, 2017 VP Aaron Twersky knew or should have known that he was only going to pay the arrears taxes if the Plaintiff executed the escrow agreement and placed the DEED in escrow and failed to disclose that fact to the Plaintiff on January 25, 2017

e) The Plaintiff reasonably relied upon VP Aaron Twersky's aforementioned supra, written

misstatements of material facts and verbal phone representations made by VP  Aaron Twersky to the Plaintiff on January 25, 2017. The Plaintiff stopped seeking funds to pay the arrears tax from other sources, and solely focused on the Riverdale Funding Refinancing. The Plaintiff also opted not to seek immediate Bankruptcy counseling as a result of VP Aaron Twersky's January 25, 2017 verbal representations and promises by phone and his January 25, 2017  written misstatement of material fact , in the payoff/demand letter.

f) The Plaintiff alleges that the First Defendant owed the Plaintiff a Duty of Care to make full disclosure to the Plaintiff, by making the Plaintiff know on January 25, 2017, along with Aaron Twersky's January 25, 2017 verbal representations and promises made by phone and his written misstatement of material fact in his January 25, 0217 payoff/demand letter, that the First Defendant would require the Plaintiff  put his DEED to his properties in escrow and execute an escrow agreement. VP Aaron Twersky allegedly knew of this condition and failed to disclose it to the Plaintiff on January 25, 2017, which was 1 day after the Plaintiff told the  Defendant no to any escrow agreement. The Plaintiff alleges that the VP Aaron Twersky induced the Plaintiff to believe that he would pay the arrears tax free of any escrow agreement condition. The Plaintiff told Aaron Twersky no to any escrow agreement on January 24, 2017 and on January 25, 2017 Aaron Twersky made no mention of any escrow agreement requirement in his verbal representation by phone or in his written misstatement of material fact in his January 25, 2017 payoff/demand letter.

g)   As a result, the Plaintiff suffered damages. On January 30, 2017 (not on January 25, 2017)

VP Aaron Twersky told the Defendant by email, that the only way that the First Defendant would consider paying the tax is if the Plaintiff executed an escrow agreement and placed the DEED in escrow. The Plaintiff refused, but on February 2, 2017, the Plaintiff felt that he had no meaningful choice because the tax sale redemption period ended on February 3, 2017, therefore he executed the escrow agreement, which resulted in the Plaintiff losing his properties, losing the equity in his properties and now the Plaintiff has to

defend a counterclaim by the Defendant, as the Defendant is attempting to collect $842, 000+ on a note that is allegedly already satisfied.

h) The Plaintiff restates his allegation in Fraudulent Misrepresentations. The Plaintiff alleges that

i) Aaron Twersky (acting in his capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness.  Aaron Twersky on February 2, 2017  made a written misstatement of material fact in the escrow agreement. The Defendant made these Intentional written misstatements of material fact in order to allegedly induce the Plaintiff to rely upon the Defendant's written misstatement of material fact. The Plaintiff did so act to his injury. VP Aaron filed the DEED to the subject properties on March 21, 2017. The filing of the DEED on March 21, 2017, pursuant to the escrow agreement, allegedly satisfied the note. VP Aaron Twersky failed to issue the satisfaction of the note and the releases of the note, mortgage and guarantor and has now filed a counterclaim to collect $842,000+ from the Plaintiff, on a note that is allegedly already satisfied.

j) The Plaintiff alleges that the First Defendant owed the Plaintiff a Duty of Care to make full disclosure to the Plaintiff, by disclosing to the Plaintiff the fact that VP Aaron Twersky allegedly knew on February 2, 2017 that the First Defendant would not issue the satisfaction of note and issue the releases of the note mortgage and guarantor, if he filed the DEED before march 22, 2017 and he failed to disclose to the Plaintiff.

The Plaintiff makes his allegations in all counts and causes of action a part of this Cause of action.

**9)** <u>Intentional Misrepresentation by Nondisclosure</u>; "Intentional misrepresentation is synonymous with fraudulent  misrepresentation. ( Internal quotation marks omitted.) Heller v.  LaPorte & Associates, Superior Court, judicial district of Tolland at Rockville, Docket No. CV–02–0079784–S (November 10, 2003, Scholl, J.) "The essential elements of a cause of action in [fraudulent misrepresentation] are:   (1) a false representation was made as a statement of fact;   (2) it was untrue and known to be untrue by the party

making it;   (3) it was made to induce the other party to act upon it;   and (4) the other party did so act upon the false representation to  Centimark Corp. v. (Internal quotation marks omitted.)   his injury."  Village Manor Associates Ltd. Partnership, 113 Conn.App. 509, 522, 967    A.2d 550, cert. denied, 292 Conn. 907, 973 A.2d 103 (2009).   "Fraud involves deception practiced in order to induce another to act to her detriment, and which causes that detrimental action. .  Because specific acts must be pleaded, the mere allegation that a fraud has been perpetrated is insufficient." (Citation omitted,   internal quotation marks omitted.) Chiulli v. Zola, 97 Conn.App. 699, 709, 905 A.2d 1236   (2006) "In an action based on fraudulent non disclosure the Plaintiff.   must prove not only the nondisclosure but this reliance on it." Creelman v. Rogowski, 152 Conn. 382, 385, 207 A.2d 272 (1965).

"Fraud by nondisclosure expands on the first three of [the] four elements [of fraud and] involves the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak .  To constitute [fraud by non disclosure], there must be a failure to disclose known facts and, in addition thereto, a request or an occasion or a circumstance which imposes a duty to speak .  The duty to disclose known facts is imposed on a party insofar as he voluntarily makes disclosure.   A party who assumes to speak must make a full and   fair disclosure  as to the matters about which he assumes to speak." (Citations omitted;   emphasis in original;   internal quotation marks  Statewide Grievance Committee v. Egbarin, 61 Conn.App. 445,  omitted.)    Denied, 255 Conn. 949, 769 A.2d 64 (2001).  454–55, 767 A.2d 732, cert.   In other words, "[a] failure to disclose can be deceptive only if, in  light of all the circumstances, there is a duty to disclose." Olson v.  Accessory Controls (Internal quotation marks omitted.)     & Equipment Corp., 254 Conn. 145, 180, 757 A.2d 14 (2000).

The Plaintiff alleges that Aaron Twersky and Gary Escandon (acting in their capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness.

a) The Plaintiff alleges that Gary Escandon on or around June 6, 2012 (acting in his capacity as Vice President of the First Defendant) Intentionally made written misstatements of material facts and omission in

the loan closing documents, where he correctly stated that the loan origination fee, which was the mortgage

broker's commission, was $37,500 and he made a written misstatement of material facts and omission by

stating that the interest payments that the Plaintiff had to pay during the one year term of the note was

$112,500. They Plaintiff alleged that he discovered that these statements were known to be untrue by the

First Defendants VP Gary Escandon and he made these written misstatements of material fact to induce the

Plaintiff to execute the loan documents. The Plaintiff did so execute the loan documents and suffered injury,

as he paid $112,500 in interest and the Plaintiff alleges that he discovered that the amount of interest was

$89,500. The Plaintiff reasonably relied upon VP Gary Escandon's aforementioned supra, written

misstatements of material facts and omission. The Plaintiff alleges that  the First Defendant disclosed to him

and in the loan documents that he would have to pay $112,000 in interest payments over the one year term

of the note and that the loan origination fee which was the mortgage broker's commission was $37,500.

However, the Plaintiff discovered that the First Defendant paid a $23,000 commission to its VP Escandon

and the Plaintiff alleges rational minds could reasonably and logically draw the necessary inferences to

determine that the $23,000, of the $112,500 that was disguised as interest payments was in fact allegedly a

commission paid by the First Defendant to Escandon. Therefore the actual amount of interest that the

Plaintiff should have paid was $89,500 and not $112,500. The Plaintiff has alleged that he would not have

agreed to the VP Escandon commission.  The Plaintiff alleges that he suffered  injury of at least $23,000.

The Plaintiff alleges that the First Defendant owed the Plaintiff a Duty of Care to make full disclosure to the

Plaintiff of the $23,000 commission it paid to its VP Gary Escandon.


The Plaintiff alleges that Aaron Twersky  (acting in his capacity as VP of the First Defendant) had motive

and opportunity to commit fraud and he had conscious behavior of recklessness.  Aaron Twersky (acting in

his capacity as Vice President of the First Defendant) made Intentional written misstatements of material

fact to the Plaintiff. These alleged Intentional written misstatements of material fact were made on January

25, 2017 verbally and in the January 25, 2017 payoff/demand letter and on February 2, 2017 in the escrow

agreement, in order to allegedly Intentionally induce the Plaintiff to rely upon the said written misstatement

of material fact. The Plaintiff so relied and suffered injury.

b) The Plaintiff restates his allegation in his Intentional Misrepresentation by Nondisclosure cause of action.

c) The VP Aaron Twersky knew on January 25, 2017 that he would later condition his acting upon his January 25, 2017 verbal promises made by phone to the Plaintiff and in his written misstatement of material fact made on January 25, 2017 in his Payoff/demand letter, on the Plaintiff placing the DEED in escrow and executing the escrow agreement and the VP Aaron Twersky Intentionally failed to disclose this information to the Plaintiff on January 25, 2017.

d) VP Aaron Twersky Intentionally failed to disclose the escrow agreement condition to the Plaintiff on January 25, 2017, to induce the Plaintiff to rely upon his January 25, 2017 verbal promises made by phone to the Plaintiff and in his written misstatement of material fact made on January 25, 2017 in his Payoff/demand letter.

e) The Plaintiff so relied. The Plaintiff stopped seeking funds from other sources to pay the tax and focused on the Riverdale funding refinancing and he opted not to seek immediate bankruptcy counseling.

f) The Plaintiff relied upon Aaron Twersky's January 25, 2017 verbal promises by phone and his January 25, 2017 written misstatement of material fact, where-in he failed to disclose the escrow agreement condition. The Plaintiff relied upon the fact that VP Aaron Twersky would pay the arrears taxes, without an escrow agreement condition.

g) The Plaintiff has been damaged as a result of VP Aaron Twersky's concealment and knowing misrepresentations. The Plaintiff pursuant to the escrow agreement, placed his DEED in escrow, lost his properties, lost the equity in his properties, the First Defendant failed to issue the satisfaction of the note and the releases of the note, mortgage and guarantor. The Defendant has filed a counterclaim to collect $842,000 + on a note that is allegedly already satisfied

h) The Plaintiff alleges that the First Defendant owed the Plaintiff a Duty of Care to make full disclosure to the Plaintiff, by making the Plaintiff know on January 25, 2017, along with Aaron Twersky's January 25, 2017 verbal representations and promises made by phone and his written

misstatement of material fact in his January 25, 0217 payoff/demand letter, that the First Defendant would require the Plaintiff to put his DEED to his properties in escrow and execute an escrow agreement. VP Aaron Twersky allegedly knew of this condition and failed disclose it to the Plaintiff on January 25, 2017, which was 1 day after the Plaintiff told the Defendant no to any escrow agreement. The Plaintiff alleges that the VP Aaron Twersky induced the Plaintiff to believe that he would pay the arrears tax free of any escrow agreement condition. The Plaintiff told Aaron Twersky no to any escrow agreement on January 24, 2017 and on January 25, 2017 Aaron Twersky made no mentioned of any escrow agreement requirement in his verbal representation by phone or in his written misstatement of material fact in his January 25, 2017 payoff/demand letter.

i) The Plaintiff alleges that Aaron Twersky (acting in his capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness. Aaron Twersky on February 2, 2017 Intentionally made a written misstatement of material fact in the escrow agreement. The Defendant made these Intentional written misstatements of material fact in order to allegedly Intentionally induce the Plaintiff to rely upon the Defendant's written misstatement of material fact. The Plaintiff did so act to his injury. VP Aaron filed the DEED to the subject properties on March 21, 2017. The filing of the DEED on March 21, 2017, pursuant to the escrow agreement, allegedly satisfied the note. The Plaintiff alleges that the language is unambiguous and the Plaintiff expectation was that the $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full. VP Aaron Twersky failed to issue the satisfaction of the note and the releases of the note, mortgage and guarantor and has now filed a counterclaim to collect $842,000+ from the Plaintiff, on a note that is allegedly already satisfied.

j) The Plaintiff alleges that the First Defendant owed the Plaintiff a Duty of Care to make full disclosure to the Plaintiff, by disclosing to the Plaintiff the fact that VP Aaron Twersky allegedly knew on February 2, 2017 that the First Defendant would not issue the satisfaction of note and issue

the releases of the note mortgage and guarantor, if he filed the DEED before march 22, 2017 and he

failed to disclose this to the Plaintiff.

k)   VP Aaron Twersky allegedly knew on February 2, 2017 that the First Defendant would not issue the

satisfaction of note and issue the releases of the note mortgage and guarantor, if he filed the DEED

before march 22, 2017 and he failed to disclose this to the Plaintiff.

The Plaintiff restates his allegation in Fraudulent Misrepresentations.

The Plaintiff makes his allegations in all counts and causes of action a part of this Cause of action.

**10)** Negligent Misrepresentation "Traditionally, an action for negligent misrepresentation requires the

Plaintiff to establish (1) that the Defendant made a misrepresentation of fact (2) that the Defendant knew or

should have known was false, and (3) that the Plaintiff reasonably relied on the misrepresentation, and (4)

suffered pecuniary Nazami v. Patrons Mutual Insurance Co., 280 Conn. harm as a result."  "It must be

established that there was a  619, 626, 910 A.2d 209 (2006).  false representation in order for a Plaintiff to

prevail on a negligent misrepresentation claim . A Plaintiff also is required to show that he Biro  (Citation

omitted.)  reasonably relied on the misrepresentation."  v. Matz, 132 Conn.App. 272, 284–85, 33 A.3d 742

(2011).

a) The Plaintiff, alleges that Gary Escandon On or around June 6, 2012 (acting in his capacity as

Vice President of the First Defendant Intentionally made written misstatements of material facts and

omission in the loan closing documents, where he correctly stated that the loan origination fee, which was

the mortgage broker's commission, was $37,500 and he made a written misstatement of material facts and

omission by stating that the interest payments that the Plaintiff had to pay during the one year term of the

note was $112,500. The Plaintiff alleges that he discovered that these statements were knows to be untrue

by the First Defendant's VP Gary Escandon and he made these written misstatements of material fact to

induce the Plaintiff to execute the loan documents. The Plaintiff did so execute the loan documents and

suffered injury, as he paid $112,500 in interest and the Plaintiff alleges that he discovered that the amount of

interest was $89,500. The Plaintiff reasonably relied upon VP Gary Escandon's aforementioned supra,

written misstatements of material facts and omission. The Plaintiff alleges that the First Defendant disclosed to him and in the loan documents that he would have to pay $112,000 in interest payments over the one year term of the note and that the loan origination fee, which was the mortgage broker's commission, was $37,500. However, the Plaintiff discovered that the First Defendant paid a $23,000 commission to its VP Escandon and the Plaintiff alleges rational minds could reasonably and logically draw the necessary inferences to determine that the $23,000, of the $112,500 that was disguised as interest payments was in fact allegedly a commission paid by the First Defendant to Escandon. Therefore the actual amount of interest that the Plaintiff should have paid was $89,500 and not $112,500. The Plaintiff has alleged that he would not have agreed to the VP Escandon commission.  The Plaintiff alleges that he suffered injury of at least $23,000.

The Plaintiff alleges that the First Defendant owed the Plaintiff a Duty of Care to make full disclosure to the Plaintiff of the $23,000 commission it paid to its VP Gary Escandon.

b) The Plaintiff alleges that Aaron Twersky (acting in his capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness.  Aaron Twersky on February 2, 2017 made a written misstatement of material fact and in the escrow agreement. The Defendant knew those written misstatements of material fact were untrue. The Defendant made these written misstatements of material fact in order to allegedly induce the Plaintiff to rely upon the Defendant's written misstatements of material fact. The Plaintiff so did rely and suffered injury. The Defendant stated in the escrow agreement that they agreed to accept (on or before March 22, 2017) $272,751.07 from the Plaintiff to satisfy the note in full and as additional security for the note the Plaintiff would place the DEED in escrow. The $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full.  VP Aaron Twersky filed the DEED in escrow on March 21, 2017. The Defendant has failed to issue the releases of the note, mortgage, and guarantor. The Plaintiff alleges that the language is unambiguous and the Plaintiff expectation was that the $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full. The Plaintiff so acted on Defendant's alleged written misstatement of material fact and he relied upon them. The Defendant

alleges that he would not have executed the escrow agreement had the Defendant not agree to accept $272,751.07 to satisfy the note in full, and not agree that the DEED secured the note and $272,715.07 to satisfy the note in full. As a result of the aforementioned written misstatement of material fact, the Plaintiff so acted and the Plaintiff suffered injury as a result of his reliance on the Defendants written misstatement of material fact. The Plaintiff alleges that Aaron Twersky ( Acting in his capacity as Vice President of the First Defendant) knew on February 2, 2017, that his aforementioned supra written misrepresentations of fact in the escrow agreement were false. He also knew that if his February 2, 2017 aforementioned supra written misrepresentations of fact in the escrow agreement were true, he allegedly had an obligation and a Duty ( pursuant to the escrow agreement) to issue the Plaintiff the satisfaction of the note and the releases for the note, mortgage and guarantor and failed to do so. Instead of issuing the aforementioned satisfaction of the note and the releases of note, mortgage and guarantor, the First Defendant has filed a counterclaim to collect $842,000+ on the very same note that the Plaintiff alleges is satisfied. The Plaintiff has also suffered injury, as he has lost the equity in his properties.

The Plaintiff makes his allegations in all counts and causes of action a part of this Cause of action.

**11**) Fraudulent Concealment:  **Fraudulent Concealment Doctrine and the Equitable Tolling of a § 1983 Statute of Limitations:**

"Equitable tolling permits a Plaintiff to avoid the bar of the statute of limitations if despite all due diligence," that Plaintiff "is unable to obtain vital information bearing on the existence of his claim." *Valdez ex rel. Donely v. U.S.*, 518 F.3d 173, 182 (2d Cir. 2008) (citation and internal quotation marks omitted). Under the fraudulent concealment doctrine, even when a claim has already accrued, a Plaintiff may benefit from equitable tolling in the event that specific steps were taken by a Defendant to conceal its actions. The Second Circuit "recognizes an equitable tolling doctrine in the context of § 1983 actions, and when a 'Defendant fraudulently conceals the wrong, the time [limit of the statute of limitations] does not begin running until the Plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action.'" *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995) (quoting *Keating v. Carey*, 706 F.2d 377, 38213 (2d Cir. 1983)). The Court of Appeals cautions that in order "[t]o

take advantage of this doctrine, however, a Plaintiff *must submit non-conclusory evidence* of a conspiracy or other fraudulent wrong *which precluded his possible discovery of the harms that he suffered*." *Id.* (citation omitted) (emphasis in original).

**Plaintiff's Proffered Proof that Fraudulent Concealment has Occurred**

The Connecticut fraudulent concealment statute, C.G.S.A. §52-595, provides: "If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of action, such cause of action shall be determined to accrue against such person so liable therefore at the time when the person entitled to sue thereon first discovers its existence." Construing this statute, the Connecticut Supreme Court has repeatedly noted that "[t]he party alleging fraud" – i.e., Plaintiff in the case at bar – "bears the burden of proving it with clear, precise, and unequivocal evidence," and "[p]roof by circumstantial evidence is sufficient [only] where rational minds could reasonably and logically draw the necessary inferences." *Falls Church Group, Ltd. v. Tyler, Cooper and Alcorn, LLP*, 281 Conn. 84, 110 (Conn. 2007) (quoting *Bound Book Association v. Norwalk*, 198 Conn. 660, 666 (Conn. 1986) and citing *J. Frederick Scholes Agency v. Mitchell*, 191 Conn. 353, 358 (Conn. 1983) and *Puro v. Henry*, 180 Conn. 301, 310 (Conn. 1982)).

In order to provide a requisite level of proof under Connecticut's fraudulent concealment

statute, a Plaintiff is "required to show that [a Defendant]: (1) had actual awareness, rather than imputed knowledge, of the facts necessary to establish the [Plaintiff's] cause of action; (2) intentionally concealed these facts from the [Plaintiff]; and (3) concealed the facts for the purpose of obtaining delay on the [Plaintiff's] part in filing a complaint on [his or her] cause of action." *Rohner v. Town of Coventry*, 581 F.Supp. 2d 315, 319 (D.Conn. 2008) (examining in relevant part14 whether a potential § 1983 claim had been equitably tolled under C.G.S.A. §52-595). Indeed, as the Second Circuit has observed, "under Connecticut law fraudulent concealment for purposes of the tolling statute is consistently treated as akin to other forms of fraud, with similar requirements of proof." *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 422 (2d Cir. 1999) (citing *Puro v. Henry*, 180 Conn. at 308 for the observation that under Connecticut law the general rule with respect to fraudulent concealment is that the

"[f]raud is not to be presumed, but must be strictly proven. The evidence must be clear, precise, and unequivocal.") The Second Circuit has further stated with respect to C.G.S.A. §52-595:

Although §52-595 does not explicitly say so, it clearly implies [a] Plaintiff's ignorance of the facts is a necessary element of tolling under that statute. A statute that tolls a limitations period because of the Defendant's fraudulent concealment of a fact or facts obviously operates for the benefit of those – and we think *only* those – who are not aware of the fact or facts that have been concealed. Moreover, because the statute provides that, after tolling, 'the cause of action shall be deemed to accrue ... at the time when the person entitled to sue thereon first discovers its existence,' there plainly can be no effective tolling for a Plaintiff who was aware of the existence of his or her cause of action from the time the claim originally accrued. We therefore conclude that [a] Plaintiff must be ignorant of the facts that [a] Defendant has sought to conceal for the statute of limitations to toll under §52-595. *Id.* at 427. Thus, as Judge Underhill recently noted, under Connecticut law "in order to toll a statute of limitations for fraudulent concealment, *the Plaintiff must prove that he did not know the facts supporting his cause of action*. In other words, the Plaintiff cannot toll a limitations period based on the Defendant's fraudulent concealment *if the Plaintiff already discovered the facts* [purportedly] establishing the Defendant's liability." *Dennany v. Knights of Columbus*, 3:10-cv-01961, 2011 WL

3490039 at *5 (D.Conn. August 10, 2011) (emphasis added) (citation omitted). Thus "[o]nce a Plaintiff is aware of facts that [a] Defendant allegedly concealed, the limitations period begins to run." *Id.*15

Plaintiff's argument with respect to the evidence which was allegedly concealed from her in 2006 and 2007 – and which allegedly gives rise to the fraudulent concealment doctrine with respect to the applicable three-year statute of limitations.

a) In this Case, the Plaintiff alleges that on or around January 2016 the Plaintiff discovered that the First Defendant filed a law suit in March of 2015, against its former Vice President Gary Escandon. Upon the Plaintiff's reading the First Defendant's complaint in a Court of Law against its own former Vice President Gary Escandon) the Plaintiff in this case discovered that the First Defendant CBD & SONS LTD paid its former Vice President Gary Escandon  a $23,000 commission in connection with the subject loan (which

was made to the Plaintiff by the Defendant on or around June, 2012) without disclosing to the Plaintiff and or disclosing in the loan closing documents and or the loan closing statement, that the First Defendant paid Vice President Gary Escandon a $23,000 commission in connection with the loan to the Plaintiff. The Plaintiff alleges that he was ignorant of the facts that the First Defendant paid a $23,000 to its former Vice President Gary Escandon from the Plaintiff loan proceeds. The First Defendant disclosed in the loan documents the commission in the amount of $37,500 which was paid to the broker. Pursuant to industry practice and law, the commission that was to be paid to the broker, from the Plaintiff loan proceeds was disclosed to the Plaintiff before and at the closing. This commission was referred to in the loan closing documents as a loan origination fee. However, the first Defendant and its VP Gary Escandon failed to disclose the commission that the First Defendant paid to VP Escandon, in connection with the loan made to the Plaintiff at or before the loan closing and failed to disclose the $23,000 commission paid to its VP Escandon anywhere in the loan closing documents. These actions by the First Defendant and its VP Escandon allegedly precluded the Plaintiff's possibility of the Plaintiff discovering the $23,000 commission paid to VP Escandon from the Plaintiff's loan proceeds.

b) The Plaintiff alleges that: i) the First Defendant and its VP Gary Escandon had actual awareness, rather than imputed knowledge, of the facts, that the First Defendant and VP Escandon, concealed and did not disclose the $23,000 commission paid to VP Escandon to the Plaintiff or anywhere in the loan closing documents. ii) The First Defendant and its VP Escandon intentionally concealed the facts that it paid a $23,000 commission to its VP Escandon in connection with the loan to the Plaintiff. iii) The Plaintiff alleges that the First Defendant and its VP Escandon concealed the aforementioned facts concealed from the Plaintiff in order to prevent the Plaintiff from discovering the $23,000 commission payment to Escandon. The Plaintiff alleges that he would not have agreed to the $23,000 commission paid to VP Escandon. The Plaintiff alleges that the First Defendant and its VP Escandon didn't want to Plaintiff to find out about the $23,000 commission paid to Escandon, so therefore they allegedly concealed it from the Plaintiff, knowing that the Plaintiff could not object to the commission or file a law suit in connection with the $23,000 commission if he was ignorant to the fact of the $23,000. The Plaintiff alleges that  the First Defendant

concealed the $23,000 commission because they wanted to delay the Plaintiff from filing a complaint and cause of action regarding the alleged concealment of the $23,000 commission the First Defendant paid to its VP Escandon in connection with the Plaintiff's loan.

c) The Plaintiff alleges that he suffered injury as a result of the First Defendant's aforementioned alleged concealment of the Escandon $23,000 commission. The Plaintiff alleges that the First Defendant disclosed to him and in the loan documents that he would have to pay $112,000 in interest payment over the one year term of the note. However, once the Plaintiff discovered that the First Defendant paid a $23,000 commission to its VP Escandon, the Plaintiff alleges rational minds could reasonably and logically draw the necessary inferences to determine that the $23,000, of the $112,500 that was disguised as interest payments was in fact allegedly a commission paid by the First Defendant to Escandon. Therefore the actual amount of interest that the Plaintiff should have paid was $89,500 and not $112,500. The Plaintiff has alleged that he would not have agreed to the VP Escandon commission.  The Plaintiff alleges that he suffered injury of at least $23,000.

## 12) Breach of the Implied Covenant of Good Faith and Fair Dealings

In Connecticut, as in many jurisdictions, the "duty of good faith and fair dealing is a covenant implied into a contract," meaning that "every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." Capstone Bldg. Corp. v. American Motorists Ins. Co., 308 Conn. 760, 794 (2013) (internal quotations omitted). For a Plaintiff to have a cognizable 17 claim of breach of the implied covenant of good faith and fair dealing, "the acts by which a Defendant allegedly impedes the Plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 433 (2004) (internal quotations and citation omitted). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties,

but by some interested or sinister motive." Id. In sum, "[b]ad faith means more than mere negligence; it involves a dishonest purpose." Id.

In this case:

a) The Plaintiff alleges that the first Defendant failed to exercise Good Faith, acted in BAD Faith and with sinister motive in the lender borrower relationship with the Plaintiff. The Defendant engaged in conduct designed to mislead or deceive as he made written misstatement of material facts in the escrow agreement and neglected or refused to fulfill some duty or contractual obligation not prompted by an honest mistake as to its rights or duties, as he failed to issue the acknowledgement of the satisfaction of the note and the releases of the note, mortgage and guarantor.  The Defendant didn't exercise Good faith performance or enforcement of a contract nor did the Defendant emphasize faithfulness to an agreed common purpose and consistency with the justified expectations of the other (the Plaintiff), as the Plaintiff alleges that the Defendant filed the DEED in escrow during the escrow period, which allegedly satisfied the note pursuant to the escrow agreement. The Plaintiff expected the acknowledgement of note satisfaction and the aforementioned releases and the Defendant failed to issue them. Pursuant to the escrow agreement the DEED in escrow secured the note. The amount to pay off the note was $272,751.07. The DEED was valued at least $672,300 (evidenced by the City of Meriden 2016 appraisal value shown on its property cards) and a net value of $572,300, which exceeds the $272,751.07. The Defendant filed the DEED during the period of the escrow agreement, allegedly satisfying the note and the Defendant failed to issue the satisfaction of the note and the aforementioned supra releases. The Plaintiff alleges that the language is unambiguous and the Plaintiff's expectation was that the $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full.  Good faith and fair dealing means an attitude or state of mind denoting honesty of purpose and freedom from intention to defraud. The first Defendant allegedly didn't exercise faithfulness to one's duty and obligation under the contract. The Plaintiff alleges that the Defendant had a state of mind to defraud. The Plaintiff alleges that the Defendant filed the DEED allegedly satisfying the note in full and the Defendant allegedly failed to issue the satisfaction of the note and the aforementioned releases. The Plaintiff alleges that the first defendant acted in Bad Faith and not

Good Faith. The first Defendant allegedly had sinister motive. The first Defendant allegedly plotted to file a legal claim against the Plaintiff to collect $842,000+ on a note that is allegedly already satisfied in full. As a result of he first Defendant's alleged wrongful and unlawful actions, the Plaintiff suffered injury. The Plaintiff alleges that he has lost his properties, lost at least $299,548.93 in equity in his properties and now the Plaintiff has to suffer the Emotional distress of defending the Defendant's counterclaim against him and the emotion distress of litigating the Plaintiff's causes of action against the first Defendant, in part to get the acknowledgement of the satisfaction of the note and the releases of the note, mortgage and guarantor and to recoup the lost equity in his properties.

b) The Plaintiff alleges that Aaron Twersky (acting in his capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness.  Aaron Twersky on February 2, 2017 made a written misstatement of material fact and in the escrow agreement. The Defendant knew those written misstatement of material fact were untrue. The Defendant made these written misstatements of material fact in order to allegedly induce the Plaintiff to rely upon the Defendant's written misstatement of material fact. The Plaintiff so did rely and suffered injury. The Defendant stated in the escrow agreement that they agreed to accept (on or before March 22, 2017) $272,751.07 from the Plaintiff to satisfy the note in full and as additional security for the note the Plaintiff would place the DEED in escrow. The $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full.  The Plaintiff alleges that the language is unambiguous and the Plaintiff expectation was that the $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full. VP Aaron Twersky filed the DEED in escrow on March 21, 2017. The Defendant has failed to issue the releases of the note, mortgage, and guarantor. The Plaintiff so acted on Defendant's alleged written misstatement of material fact and he relied upon them. The Defendant alleges that he would not have executed the escrow agreement had the Defendant not agree to accept $272,751.07 to satisfy the note in full, and not agree that the DEED secured the note and $272,715.07 to satisfy the note in full. As a result of the aforementioned written misstatement of material fact, the Plaintiff so acted and the Plaintiff suffered injury as a result of his reliance on the Defendant's written misstatement

of material fact. The Plaintiff alleges that Aaron Twersky ( Acting in his capacity as Vice President of the First Defendant) knew on February 2, 2017, that his aforementioned supra written misrepresentations of fact representation in the escrow agreement were false. He also knew that if his February 2, 2017, aforementioned supra written misrepresentations of fact in the escrow agreement were true, he had an obligation and a Duty ( pursuant to the escrow agreement) to issue the Plaintiff the satisfaction of the note and the releases for the note, mortgage and guarantor and failed to do so. Instead of issuing the aforementioned satisfaction of the note and the releases of note, mortgage and guarantor, the First Defendant has filed a counterclaim to collect $842,000+ on the very same note that the Plaintiff alleges is satisfied. The Plaintiff has also suffered injury, as he has lost the equity in his properties. The Plaintiff makes his allegations all of his causes of action a part of this cause of action.

## PLAINTIFF'S CAUSE OF ACTION AS TO THE SECOND DEFENDANT

Under Connecticut law a violation of CUTPA may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy. Web Press Services Corp. v. New London Motors, Inc., 525 A.2d 57, 64, 203 Conn. 342, 355 (1987). Misleading representations can constitute deceptive acts or practices under CUTPA. See Southington Sav. Bank v. Rodgers, 668 A.2d 733, 736, 40 Conn. App. 23 (Conn. App. Ct. 1995). The standards for determining CUTPA liability do not depend on federal law. The factors to be considered in determining whether an act or practice violates CUTPA are: (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers, competitors, or other businesspersons. Hartford Elec. Supply Co. v. Allen-Bradley Co., Inc., 736 A.2d 824, 843, 250 Conn. 334, 368 (1999). All three criteria need not be met to support a finding of unfairness. See id. A violation of CUTPA may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy. Web Press Services Corp. v. New London Motors, Inc., 525 A.2d 57, 64, 203 Conn. 342, 355 (1987).

Civil Conspiracy Claim: the civil conspiracy claim is for damages caused by acts committed pursuant to a formed conspiracy and extends liability to all conspirators for the damage that result from any overt act committed by one of them pursuant to the combination. Id.; Edwards v. Novato Consumer Health, 2002

Conn.Super.LEXIS 2319 at * 7-8 (July 15, 2002). because of the requirement of knowledge and intent, only an intentional tort will support a claim of civil conspiracy. United States v. Mitloff, 165 F.Supp.2d 558, 564 (S.D.N.Y. 2001); the plaintiff must plead and prove that the defendant knowingly agreed to pursue the underlying torts (in this unfair trade practices). Marshak v. Marshak, 226 Conn. 652, 665, 628 A.2d 964 (1993) (a civil conspiracy requires a combination between two or more persons to do a criminal or unlawful act or an act by criminal or unlawful means); Schink v. Baker, 2002 Conn.Super.LEXIS 612 at * 31-32 (February 25, 2002) ("The combination required is an agreement to pursue certain actions and/or attain certain ends."). To establish such an agreement, the plaintiff must necessarily plead and prove that the Defendant knew of the alleged co-conspirator's unlawful scheme, and that he acted with the specific intent to purse the unlawful scheme. Litchfield Asset Management Corp., 70 Conn.App.at 140-142; State v. Stellato, 10 Conn.App. 447, 454, 523 A.2d 1345 (1984); Interstate Aviation, Inc. v. City of Meriden, 1997 Conn.Super.LEXIS 2563 at * 13-14 (June 12,1997).2

a) The Plaintiff's alleges that the Second Defendant allegedly conspired with the First Defendant in wrongfully and unlawfully circumventing the foreclosure process and to violate The Connecticut Unfair Trade Practices Act (CUTPA). The Plaintiff alleges that The First and Second Defendants "entered into a combination, agreement or conspiracy" to allegedly wrongfully and unlawfully circumvent the foreclosure process and to Violated Connecticut Unfair Trade Practices Act (CUTPA). The Second defendant had knowledge that the first Defendant was attempting to wrongfully and unlawfully avoid the foreclosure process.  Aaron Twersky ( Principal of Twersky PLLC) knew that the both defendants alleged in a NY  law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss. Aaron Twersky ( Principal of Twersky PLLC) knew that the first Defendant allegedly wanted to  attempt to avoid the foreclosure process. He knew this because Aaron Twersky ( Principal of Twersky PLLC) is also the Vice President of the first Defendant and Aaron Twersky Vice President of the first Defendant was the one attempting to collect on the loan made to the Plaintiff by the Defendant. Aaron Twersky (Vice President of the first Defendant) made all of the first defendant's communication with the Plaintiff.

The Aforementioned alleged conspiracy, was the Second Defendant's motive (he had means and opportunity) to communicate with the winning tax sale bidder during the tax redemption period, in an effort to sell him the note to the subject properties. This act allegedly violates public policy. The Plaintiff alleges that he discovered on or around January 2016 that the First Defendant and VP Aaron Twersky (through their attorney Twersky PLLC who represented the First Defendant in their law suit against their former Vice President Gary Escandon) told the NY Court (in a law suit filed in March 2015, against its former vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and **impossible** to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss. They alleged in that law suit that the properties' values decreased, and they could not recoup the money loaned to the Plaintiff in this case through foreclosure. The Plaintiff has alleged that the First Defendant had motive and means to plot to wrongfully and unlawfully avoid the foreclosure process and the Plaintiff has alleged that in at least one instance the Second Defendant who allegedly conspired with the First Defendant to allegedly wrongfully and unlawfully circumvent the foreclosure process allegedly conspired with the First Defendant in an allegedly wrongfully and unlawfully attempt to avoid the foreclosure process. In that instance the Second Defendant on or around January 25, 2017  allegedly violated public policy when he allegedly assisted the First Defendant in their efforts to allegedly wrongfully and allegedly unlawfully circumvent the foreclosure process, by allegedly wrongfully and allegedly in violation of public policy, and allegedly committing an immoral, unethical, oppressive, or unscrupulous act  by communicated with the winning tax sale bidder of the aforementioned supra properties during the tax sales redemption period, as the Plaintiff to give the winning tax sale bidder full access to the Plaintiff's property, all while allegedly knowing that such acts are allegedly directly in violation of the rules of the tax sale. The Second Defendant also allegedly in violation of public policy, told the Plaintiff in this case to give the winning tax sale bidder Ross Gulino full access to the properties. All of this was allegedly done (by the Second Defendant) during the tax sale redemption period (which allegedly violates public policy) and on behalf of the First Defendant,

in an effort to sell the winning tax sale bidder the Plaintiff's note in an attempt to wrongfully and unlawfully avoid the foreclosure process.

The Plaintiff alleges that when he told the Second Defendant that his aforementioned act, allegedly violated the rules of the tax sale and public policy, Aaron Twersky of the Second Defendant, responded by saying to the Plaintiff, let he worry about that. The Plaintiff alleges that an attempt to sell a note doesn't constitute a violation of public policy, but  contacting the winning tax sales bidder on the subject properties during the tax sale redemption period in an effort to sell the note to the winning tax sale bidder, and allegedly attempting to allow the winner tax sale bidder access to the properties during the tax sales redemption period and allegedly allowing the winning tax sale bidder to interfere with the Plaintiff's ownership and contractual relationship with the First Defendant of his properties, during the tax sale redemption period, allegedly does violate Public Policy, Connecticut General Statute, the rules of the property tax sale and is allegedly is immoral, unethical, oppressive, or unscrupulous; The Plaintiff alleges in his CUTPA cause of Action against the Second Defendant, that the Second Defendant is not indemnified from this claim, made against it. The Plaintiff alleges that as a result of this alleged conspiracy he suffered injury, as he lost his properties to the first Defendant and he had to file and law against both defendants and defendant a counterclaim from the both Defendants.

On its face, Plaintiffs' proposed amendment alleges underlying facts, claims and allegations, which can provide the basis for all of his cause of actions.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT.

It is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere 371 U.S. 178 (1962) technicalities. "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by 182*182 counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." _Conley_ v. _Gibson,_ 355 U. S. 41, 48. The Rules themselves provide that they are to be construed "to secure the just, speedy, and inexpensive determination of every action." Rule 1. The Court

of Appeals also erred in affirming the District Court's denial of petitioner's motion to vacate the judgment in order to allow amendment of the complaint. As appears from the record, the amendment would have done no more than state an alternative theory for recovery.

Rule 15 (a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded. See generally, 3 Moore, Federal Practice (2d ed. 1948), ¶¶ 15.08, 15.10. If the underlying facts or circumstances relied upon by a Plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant it leave to file the attached Amended Complaint.

PLAINTIFF:

BY: _____

**PAUL EDWARDS**

**PRO SE**

**PO BOX 9**

**MERIDEN CT 06451**

**TEL: 203-715-2776**

**pedevelopmentonline@gmail.com**

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2017 a copy of the foregoing was electronically served on Defendants' Attorney, who filed an appearance in this case as follows: Glenn A. Duhl  ct 03644 Zangari Cohn Cuthbertson Duhl & Grello P.C. 59 Elm Street, Suite 400, New Haven, CT 06510, gduhl@zcclawfirm.com, by email.

PLAINTIFF:

BY: _____

**PAUL EDWARDS**

**PRO SE**

**PO BOX 9**

**MERIDEN CT 06451**

**TEL: 203-715-2776**

**pedevelopmentonline@gmail.com**

### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

_____

| | | |
|---|---|---|
| **PAUL EDWARDS** | : | **CASE NO. 3:17-cv-0466 (SRU)** |
| **PLAINTIFF** | : | |
| **V.** | : | |
| **CBD & SONS LTD AND TWERSKY PLLC,** | : | |
| **DEFENDANTS** | : | **SEPTEMBER 25, 2017** |
| _____ | : | |

## AMENDED COMPLAINT

**The Plaintiff hereby files this 2ND Amended Complaint Pursuant to Rule of Civil Procedure 15 (A) 2 Amended and Supplemental Pleadings.**

### I.                           BACKGROUND FACTS

1. Paul Edwards (herein "Plaintiff") is a Connecticut resident and until March 21, 2017, was the owner of 9-11 & 13-17 Colony St., Meriden CT 06451

2. CBD & SONS LTD (herein "Defendant") has claimed (in the commercial promissory note between Plaintiff & Defendant dated June 6, 2012) that it is a New York Commercial entity with a principal place of business at 2517 Highway 35, Bldg M-201 Manasquan, NJ 08736. **(Exhibit A)**

3.  Lender in this case is the Defendant.

4.  The borrower in this case is the Plaintiff.

5.  The subject properties of the note and mortgage are located in the State of Connecticut, whose address is 9-11 & 13-17 Colony St., Meriden CT 06451.

6.  The Plaintiff and the Defendant executed a promissory note with guaranty dated June 6, 2012. **(Exhibit A).** The maturity date of the note was June 1, 2013.

7.  The Plaintiff and the Defendant executed an open-ended commercial mortgage **(Exhibit B)** The mortgaged property is described as 9-11 & 13-17 Colony St., Meriden, County of New Haven (Land described in schedule A) dated June 6, 2012.

8.  The Commercial Promissory Note states that a) **GOVERNING LAW**: This note shall be governed by and construed in accordance with The Laws of The State of Connecticut. b) the transaction is a commercial transaction and is governed by Connecticut General Statues Sections 52-278A to 52-278M Inclusive.

9.  The open ended mortgage states that this is a commercial mortgage and the holder hereof shall have all the rights, powers and protection to which the holder of any open-ended mortgage shall now or hereafter be entitled, as authorized by Connecticut General Statute Section 49-2.

10. The Open Ended Mortgage states: **GOVERNING LAW**: This mortgage is made and executed by mortgagor and accepted by Mortgagee in the State of Connecticut under The Laws of such State and shall be construed, interpreted, enforced and governed by and in accordance with the Laws of such State. .

11. The promissory note and mortgage were all executed in the State of Connecticut and notarized by a Commissioner of the Superior Court of Connecticut.

12. The City of Meriden approved buildings plans (dated 9-13-2011) for the subject properties 9-11 & 13-17 Colony Street, Meriden, CT 06451. The City of Meriden issued a building permit in connection with those plans. Said permit was for renovations to the Lower level & 1st floor of the subject properties.

13. The Plaintiff continued to make improvements to the properties.

14. On or around August 2012, (after the execution of the aforementioned note) CBD & SONS LTD's President Gary Escandon, acting in his capacity as VICE PRESIDENT of CBD & SONS LTD, demanded by phone, that the Plaintiff not open the Lower Level or the First floor, without opening the Second Floor at the same time.

15. In order to open the second floor, (as Defendant demanded) a sprinkler system would need to be installed and the building plans would have to be updated.

16. On or around July 2012, the Plaintiff discovered that there was no fire protection water main coming into the building from the water main under the street level.

17. The Plaintiff told the Defendant's Vice President that since there was no fire protection water main coming into the building, he was going to move forward and open the First Floors.

18. The Defendant's Vice President Gary Escandon, told the Plaintiff by phone conversation, not to do so, or he would call the note and start legal action against the Plaintiff, if the Plaintiff didn't open the second floor at the same time as the first floor and lower level.

19. The Plaintiff then informed the City of Meriden officials that there was no fire protection water main coming into the buildings and the City agreed to install one fire protection water main, coming into 9-11 Colony St., Meriden, CT 06451.

20. On or around October 10, 2012 (five months into a 12 month note) the City installed the fire protection water main.

21. As a result of the demand by the Defendant that the Plaintiff open the second floor at the same time as the lower level and the first floor, the Plaintiff had to change the previously approved  September 2011 approved building plans which meant that the Plaintiff had to go through the entire City of Meriden approval process again.

22. On or around December 9, 2012 the Plaintiff submitted new building plans to the City of Meriden's building department, which included a sprinkler system among other changes. The Plaintiff then revised said plans on December 11, 2012 and on January 11, 2013. The new building plans were approved by the City on January 28, 2013. (8 months in a 12 month loan term).

23. On or around January 30, 2013 the City of Meriden's Planning Commission approved the Plaintiff's request for a waiver of Certificate of Approval for a change of use of the subject properties.

24. On or around March 6, 2013 The Meriden Zoning Board of Appeals voted to approve a special exception for the subject properties.

25. On or around May 31, 2013 the Plaintiff and the Defendant executed a loan modification agreement, wherein the maturity date of the note and mortgage were extended to May 31, 2014 from its original maturity date of June 1, 2013. **(Exhibit C)**

26. The loan modification agreement: a) On page #4, item # 4.13, states that this agreement shall be governed by and construed in accordance with the laws of the State of Connecticut. b) On page #4, item # 4.11, it refers to Connecticut General Statutes.

27. On or around July, 2013 the Plaintiff began to seek refinancing for the subject properties to payoff the note and release the mortgage and guarantor.

28. On or around July 13, 2013 the Plaintiff submitted sprinkler plans to the City of Meriden Fire Marshal and Building Inspector.

29. On or around July 19, 2013, the City of Meriden's Building Department issued a building permit in accordance with the revised building plans dated January 11 2013.

30. The Plaintiff continued to make improvements to the properties.

31. On or around September 16, 2013 the City of Meriden Fire Marshal approved the sprinkler plans.

32. The Plaintiff made all his loan payments on time during the original term of the note, June 6, 2012 to June 1, 2013.

33. On or around September, 2013 the Plaintiff sought a refinance of the subject properties from Velocity Commercial Capital, in order to payoff the note, release the mortgage and guarantor.

34. On September 3, 2014 CBD & SONS LTD's Vice President Gary Escandon issued the Plaintiff a discount payoff letter to release the mortgage, acknowledge payment of the note in full and release the guarantor, provided that the Plaintiff pays or causes to be paid (via a refinance loan) to the order of the Defendant $400,000 on or before September 30, 2014.

35. On or around September 23, 2013 CBD & SONS LTD's Vice President Gary Escandon, issued a letter to Velocity Commercial Capital, stating in part that the Plaintiff made all of his loan payments on time and is in good standing.

36. Velocity Commercial Capital declined to approve the Plaintiff's refinance loan request.

37. The Plaintiff continued to seek refinancing for the subject properties to payoff the note, release the mortgage and the guarantor.

38. The Plaintiff also continued to finalize the revised updated building plans and seek additional approval that were required to open the business.

39. The Plaintiff was forced to submit revised building plans (dated November 1 2013) which revised the portions of the January 11 2013 approved building plans.

40. As a result of the Defendant's demand that the Plaintiff not open for business until he can open the second floor of the subject properties, the Plaintiff had to submit new building plans, wait for fire protection main to be brought into the properties, submit new sprinkler plans, get new permits and City approvals. All of which took over a year and a half, due to the multiple revisions in plans, which was a result of the Defendant's demand that the Plaintiff not open the lower level and or first floor without opening the second floor at the same time. Had the Plaintiff opened the first floor as planned, Plaintiff allegedly would have been generating income from the properties. Instead he was not able to generate any income (from the properties) which said income could have been used to pay business expenses and property carrying costs. Instead the Plaintiff had to exhaust the loan proceeds on business expenses and some improvements, before the construction was completed.

41. On or around January 10, 2014 the City of Meriden, CT Health Department approved the Plaintiff's food service and kitchen plans.

42. On or around March 17, 2014 the Plaintiff became a Certified Food Service Operator.

43. The Plaintiff was not able to open the first floor for business, primarily as a result of the Defendant's demand as it pertained to opening the second floor along with the first.

44. The Plaintiff was not able to open for business and generate income, in order to continue to make the payments during the loan modification period and the forbearance period.

45. As a part of the modification agreement: a) The loan maturity date was extended one year to May 31, 2014. b) the Defendant deferred six months ( June 1, 2013- November 31, 2013) of interest payments during the modification period and said deferred payments were to be added to the principal of the loan.

46. On or around April 14, 2014 the Plaintiff and the Defendant executed a Forbearance agreement, wherein the Defendant forbear its rights and remedies in connection with the loan interest payment defaults, (from January, 2014 to March 2014) until May 31, 2014.

    **(Exhibit D)**

47. The Plaintiff continued his attempts to secure refinancing of the subject properties to payoff the note, and to release the mortgage and the guarantor as the Forbearance period ended May 31, 2014.

48. On or around August 25, 2014 RCN Capital issued a preapproval letter confirming that RCN Capital has preapproved the Plaintiff for a refinancing of the subject properties 9-11 & 13-17 Colony St., Meriden CT 06451, the loan approval is conditioned ( among other things) on RCN further due diligence and  that the Defendant issue the Plaintiff a payoff letter to satisfy the mortgage, note, in full and release the guarantor in the amount of $275,000 for 9-11 Colony St Meriden CT 06451 &  $125,000 for 13-17 Colony ST Meriden CT 06451 totaling $400,000. However, RCN Capital's payoff  was subject to completion of their due diligence during the loan process.

49. On or around October 24, 2014, RCN Capital issued an additional pre approval letter, which stated among other things that they were awaiting completion of their due diligence process and that they would need a revised payoff letter from the Defendant accepting the revised payoff offer in order to final approval, loan commitment and loan closing.

50. On or around October 28, 2014 and October 31, 2014 RCN Capital issued updated pre approval letters, (after completion of their due diligence process) which stated among other things, that they would need a revised payoff letter from the Defendant accepting the revised payoff offer in the amount of $280,000 to satisfy the mortgage, note in full and to release any guarantors, then they will move to final approval, loan commitment and loan closing within 10 days.

51. On or around November, 2014 the Plaintiff contacted the Defendant's then attorney, by phone, to follow up on the RCN Capital Revised payoff offer of $280,000 to satisfy the note in full and to release the mortgage and the guarantor. He told the Plaintiff that they were considering accepting the offer.

52. Shortly thereafter, the Plaintiff again contacted the Defendant's attorney at that time by phone to follow up on the Defendant's acceptance of the RCN Capital offer of $280,000. In that phone conversation the Plaintiff was told by the Defendant's attorney that CBD & SONS LTD's Vice President Gary Escandon was no longer Vice President and no longer with the Company, and that he was no longer the Defendant's attorney. He also gave me the name and phone number of the new attorney representing the Defendant: Aaron Twersky of Twersky PLLC 747 Third Ave 32nd fl NY NY 10017 whose phone number is  212-425-0149

53. On or around November 2014 The Plaintiff contacted the Defendant's new attorney Aaron Twersky by phone in order to follow up on the RCN Capital refinance loan pre approval and the Defendant's acceptance of the RCN offer of $280,000 to satisfy the note in full and to release the mortgage and the guarantor. In that conversation Aaron Twersky told the

Plaintiff a) he was the Defendant's legal counsel. b) Gary Escandon was no longer with CBD & SONS LTD and Gary was no longer authorized to act of behalf of the Defendant. c) The Plaintiff was to have no further contact with Gary. d) he would review the file and get back to the Plaintiff.

54. After not hearing back from Aaron Twersky, on or around January, 2015, the Plaintiff contacted Aaron Twersky by phone, again to follow up on the RCN offer of $280,000. Again in that phone conversation he said he would get back to the Plaintiff.

55. On January 19, 2015, the Plaintiff finally made contact again with Aaron Twersky's office and his office scheduled a January 28, 2015 meeting in his NYC office with the Plaintiff.

56. On January 26, 2015 Aaron Twersky's office rescheduled the meeting with the Plaintiff to February 3, 2015.

57. On February 3, 2015 Aaron contacted the Plaintiff to tell him that the meeting was off and rescheduled the meeting to February 4, 2015. Then later that same evening Aaron again contacted the Plaintiff to tell him the February 4, 2015 meeting was off. On the morning of February 4, 2015 Aaron contacted the Plaintiff to tell him the meeting was on again. After all of that, the Plaintiff drove from Connecticut to Aaron Twersky's Third Ave NY City office for the meeting.

58. During the February 4, 2015 meeting at Aaron's office, Aaron Twersky told the Plaintiff (among other things) RCN would have to raise their offer up from $280,000.

59. On or around March 27, 2015 RCN Capital issued an updated pre approval letter, which stated among other things, that they revised the payoff offer letter from $280,0000 up to $300,000 to satisfy the mortgage, note in full and to release any guarantors. Once the Defendant accepted this new offer, they would then move to final approval, loan commitment and loan closing within 10 days.

60. Aaron Twersky stated that the Defendant would not accept the RCN payoff offer of $300,000.

61. Without disclosing the following to the Plaintiff, the Defendant, on or around March 31, 2015 filed a complaint at the Kings County Clerk Office, Supreme Court of The State of New York, County of Kings against Gary P. Escandon, the former President of the Defendant. The case is titled, Chana Daskal and CBD & SONS, LTD (Plaintiffs) against Gary P. Escandon index # 50376312015. **(Exhibit E)**

62. In that case Chana Daskal and CBD & SONS, LTD brought an action against Gary P. Escandon for Breach of Fiduciary Duty, Breach of Faithless Servant Doctrine, Fraudulent Concealment by a Fiduciary, Breach of Contract, Conversion, Mismanagement of Trust by a Trustee and Unjust Enrichment arising out of a long-standing and well established fiduciary and employee/employer relationship between Chana Daskal and CBD & SONS, LTD and Gary P. Escandon. They also alleged a) that Gary P. Escandon knowingly engaged in a systematic, planned and calculated fraud, theft and misappropriation of funds and monies belonging to his employer. b) Escandon's scheme and depth of his fraud and theft are still being uncovered and identified, but those already discovered total more than $6,000,000 ( six million dollars).

63. Chana Daskal and CBD & SONS, LTD also alleged in that case that Escandon a) abused his position when he authorized the EDWARDS loan in the amount of $750,000, which is secured by the subject properties 9-11 & 13-17 Colony St. b) for brokering the Edwards loan, in a blatant act of self-dealing by Escandon, Escandon paid himself $23,000 in commission fees.

64. The Plaintiff in this case alleges that Escandon failed to disclose to the Plaintiff in this case that he Escandon, took a commission on the EDWARDS loan, nor was it disclosed in the loan closing documents.

65. The Plaintiff alleges that he only discovered that Escandon took a commission when he read the Chana Daskal and CBD & SONS, LTD complaint against Escandon.

66. Chana Daskal and CBD & SONS, LTD's complaint against Gary P. Escandon, claims $6,000,000 (six million dollars) in actual losses and they pray for punitive damages in the amount of $12,000,000 which totals $18,000, 000 ( eighteen million dollars). Therefore they sought a judgment against Escandon for $18,000,000 (eight million dollars) and said judgment included the amount of the loan to the Plaintiff to allegedly satisfy the note between the Plaintiff and the Defendant, in the amount of $750,000 plus $1,500,000 (one million five hundred thousand dollars) in punitive damages, which totals $2,250,000 (two million two hundred and fifty thousand dollars).

67. Chana Daskal and CBD & SONS, LTD included the note between the Plaintiff and the Defendant in the amount of $750,000 (which was secured by a mortgage on the subject properties 9-11 & 13-17 Colony St Meriden CT 06451 that are owned by the Plaintiff) in their claim against Escandon for $6,000,000 (six million dollars) in losses and their prayer for punitive damages in the amount of $12,000,000 (twelve million dollars) which is two times their alleged losses.

68. Chana Daskal and CBD & SONS, LTD allegedly in an effort to induce the court to include the amount of the note between the Plaintiff and the Defendant (in the amount of $750,000) as a part of their losses and a part of their prayer for relief they sought against Escandon, they alleged that foreclosure on the subject properties securing the note would be costly, unfulfilling and impossible for CBD & SONS LTD to recoup their loss, due to the fact that the property values have decreased.

69. The Plaintiff believes, that on or around April 8, 2016 the aforementioned case titled Chana Daskal and CBD & SONS, LTD index # 503763/2015 was deposed.

70. On or around April 7, 2016, the Plaintiff believes, but have not been able to confirm, that a Judgment (in the aforementioned case) was rendered in favor of Chana Daskal and CBD & SONS, LTD in the amount of $18,000,000 (Eighteen Million dollars). This amount included

the $750,000 to satisfy the note between the Plaintiff and the Defendant, not including the punitive damages on that amount.

71. CBD & SONS LTD has denied that they received a Judgment against Gary Escandon and has denied that they have received any money from Gary Escandon.

72. CBD & SONS, LTD failed to issue to the Plaintiff an acknowledgement that the note was satisfied in full and to release the mortgage and guarantor on the subject properties 9-11 & 13-17 Colony St., Meriden CT 06451 and said failure continues to date.

73. On or around May 3, 2016 the Defendant continued to try to collect an amount from the Plaintiff to settle the note.

74. On or around May 3, 2016, (over one year after the RCN $300,000 offer and allegedly after the New York case was deposed) Aaron Twersky finally responded to the Plaintiff's emails and phone calls, where he told the Plaintiff that he would send out a new payoff letter with a payoff amount that is acceptable to the Defendant to satisfy the note in full and release the mortgage lien and the guarantor.

75. On or around May 23, 2016 and May 26, 2016 the Plaintiff again contacted the Defendant, where he a) again asked the Defendant for the payoff letter b) notified the Defendant that the City of Meriden issued a tax sale notice for arrears taxes, interest, fees and costs.

76. On or around May 31, 2014 the Defendant issued a payoff letter wherein it states that the Defendant would accept $400,000 to satisfy the note, release the mortgage and guarantor.

77. On or around May 31, 2016, the Plaintiff told the Defendant that the terms of his May 31, 2016 payoff letter is not likely to be met, as the RCN offer was $300,000 plus they would pay the arrears taxes that needed to be paid.

78. On or around June 17, 2016, the Defendant told the Plaintiff that $300,000 to satisfy the note is honestly not going to cut it.

79. On or around June 17, 2016 the Plaintiff told the Defendant that arrears taxes and growing interest on said arrears taxes had to be paid, therefore RCN could not offer the $400,000 to satisfy the note.

80. On or around June 17, 2016, (despite the fact that the Defendant already asked the Court for a judgment in the amount of $18,000,000 (eighteen million dollars) of which $2,250,000 (Two million Two Hundred and Fifty Thousand) was to allegedly satisfy the note between the Defendant and despite the fact that the Plaintiff told the New York Court that foreclosure would be too costly, unfulfilling, and they could not recoup the $750,000, therefore the court should issue a judgment in favor of the Defendant, which would allegedly satisfy the note) the Defendant told the Plaintiff that they may move forward with the foreclosure on the subject properties if RCN or I couldn't offer a more significant payoff amount to satisfy the note, release the mortgage and guarantor.

81. On or around June 17, 2016 the Plaintiff told the Defendant that he would seek a new financing source to try to increase the payoff amount, however, he wasn't sure he was likely to get another lender to increase the payoff offer and the Plaintiff also reminded the Defendant that the tax sale was August 3, 2016 and the Plaintiff also reminded the Defendant that RCN was prepared to pay the arrears taxes as a part of the refinancing, if the Defendant accepted the $300,000 payoff offer to settle the note in full.

82. On or around August 1, 2016 (two days before the tax sale) the Defendant issued a revised payoff letter to the Plaintiff, where it states that the Defendant would accept $350,000 (if paid on or before August 31, 2016) to satisfy the note, release the mortgage and guarantor.

83. The City of Meriden tax sale (for the subject properties) occurred on August 3, 2016. The winning bid was $81,920.04 and the winning bidder was Meriden City Properties, LLC 55 Grove Street Meriden CT 06451, whose Member is Rosario Gulino. The redemption period was scheduled to end 6 months after the tax sale (February 3, 2017) and the redemption

amount to be paid was estimated to be $89,642.84, if paid between January 4, 2017 and February 3, 2017.

84. On or around March 27, 2015 RCN Capital, as a part of the refinance preapproval, offered to pay the Defendant $300,000 to satisfy the note in full and to release the mortgage and guarantor. Also as a part of the refinancing RCN agreed to pay the arrears taxes from the refinance loan proceeds to the Plaintiff.

85. On or around August, 2016 the Plaintiff forwarded to RCN the Defendant's August 1, 2016 payoff letter, wherein the Defendant stated that they would accept $350,000 to satisfy the note in full, release the mortgage and the guarantor. RCN declined to offer that amount and also informed the Plaintiff that RCN has changed their lending focus to residential single and multifamily projects and was no longer interested in refinancing the subject properties in light of all of the time that has passed since the first RCN offer.

86. The Plaintiff continued to seek a new lender to approve the refinance of the subject properties 9-11 & 13-17 Colony St., Meriden CT 06451.

87. On or around December 8, 2016 the Plaintiff informed the Defendant that he was close to getting a refinance approval from a new lender and close to having an offer to satisfy the note in full and release the mortgage and guarantor. From the refinance loan proceeds the Plaintiff would a) pay the Defendant the offer amount to the Defendant b) Pay the arrears tax to redeem the subject properties that were sold at the August 3, 2016 tax sale.

88. On or around December 12, 2016 the Plaintiff told the Defendant that if the Defendant exercised its legal right as the first position mortgage holder to pay the arrears taxes, (before the end of the redemption period) thereby redeeming the properties (before the Plaintiff paid the arrears taxes and redeemed the properties from the refinancing loan proceeds or any source) the Plaintiff would reimburse the Defendant the amount of the arrears tax payment plus pay the Defendant the agreed upon amount to satisfy the note and release the mortgage and guarantor.

89. On or around January 4, 2016, the Plaintiff sent the Defendant a letter that stated a) Riverdale Funding has approved a payoff offer  in the amount of $180,000 to satisfy the note in full, release the mortgage and the guarantor. b) From the loan proceeds the arrears taxes will be paid to the City of Meriden CT (to redeem the properties ) if the Defendant accepted the $180,000 payoff. c) If the Defendant accepted the $180,000 loan payoff offer and exercised their right to redeem the properties (by paying the arrears taxes) before the refinance closing, the Defendant would be paid from the refinance loan proceeds the $180,000 to satisfy the note, release the mortgage and the guarantor plus the estimated $90,000 that the Defendant paid to redeem the properties.

90. On or around January 5, 2017 the Defendant sent a payoff letter to the Plaintiff wherein the Defendant would a) Accept the payoff offer amount of $180,000 provided they receive the $180,000 on or before February 2, 2017 b) the Plaintiff must pay or cause to be paid the delinquent taxes on the subject properties estimated to be $89,642.84 on or before February 2, 2017.

91. On or around January 24, 2017 The Plaintiff told the Defendant that a) Riverdale Funding is prepared to move forward however, they don't believe that they can close the refinance loan before February 2, 2017, as they have not completed their due diligence process b) Riverdale Funding also told the Plaintiff, that if the Defendant paid the arrears taxes due and provided Riverdale Funding with proof of said payment, the Defendant would be paid (from the refinance loan proceeds) the agreed upon payoff amount of $180,000 plus the estimated $90,000 in arrears taxes paid to redeem the property.

92. On or around January 24, 2017 the Defendant told the Plaintiff that the Defendant  wanted the Plaintiff to put the Deed to the subject properties 9-11 & 13-17 Colony St Meriden CT 06451 in escrow with Twersky LLPC and if Riverdale Funding doesn't come through, or if Riverdale funding doesn't pay the $180,000 plus the estimated $90,000 in arrears taxes, then the Defendant has the right to file the Deed and take the property free and clear.

93. On or around January 24, 2017, the Defendant told the Plaintiff that he will **NOT** and **cannot** give the Defendant the Deed because (among other things) there is a second mortgage on the properties. The Plaintiff also told the Defendant by phone that he didn't want to put the Deed in escrow because he wanted to continue to seek refinancing and he didn't want to lose his properties.

94. On or around January 25, 2017, the Defendant by phone told the Plaintiff that he was in contact with the winning bidder of the August 3, 2016 tax sale of the subject properties (Ross Gulino of Meriden City Properties, LLC) and the Defendant asked the Plaintiff to let Ross Gulino have full access to the subject properties, as Ross Gulino told the Defendant that he wanted to buy the note between the Plaintiff and the Defendant from the Defendant.  The Plaintiff alleged that this is communication between the winning tax sale bidder and the lender, and the request to let the winning tax sale bidder have access to set foot on  the tax sale property during the redemption period is allegedly unlawful, allegedly wrongful and allegedly in violation of the rules of the tax sale and Connecticut General Statutes. During the redemption period the winning bidder is a) not to contact the owner or any lien holder of the subject properties b) not to set foot or attempt to set foot on the subject properties of the tax sale.

95. On or around January 25, 2017, (during the redemption period) Ross Gullino called the Plaintiff by phone and asked for access to the properties and told the Plaintiff that the Second Defendant told him he could have access to the properties.

96. On or around January 27, 2017 the Plaintiff sent a letter to Ross Gulino advising him that he was allegedly in violation of the rules of the tax sale and he was allegedly interfering with the Plaintiff's contractual relationship with the Defendant. A copy of said letter to Gulino was sent to the attorney for The City of Meriden CT and the Office of The Attorney General of the State of Connecticut.

97. On January 25, 2017, (which was one day after the Plaintiff told the Defendant on January 24, 2017 no, he would not put the DEED in escrow) Twersky PLLC requested the

68

arrears/delinquent tax payoff statement from Adam Cohen of Pullman & Comley, LLC (the attorneys representing the City of Meriden in the tax sale) and on January 25, 2017 Adam Cohen sent the tax payoff statement to Aaron Twersky of Twersky PLLC wherein the payoff statement stated that the payoff amount to redeem the properties if received by noon January 31, 2017 was $92, 684.09

98. On January 25, 2017 (which was one day after the Plaintiff told the Defendant on January 24, 2017 no, he would not put the DEED in escrow) the Defendant represented to the Plaintiff by phone and reduced said representations to writing in the form of an updated payoff/demand letter, which the Defendant sent to the Plaintiff and said updated payoff/demand letter stated a) The Defendant has agreed to pay the arrears/delinquent taxes on the property in the amount of $92,684.09 b) The lender has agreed to accept $272,684.09 to satisfy the loan/note and release the mortgage if received on or before February 22, 2017. The $272,684.09 is the total of the $180,000 payoff amount to satisfy the note in full plus the reimbursement for the $92,684.09 arrears/delinquent tax payment. The terms of the payoff/demand letter omitted to include a conditioned that the Plaintiff execute an escrow agreement. The Plaintiff alleges that the Payoff/demand letter did not include any condition that required the Plaintiff to execute an escrow agreement.

99. The Plaintiff relied upon the Defendant's promise to pay the arrears /delinquent taxes and redeem the properties on or before February 3, 2017. As a result the Plaintiff, instead of seeking funds (from other sources) to pay the arrears/delinquent taxes and redeem the properties before February 3, 2017, or seeking current and immediate Bankruptcy counseling and then filing for Bankruptcy protection (which could stop the filing of the tax sale deed), the Plaintiff continued to work on the refinancing to pay the Defendant the $180,000 settlement amount and the $92,684.09 to reimburse the Defendant for the redeeming of the properties as per the Plaintiff's January 25, 2017 representations to the Plaintiff.

100. On or around January 27, 2017 the Plaintiff sent an email to the Defendant advising him that he was moving forward with the Riverdale Refinancing and that the Plaintiff would need proof of the arrears/delinquent tax payments to the City of Meriden from the Plaintiff.

101. On or around January 30, 2017 (four days before the end of the redemption period which is February 3, 2017 and after the Defendant in its January 25, 2017 payoff/demand letter and by phone to the Plaintiff, represented that he would pay the arrear/delinquent taxes in the amount of $92,684.09) the Defendant told the Plaintiff by email that the only way he would now consider paying the arrears/delinquent taxes, thereby redeeming the properties, is if the Plaintiff agreed to put the DEED in escrow and if the Plaintiff doesn't agree to these new terms, they will not redeem the properties by paying the arrears/delinquent taxes. Therefore the Plaintiff would lose the properties, as the tax DEED would be filed. The Defendant also told the Plaintiff that he must give him an answer by January 31, 2017.

102. On January 30, 2017 the Plaintiff again told the Defendant by phone (as he did on January 24, 2017).

   a)  that he didn't want to and could not give the Defendant the DEED as there is a second mortgage lien on the property.

   b)  that he didn't want to give the Defendant the DEED and the Plaintiff told the Defendant that the Defendant represented to the  Plaintiff (on January 25, 2017) that he would pay the arrears/delinquent taxes and that the January 25, 2017 representations, promises, written misstatement of material fact and omission, omitted to include a escrow agreement condition. The Plaintiff again told the Defendant, that the Defendant should act on his (January 25, 2017) representations, promises, written misstatement of material fact and omission, made to the Plaintiff on January 25, 2017, wherein they represented that they

70

would pay the arrears/delinquent taxes in order to redeem the properties on or before February 3, 2017.

103. On January 30, 2017 by phone, the Defendant again told the Plaintiff that if he didn't escrow the DEED with Twersky PLLC, the Defendant would not pay the arrears/ delinquent taxes to redeem the properties. Therefore the Plaintiff would lose the properties, if the arrears/ delinquent taxes are not paid before February 3, 2017, as the tax sale DEED would be filed.

104. On January 31, 2017 (3 days before the end of the redemption period) The Plaintiff in an email again told the Defendant this is a change to his January 25, 2017 representations and written misstatements, wherein the Defendant agreed to pay the taxes on or before February 3, 2017, which was before the end of the redemption period.

105. On February 1, 2017, (2 days before the end of the redemption period) Twersky PLLC, attorney for the Defendant told the Plaintiff a) that he was working on the agreement and DEED relating to the subject properties and he will send them to the Plaintiff as soon as they are done-either later that night or in the morning as they are straight forward and should not take much time to review.  b) The Plaintiff should come to Twersky PPLC's New York City office Thursday at 2pm (which is 1 day before the end of the redemption period) to sign and execute the documents. c) only after successful execution of the documents would the Defendant pay the arrears/delinquent taxes and redeem the properties.

106. On Wednesday February 1, 2017 at 7: 11 PM the Plaintiff emailed Twersky PLLC and told them than he would like to review the documents before he left Connecticut on February 2, 2017 to go to Twersky PLLC's New York City office at 2pm as the Defendant requested.

107. The Defendant failed to send the Documents to the Plaintiff. The first time that the Plaintiff saw the documents was in Twersky PLLC's office on February 2, 2017 on or around between 1:30 PM and 2:30 PM ( approximately 24 hours before the end of the redemption period).

108.  The Defendant asked the Plaintiff to wait for approximately half of an hour in the waiting area of the Defendant's office. The Defendant told the Plaintiff that the documents were not completed and the Defendant needed time to complete them.

109.  Sometime after 2 pm on February 2, 2017, the Defendant brought the Plaintiff into the conference room in the Defendant's 3 rd Ave., New York City office. The Defendant gave the Plaintiff an escrow agreement and a Deed (which was to be held in escrow) and told the Plaintiff to sign them both. The Plaintiff read both documents and told the Defendant that he a) didn't understand all of the terms of the document. b) he didn't agree with the terms that he did understand c) didn't want to execute the Deed or the escrow agreement.

110.  While the Plaintiff didn't fully understand the legal meaning of many of the terms, the Plaintiff disagreed with many of the terms he did understand. Some of the terms contained blatant lies. The Plaintiff didn't understand the legal meaning of all of the terms.

111.  The Plaintiff didn't have a chance to review the document with an attorney or review the documents before he saw them on the evening of February 2, 2017, while in the Defendant's office.

112.  The Plaintiff disagreed with many of the terms in the escrow agreement and told the Plaintiff as such and the Plaintiff also told the Defendant he didn't understand some of the terms and the legal meaning of those terms and the escrow agreement in general.

113.  The Plaintiff again told the Defendant that he a) felt under duress b) there was a second mortgage on the properties and the Plaintiff felt that even if he wanted to, which he didn't, he couldn't convey proper title to the properties c) the Plaintiff wanted to talk to an attorney, d) again told the Defendant to honor his January 25, 2017 representation and misstatements, wherein he represented that he would pay the taxes and arrears. No escrow agreement condition was included in the Defedant's January 25, 2017 representations to the Plaintiff.

114.  The Defendant told the Plaintiff  to sign the document or lose your properties. This is your last chance.

115. The Defendant then told the Plaintiff that  a) he was not going to change a word in the escrow agreement and the new DEED. b) the Plaintiff must hurry up and sign the escrow agreement and the Deed, because they had to wire the funds that afternoon and they had very little time left to contact their bank and tell the Defendant's bank to wire the funds to Adam Cohen's office in order to redeem the subject properties. c) If the Plaintiff didn't sign the document as they were, the Plaintiff would not wire the funds to redeem the properties and the Plaintiff would lose his properties.

116. The Plaintiff again asked the Defendant to honor and act on his January 25, 2017 representations and written misstatements of fact and omissions, wherein Defendant represented that he would to pay the arrears/delinquent taxes and redeem the properties. Said January 25, 2017 representation and written misstatements of fact and omission did not include a condition that the Plaintiff execute an escrow agreement before the tax payment would be made by the Defendant. The Defendant replied to the Plaintiff with the word no.

117. The Plaintiff again told the Defendant that he felt that he was under duress and that because the Defendant now said that they would not act upon their January 25, 2017 representation and alleged written misstatement, without the new condition that the Plaintiff execute an escrow agreement, the Plaintiff felt that he had no choice but to sign the document as he felt that he would lose his properties if he didn't. The Defendant replied to the Plaintiff by saying, this is your last chance, sign the escrow agreement and the new DEED or lose your properties.

118. The Plaintiff felt under extreme emotional distress and felt that his choices were limited, therefore the Plaintiff executed the escrow agreement and the Deed.

119. After the Plaintiff executed the documents the Defendant left the conference room after telling the Plaintiff that he was going to call the Defendant's bank and tell them to wire the funds to pay the arrears/delinquent taxes and redeem the properties.

120. The Defendant allegedly attempted to wrongfully and allegedly unlawfully circumvent the foreclosure process, after they told the New York Court that foreclosure would be costly, unfulfilling and they could not recoup their money as the value of the properties has decreased.

121. The Plaintiff contacted Adam Cohen on February 3, 2017 and Adam Cohen confirmed the receipt of the Defendant's February 2, 2017 wire and told the Plaintiff that he was mailing a Certificate of Satisfaction to the Plaintiff.

122. The escrow agreement allegedly includes false statements and allegedly includes illegal provisions (that allegedly violate Public Policy) that states among other things the following, a) Bankruptcy restriction clause, this allegedly violates Public Policy, as this clause allegedly prohibits and restricts the Plaintiff from filing Bankruptcy or any other court filing b) a statement mortgagor has made no loan payments, which is allegedly false c) the Defendant was forced to payoff the tax lien, which is allegedly false d) tenancy right release, this allegedly violates Public Policy e) general representations f) participation in drafting, which allegedly falsely stated that each party has cooperated in the drafting and preparation of the agreement, as the Plaintiff denies  this statement g) representation of counsel, which states that each party had the opportunity to seek legal advice from an attorney of their choice before executing the escrow agreement and Deed; the Plaintiff first saw the escrow agreement and the Deed for the first time on February 2, 2017 at approximately 2 pm in the Defendant's office. The Plaintiff alleges that the only opportunity he may have had to even possibly somehow review the documents with an attorney was a small window of minutes between the time he first saw the documents and the time he was rushed to execute the documents.   h) That the parties understand the agreement which is allegedly a false statement, as the Plaintiff told the Defendant that he didn't understand the meaning of some of the clauses i) Governing Laws and Interpretation, says that the agreement shall be governed by and conformed in accordance with the Laws of The State of New York. This is allegedly in direct conflict with the underlying loan documents ( that state that the Governing Laws are the Laws of The State of Connecticut).

The subject properties, the Plaintiff's residence, the loan closing, the Defendant and Plaintiff closing attorney's offices are in the State of Connecticut.

123. The Plaintiff filed a Motion for Temporary Restraining Order & Motion for Temporary Injunction and Order to Show Cause on March 13, 2017 in the State of Connecticut Superior Court, New Haven Judicial District at New Haven, Docket No. NNH-CV17-5038041-S.  The Plaintiff had prayed that the Court stop the Defendant from filing the DEED, as the Plaintiff alleged that he was forced to sign the DEED.

124. In addition the Plaintiff's prayer for relief also included a) escrow agreement be declared unenforceable and void or b) the court declare the note satisfied in full c) the escrow DEED  be declared unenforceable. There were also addition actions prayed for in the Plaintiff's prayer for relief.

125. As of the Aforementioned filing in (151) the Plaintiff wanted the escrow voided, his DEED to his properties returned to him and the Plaintiff honor and act on the January 25, 2017 representation, promise and written misstatements of fact.

126. Service was made by Connecticut State Marshal.

127. The Defendants in their Memorandum in Opposition to Plaintiff's Application for TRO, Temporary Injunction/or Preliminary Injunction, stated that they received on March 20, 2017 a copy of the Plaintiff summons, complaint, application for temporary injunction and order to show cause, where Judge Burke, J granted the motion for order to show cause and  set matter down for a hearing on March 22, 2017 at 9: 30am in court room 4E of Superior Court, New Haven Judicial District at New Haven, which is located at 235 Church St., New Haven CT 06510.

128. The Defendants where required to show good cause (on March 22, 2017) to the court, as to why the court should not grant the Plaintiff Motion for Temporary Injunction. The Plaintiff prayed that the Court stop the Defendants from filing the DEED.

129.  In a blatant disregard for the Honorable Judge Burke's order setting the matter down for an order to show cause hearing on March 22, 2017, as to why the court should not grant the Plaintiff motion for temporary injunction, thereby stopping the Defendants from recording the DEED with the City of Meriden, CT Clerk's Office, on March 21, 2017 ( one day before the March 22, 2017 hearing date) which is before the expiration date of the escrow agreement, the Plaintiff filed the DEED on March 21, 2017.

130.  The filing of the DEED allegedly made the Defendant the owners of the properties.

131.  The Defendants allegedly changed the status quo, making the Plaintiff's burden at the TRO hearing higher as they filed the DEED with the City of Meriden CT Clerk's Office on March 21, 2017 (one day before the March 22, 2017 hearing that was ordered by the Hon. Judge Burke) and one day before the expiration of the escrow agreement.

132.  During the night on March 21, 2017 ( hours before the March 22, 2017 hearing scheduled for 9:30am March 22, 2017 hearing) the Defendants filed (with this court) a notice of removal to remove this action from The State of Connecticut Superior Court, New Haven Judicial District at New Haven to this court pursuant to 28 U.S.C. 1332, 1441 and 1446.

133.  On March 22, 2017 at 7:50am (1 hour and 40 minutes before the hearing) the Defendants filed an appearance and the notice of removal in The State of Connecticut Superior Court, New Haven Judicial District at New Haven.

134.  The March 22, 2017 hearing didn't go forward as the case was removed from The State of Connecticut Superior Court, New Haven Judicial District.

135.  While waiting for the March 22, 2017 hearing the Defendants acted upon the DEED that they filed (in accordance with provision #4 of the escrow agreement, which said provision allegedly violates public policy) and served the Plaintiff with a Notice to Quit, despite knowing that there was a hearing set down that could stop them from filing the DEED.

136.  The Defendants failed to file the Plaintiff's full Motion for Temporary Restraining Order & Motion for Temporary Injunction and Order to Show cause with this court upon the removal of

the case to this Court. Only after the Plaintiff visited the Clerk of the Court's office in this court and the clerk's office calling the Defendant's attorney, did the Defendants (on March 22, 2017) file the Plaintiff Motion for Temporary Restraining Order & Motion for Temporary Injunction and Order to Show Cause.

137. The Defendants also failed to serve the Plaintiff with a copy of the March 22, 2017 filing of the Motion for Temporary Restraining Order & Motion for Temporary Injunction and Order to Show Cause.

138. On March 23, 2017 Proceedings were held before The Honorable Judge Stefan R. Underhill. An off the record discussion resulted in an agreement to try to resolve the case pursuant to terms documented on the record. As a part of those terms the Defendants agreed to work with the Plaintiff and the lender in order for the Plaintiff to close a refinance loan to satisfy the note in full and release the mortgage, guarantors and release all parties.  For the reasons stated above the Court took the motion under advisement.

139. On March 24, 2017, the Plaintiff told the Defendants that after a discussion with the lender on March 24, 2017, the lender asked if I owned the property and the lender told me that  in order for a refinancing to close, I have to own the properties and a title search will be performed.

140. On March 24, 2017, I asked the Defendants to un-record the DEED, so I can continue with the refinancing process and they refused to un-record the DEED.

141. The Plaintiff felt that he could not refinance the properties if he doesn't own the properties.

142. The Defendants were made aware by the Plaintiff that the Plaintiff felt that he could not refinance properties that he doesn't own.

143. This Court has ruled at the April 7, 2017 Evidentiary and Motion hearing regarding 8 Motion for TRO 16, Amended Motion for TRO, 8 Motion for Order to Show Cause, 16 Motion for Order to Show Cause that the overall tenor of the escrow agreement didn't violate Public

Policy, but issues as to whether provision #4 and other provisions violate public policy was not ruled on by the Court.

144. The Plaintiff has alleged in his Amended Complaint dated April 10, 2017, that provision # 4 allegedly violates Public Policy.

145. Courts have refused to enforce provisions in contracts where said provisions prohibits or restrict a party from filing bankruptcy in whole or in part. Courts have also refused to enforce any provisions (not just provisions that prohibits or restrict a party from filing bankruptcy in whole or in part) in a contract that violates Public Policy.

146. The provision # 4 of a contract also prohibits and restricts the Plaintiff from any court filing. This also violates public policy.

147. CBD was not indemnified.

148. Courts have held that a provision of a contract which violates Public Policy will not be enforced. However, the remainder of the provisions that are not in violation of public policy (General Statutes and or common law) are enforced.

149. The Plaintiff has alleged in his April 10, 2017 Amended Complaint that provision #4 violates Public Policy and he has alleged that this provision is unenforceable. If the court finds that this is true and correct, on March 21, 2017, before the Defendant filed the DEED there was no breach of the Escrow Agreement.

150. On March 21, 2017, (which was during the period of the escrow agreement) the Defendant acted upon provision #4 of the escrow agreement (said provision allegedly violates Public Policy) and filed the Deed before March 22, 2017. The Defendant took title to the subject mortgage properties (that secured the note and secured the $272,751.07 that they agreed to accept to satisfy the note) when they filed the DEED on March 21, 2017.

151. The Defendant stated in the escrow agreement that they agreed to accept (on or before March 22, 2017) $272,751.07 from the Plaintiff to satisfy the note in full and as additional security for the $272,751.07.

152.  The Plaintiff would place the DEED in escrow, which could be filed by the Defendant, as the DEED secured the amount to satisfy the note in full.

153.  The Value of the subject properties exceeded $272,751.07.

154.  The Defendant on March 21, 2017 filed the DEED in escrow (which was before the expiration of the escrow agreement) which secured the note and the $272,751.07 amount to settle the note on or before March 22, 2017.

155.  The Plaintiff has alleged in his April 10, 2017 Amended Complaint that provision #4 violates Public Policy and he has alleged that this provision is unenforceable. If the court finds that this is true and correct, on March 21, 2017, before the Defendant filed the DEED there was no breach of the Escrow Agreement.

156.  As of March 21, 2017 the Defendant didn't receive the $272,751.07 and on March 21, 2017, ( which was before the escrow agreement expired) they filed the DEED that was held in escrow in lieu of the $272,751.07. The Value of the subject properties exceeded $272,751.07.

157.  The Defendant has failed to issue the note, mortgage & guarantor releases.

158.  The Defendant in their Amended Counterclaim has asked the court for a judgment against the Counterclaim Defendant in the amount of $842,751.07 +.

## AS TO THE FIRST DEFENDANT

## THE PLAINTIFF ALLEGES THE FOLLOWING

## COUNT I

## CONNECTICUT UNFAIR TRADE PRACTICE

I.

**The Plaintiff alleges that the Defendants** engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of the lender borrower relationship with the Plaintiff. The Defendants engaged in conduct designed to mislead or deceive, or neglect or refuse to fulfill some duty or contractual obligation not prompted by an honest mistake as to its rights or duties. The Defendants didn't exercise good faith performance or faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.  The Defendant didn't act in good faith and fair dealing, as they allegedly didn't have an attitude or state of mind denoting honesty of purpose and freedom from intention to defraud.

1)   The Plaintiff alleges that the First Defendant knew and had awareness of the VP Escandon $23,000 commission.

2) The Plaintiff the First Defendant failed to disclose the VP Escandon $23,000 commission to the Plaintiff and that they intentionally fraudulently concealed a cause of action from the Plaintiff.

3) The Plaintiff the First Defendant allegedly knew that it misrepresented and omitted to disclose the alleged $23, 000 commission it paid to its Vice President Escandon, in connection with the loan to the Plaintiff and allegedly concealed a cause of action for the purpose of delaying the Plaintiff from filing a law suit in connection with the $23,000 commission the First Defendant paid to its VP Escandon without disclosing it and concealing said $23,000 commission paid to its VP Escandon.

4) The Plaintiff alleges that the First Defendant (1) had actual awareness, rather than imputed knowledge, of the facts necessary to establish the [Plaintiff's] cause of action; (2) intentionally concealed these facts from

the Plaintiff; and (3) concealed the facts for the purpose of obtaining delay on the Plaintiff's part in filing a complaint on [his or her] cause of action. The Plaintiff alleges that he suffered injury as a result of the First Defendant's aforementioned alleged concealment of the Escandon $23,000 commission.

5) The Plaintiff alleges that the First Defendant disclosed to him and in the loan documents that he would have to pay $112,000 in interest payment over the one year term of the note.

6) The Plaintiff the alleges that once the Plaintiff discovered that the First Defendant paid a $23,000 commission to its VP Escandon, the Plaintiff alleges rational minds could reasonably and logically draw the necessary inferences to determine that the $23,000, of the $112,500 that was disguised as interest payments was in fact allegedly a commission paid by the First Defendant to Escandon. Therefore the actual amount of interest that the Plaintiff should have paid was $89,500 and not $112,500.

7) The Plaintiff has alleged that he would not have agreed to the VP Escandon commission.

8) The Plaintiff alleges that he suffered  injury of at least $23,000.

II.

The Plaintiff alleges that the Defendant engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of the lender borrower relationship with the Plaintiff. The Defendants engaged in conduct designed to mislead or deceive, or neglect or refuse to fulfill some duty or contractual obligation not prompted by an honest mistake as to its rights or duties.

1)  The Plaintiff alleges that the First Defendant  had a duty to use reasonable care and breached that duty by its failure to refrain from interfering with the Plaintiff's ability to perform his obligations under the one year term of the note.

2) The Plaintiff alleged that after the execution by the parties of the note, mortgage and loan documents, the First Defendant made new demands upon the Plaintiff, during the term of the note and said new demands were not included in the express terms of the note and or mortgage.

3)  The Plaintiff alleges the formation of the note and mortgage agreements on or around June 6, 2012.

4) The Plaintiff alleges that the First Defendant former VP Gary Escandon allegedly interfered with and hindered  his ability to perform under the term of the note. VP Escandon demanded that the Plaintiff not

open the first floor of this property without opening the second floor at the same time, which was not a condition of the note or mortgage.

5) The Plaintiff alleges that  the First Defendant VP Escandon's new demands interfered with and hindered the Plaintiff's ability to open his restaurant and generate enough income to pay back the loan within one year or refinance within one year and payoff the loan.

6) The Plaintiff alleges that to open the second floor a sprinkler system is required by The City of Meriden building and fire code.

7) The Plaintiff alleges that the Plaintiff discovered after the loan closing that there was no fire protection water main coming into the properties from the street. Therefore he could not install a sprinkler system, which was a City of Meriden Building and Fire Department condition to opening the second floor.

8) The Plaintiff alleges that after the Plaintiff discovered this he told VP Escandon that (in light of the fact that the loan term was one year) the Plaintiff would move forward and open the first floor. VP Escandon told the Plaintiff no and if the Plaintiff opened the First floor without opening the second floor he would call the note and sue him for the money back.

9) The Plaintiff alleges that the Plaintiff followed VP Escandon's instructions and suffered injury as he could not open and generate any income from his restaurant within one year as a result of the VP Escandon new demands and as a result the Plaintiff defaulted on the loan.

III.

The Defendants engaged in conduct designed to mislead or deceive

1) The Plaintiff alleges that Vice President of the First Defendant Aaron Twersky, had motive and opportunity to commit fraud and to wrongfully and or unlawfully circumvent the foreclosure process and he had conscious behavior of recklessness.

2) The Plaintiff alleges that  the First Defendant VP Aaron Twersky told the NY Court (in a law suit filed in March 2015, against its former vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and **impossible** to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time

the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first

Defendant to recoup their loss.

3) The Plaintiff alleges that Aaron Twersky (acting in his capacity as Vice President of the First Defendant)

then plotted to allegedly wrongfully and unlawfully circumvent the foreclosure process, in order to get the

Plaintiff's  DEED to his properties, without going through the foreclosure process.

4) The Plaintiff in This Second Amended complaint, has alleged with particularity. The Plaintiff has

specified that the Defendant's representative and Vice President Aaron Twersky (acting in his capacity as

Vice President of the First Defendant) Intentionally made the aforementioned supra January 25, 2017 verbal

and written representations, promises and written misstatement of material facts and omission to the

Plaintiff by phone on January 25, 2017 and in the Defendants January 25, 2017 payoff/demand letter,

executed by Aaron Twersky on January 25, 2017.

5) The Plaintiff alleges that the first Defendant and its VP Aaron Twersky, had motive and opportunity to

commit fraud and to wrongfully and or unlawfully circumvent the foreclosure process and he had conscious

behavior of recklessness.

6) The Plaintiff alleges that VP Aaron Twersky told the NY Court (in a law suit filed in March 2015, against

its former vice President Gary Escandon) that foreclosure on the subject properties would be costly and

unfulfilling and impossible to recoup their money. They alleged in that law suit that the properties that

secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was

made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup

their loss.

7) The Plaintiff alleges that VP Aaron Twersky knew that he was not going to act upon his January 25, 2017

representations, promises and written misstatement of material facts and omission, which didn't include an

escrow agreement precondition to the Defendant paying the arrears tax before the end of the tax sale

redemption period.

8) The Plaintiff alleges that Vice President Aaron Twersky intentionally waited until days before the end of the redemption period to disclose this new precondition to his January 25, 2017 representations, promises and written misstatement of material facts omission.

9) The Plaintiff alleges that Aaron Twersky Intentionally made those January 25, 2017, representations, promises and written misstatement of material facts omission to induce the Plaintiff to rely upon his representations, promises and written misstatement of material facts omission, without an escrow agreement precondition.

10) The Plaintiff alleges that the Defendant allegedly mislead and deceived him by making, on January 25, 2017, representations, promises, misstatement of written fact and omissions which was one day after the Plaintiff told the Defendant no he would not put the DEED.in escrow. On January 25, 2017 the Defendant made representations of fact to the Plaintiff by phone and reduced said representations to writing in the form of an updated payoff/demand letter addressed to Riverdale Funding and the Defendant then sent said updated payoff/demand letter to the Plaintiff and the Plaintiff forwarded the payoff/demand letter to Riverdale Funding. The Defendant made representations of fact to the Plaintiff by phone and reduced said representation to writing, in the form of a payoff/demand letter addressed to Riverdale Funding allegedly to confirm its representation made to the Plaintiff by phone.

11) The Plaintiff alleges that said letter included written material misstatement of material fact and omission and representations, as the January 25, 2017 payoff/demand letter represented the Defendants conditions in connection with them paying the arrears tax.

12) The Defendant  made representations, promises, and written misstatements of material facts and omissions that they would pay the arrears tax subject to the January 25, 2017 conditions contained in the January 25, 2017 payoff/demand letter, which represented that the Defendant  will be paying the arrears/delinquent taxes on the property in the amount of $92,684.09 and  the Defendant /lender represented in the payoff letter that it is prepared to deliver a satisfaction of the mortgage provided Borrower pays or causes to be paid to the order of the Lender by bank check the sum of $272,684.09 on or before February

22, 2017. This total includes the delinquent taxes on the Property which Lender will be paying, in the amount of $92,684.09. No escrow agreement conditions or any other conditions were made apart of the Defendant's representations to the Plaintiff in its January 25, 2017 representations and written misstatements of fact.

13) The Plaintiff alleges that he acted upon those January 25, 2017 representations, promises and written misstatement of fact and omissions and suffered injury. The Plaintiff relied upon the Defendant's promise to pay the arrears /delinquent taxes and redeem the properties on or before February 3, 2017. As a result the Plaintiff, instead of seeking funds (from other sources) to pay the arrears/delinquent taxes and redeem the properties before February 3, 2017, or seeking current and immediate Bankruptcy counseling  and then filing for Bankruptcy protection (which could stop the filing of the tax sale deed), the Plaintiff continued to work on the refinancing to pay the Defendant the $180,000 settlement amount and the $92,684.09 to reimburse the Defendant for the redeeming of the properties as per the Plaintiff's January 25, 2017 representations to the Plaintiff.

14) The Plaintiff alleges the Defendant refused to fulfill those duties that he had as a result of his representations, promises and written misstatements and omissions of fact and the Plaintiff alleges that said refusal was not prompted by an honest mistake as to the Plaintiff rights or duties. The Plaintiff acted upon those January 25, 2017 representations promises and written misstatements and suffered injury.

15) The Plaintiff alleges that the Defendant didn't act in good faith and fair dealing, as they allegedly didn't have an attitude or state of mind denoting honesty of purpose and freedom from intention to defraud.

16) The Defendant didn't act in good faith and fair dealing, as they allegedly didn't have an attitude or state of mind denoting honesty of purpose and freedom from intention to defraud. On January 30, 2017, the Defendant added a new condition to its January 25, 2017 representations, promise and written misstatements of material facts.

17) On or around January 30, 2017 (four days before the end of the redemption period which is February 3, 2017 and after the Defendant in its January 25, 2017 payoff/demand letter agreed to pay the arrears/delinquent taxes in the amount of $92,684.09) the Defendant told the Plaintiff by email that the only way he would now consider paying the arrears/delinquent taxes, thereby redeeming the properties, is if the Plaintiff agreed to put the DEED in escrow and if the Plaintiff doesn't agree with these terms they will not redeem the properties by paying the arrears/delinquent taxes. Therefore, the Plaintiff would lose the properties, as the tax DEED would be filed. Defendant also told the Plaintiff that he must give him an answer by January 31, 2017. The Plaintiff alleges that these representations and conditions were not made to the by the Defendant to the Plaintiff in his January 25, 2017 aforementioned representations, promises and written misstatement of material facts and omissions.

18) The Plaintiff told the Defendant that he didn't want to give the Defendant the DEED and that the Defendant should act upon its (on January 25, 2017) representations, promises and written misstatement of material facts and omissions made to the Plaintiff, by paying the arrears/delinquent taxes (in order to redeem the properties on or before February 3, 2017) as they represented to the Plaintiff (on January 25, 2017) that they would do. The Plaintiff alleges that said tax payment was not conditioned on an escrow agreement or new and additional conditions.

19) On February 1, 2017, (2 days before the end of the redemption period) Twersky PLLC attorney for the Defendant told Plaintiff a) that he was working on the escrow agreement and DEED relating to the subject properties and he will send them to the Plaintiff as soon as they are done-either later that night or in the morning as they are straight forward and should not take much time to review.  B) The Plaintiff should come to Twersky PPLC's New York City office Thursday at 2pm (which is 1 day before the end of the redemption period) to sign and execute the documents. c) only after successful execution of the documents would the Counterclaim Plaintiff pay the arrears/delinquent taxes and redeem the properties.

20) The Defendant told the Plaintiff to sign the documents or lose your properties. This is your last chance. The Defendant then told the Plaintiff that he was not going to change a word in the escrow agreement and the new DEED.

21) The Plaintiff felt under emotional distress and felt that his choices were limited, therefore the Plaintiff executed the escrow agreement and the Deed, and suffered injury, as the Defendant has filed the DEED and the Plaintiff has lost his properties to the Defendant. The Defendant has also failed to issue the releases that the Plaintiff alleges the escrow agreement obligates the Defendant to issue said releases. The Plaintiff alleges the DEED secured the amount to satisfy the note in full.

22) The Plaintiff alleges that the First Defendant on January 30, 2017, 3 days before the end of the tax sale redemption period, preconditioned its honoring of its January 25, 2017 representations of material fact (which was to pay the tax, free of any other conditions than those expressed on January 25, 2017) on the Plaintiff signing an escrow agreement and placing this DEED to the subject properties in escrow.

23) The Plaintiff alleges that on January 30, 2017, that he told the Plaintiff no to executing an escrow agreement.

24) The Plaintiff alleges that the First Defendant, On January 30, 2017 still refused to honor his January 25, 2017 representation of material fact, which was to pay the arrears taxes free of any escrow agreement condition.

25) The Plaintiff alleges that the First Defendant On January 25, 2017 did not condition the payment of the arrears tax on the Plaintiff executing an escrow agreement.

26) The Plaintiff alleges that As a result of VP Aaron Twersky's alleged actions, the Plaintiff felt he had no choice but to put the DEED in escrow pursuant to an escrow agreement, and suffered injury as he lost his properties and the equity in his properties.

III.

1) The Plaintiff's alleges that the First Defendant allegedly conspired with the Second Defendant in wrongfully and unlawfully circumventing the foreclosure process and to violate The Connecticut Unfair Trade Practices Act (CUTPA).

2) The Plaintiff alleges that The First and Second Defendants "entered into a combination, agreement or conspiracy" to allegedly wrongfully and unlawfully circumvent the foreclosure process and to Violated Connecticut Unfair Trade Practices Act (CUTPA).

3) The Plaintiff alleges that the Second defendant had knowledge that the first Defendant was allegedly attempting to wrongfully and unlawfully avoid the foreclosure process.

4) The Plaintiff alleges that Aaron Twersky ( Principal of Twersky PLLC) knew that the both defendants alleged in a NY law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss.

5) The Plaintiff alleges that Aaron Twersky ( Principal of Twersky PLLC) knew that the first Defendant allegedly wanted to attempt to avoid the foreclosure process. The Plaintiff alleges that he knew this because Aaron Twersky ( Principal of Twersky PLLC) is also the Vice President of the first Defendant and Aaron Twersky Vice President of the first Defendant was the one attempting to collect on the loan made to the Plaintiff by the Defendant. Aaron Twersky (Vice President of the first Defendant) communicated with the Plaintiff.

6) The Aforementioned alleged conspiracy to allegedly wrongfully and unlawfully avoid the foreclosure process, was the First and Second Defendant's motive (he had means and opportunity) to communicate with the winning tax sale bidder during the tax redemption period, in an effort to sell him the note to the subject properties. This act allegedly violates public policy.

7) The Plaintiff alleges that he discovered on or around January 2016 that the First Defendant and VP Aaron Twersky (through their attorney Twersky PLLC who represented the First Defendant in their law suit against their former Vice President Gary Escandon) told the NY Court (in a law suit filed in March 2015, against its former vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and **impossible** to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was

made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss.

8) The Plaintiff alleges that  the First Defendant alleged in that law suit that the properties' values decreased, and they could not recoup the money loaned to the Plaintiff in this case through foreclosure.

9) The Plaintiff has alleges that the First Defendant had motive and means to plot to wrongfully and unlawfully avoid the foreclosure process.

10) The Plaintiff alleges that  the First Defendant  in at least one instance allegedly conspired with the Second Defendant to allegedly wrongfully and unlawfully circumvent the foreclosure process allegedly assisted the First Defendant in an allegedly wrongfully and unlawfully attempt to avoid the foreclosure process.

11) The Plaintiff alleges that  the Second Defendant on or around January 25, 2017  allegedly violated public policy when he allegedly assisted the First Defendant in their efforts to allegedly wrongfully and allegedly unlawfully circumvent the foreclosure process, by allegedly wrongfully and allegedly in violation of public policy, and allegedly committing an immoral, unethical, oppressive, or unscrupulous act  by communicating with the winning tax sale bidder of the aforementioned supra properties during the tax sales redemption period, asked the Plaintiff to give the winning tax sale bidder full access to the Plaintiff's property, all while allegedly knowing that such acts are allegedly directly in violation of the rules of the tax sale.

12) The Plaintiff alleges that the Second Defendant also allegedly in violation of public policy, told the Plaintiff in this case give the winning tax sale bidder Ross Gulino full access to the properties. All of this was allegedly done (by the Second Defendant) during the tax sale redemption period (which allegedly violates public policy) and on behalf of the First Defendant,(and a part of their conspiracy) in an effort to sell the winning tax sale bidder the Plaintiff's note in an attempt to wrongfully and unlawfully avoid the foreclosure process.

13) The Plaintiff alleges that when he told the Second Defendant that his aforementioned act, allegedly violated the rules of the tax sale and public policy, Aaron Twersky of the Second Defendant, responded by saying to the Plaintiff, let he worry about that.

14) The Plaintiff alleges that an attempt to sell a note doesn't constitute a violation of public policy, but communicating with the winning tax sales bidder on the subject properties during the tax sale redemption period in an effort to sell the note to the winning tax sale bidder, and allegedly attempting to allow the winner tax sale bidder access to the properties during the tax sales redemption period and allegedly allowing the winning tax sale bidder to interfere with the Plaintiff's ownership and contractual relationship with the First Defendant of his properties, during the tax sale redemption period,  allegedly does violate Public Policy, Connecticut General Statute, the rules of the property tax sale and is allegedly is immoral, unethical, oppressive, or unscrupulous.

15)  The Plaintiff alleges in this CUTPA cause of Action against the Second Defendant, that the Second Defendant is not indemnified from this claim, made against it.

16)  The Plaintiff alleges that as a result of this alleged conspiracy he suffered injury. After the aforementioned communication with the winning tax sale bidder, during the tax sale redemption period, the first Defendant intensified his attempt to unlawfully and wrongfully avoid the foreclosure process, by refusing to honor its aforementioned January 25, 2017 promises, representations, written Misstatement of Material fact and omission and unless the Plaintiff put the DEED in escrow and execute the aforementioned supra escrow agreement.

17) The Plaintiff alleges that he suffered injury, as he so entered into the escrow agreement, placed his DEED in escrow and lost his properties.

18)  The Plaintiff alleges that he suffered injury, as he is suffering the emotional distress of having to file and law against both defendants and defendant a counterclaim from the both Defendants as a pro se litigant.

IV) The Defendants engaged in conduct designed to mislead or deceive, or neglect or refuse to fulfill some duty or contractual obligation not prompted by an honest mistake as to its rights or duties. The Plaintiff alleges that the Defendant engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of the lender borrower relationship with the Plaintiff. The Defendants engaged in conduct designed to mislead or deceive, or neglect or refuse to fulfill some duty or contractual obligation not prompted by an honest mistake as to its rights or duties. The Plaintiff and the Defendant entered in an

escrow agreement. The Defendant made the representations of material facts (stated below) to the Plaintiff in the escrow agreement. The Defendants didn't exercise good faith performance or faithfulness to an agreed common purpose and consistency with the justified expectations of the other party. The Defendant didn't act in good faith and fair dealing, as they allegedly didn't have an attitude or state of mind denoting honesty of purpose and freedom from intention to defraud.

1) The Plaintiff also alleges that Aaron Twersky Vice President of the First Defendant made representations, written misstatement of material facts in the escrow agreement on February 2, 2017.

2) The Plaintiff alleges that Aaron Twersky (acting in his capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness. Aaron Twersky on February 2, 2017 Intentionally made a written misstatement of material fact and in the escrow agreement. The Defendant made these Intentional written misstatements of material fact in order to allegedly Intentionally induce the Plaintiff to rely upon the Defendant's written misstatement of material fact.

3) The Defendant stated in the escrow agreement that they agreed to accept (on or before March 22, 2017) $272,751.07 from the Plaintiff to satisfy the note in full and the DEED in escrow would provide additional security for the note.

4) The Plaintiff alleges that the language is unambiguous and the Plaintiff expectation was that the $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full.

5) The Value of the subject properties was allegedly at least $672,300 (evidenced by the City of Meriden 2016 appraisal value shown on its property cards) which exceeded $272,751.07. There was a second mortgage lien of $100,000 on the subject properties. Therefore, the net value was at least $572,300 and the Plaintiff alleges that the note was satisfied in full, as a result of the March 21, 2017 filing of the DEED held in Escrow.

6) The Plaintiff alleges that the first Defendant has failed to issue the releases of the note, mortgage, and guarantor and the acknowledgement of the satisfaction of the note.

7) The Plaintiff alleges that the Plaintiff so acted on Defendant's alleged Intentional written misstatement of material fact and the Defendant alleges that he would not have executed the escrow agreement had the Defendant not agree to accept $272,751.07 to satisfy the note in full, and not agree that the DEED secured the note and $272,715.07 to satisfy the note in full.

7) The Plaintiff alleges that as a result of the aforementioned written misstatement of material fact, the Plaintiff so acted and the Plaintiff suffered injury as a result of his reliance on the Defendants written misstatement of material fact.

8) The Plaintiff alleges that Aaron Twersky ( Acting in his capacity as Vice President of the First Defendant) knew on February 2, 2017, that his aforementioned supra written misrepresentations of fact representation in the escrow agreement were false.

9) The Plaintiff alleges that  the First Defendant  and VP Aaron Twersky also knew that if his February 2, 2017, aforementioned supra written misrepresentations of fact in the escrow agreement were true, he had an obligation and a Duty ( pursuant to the escrow agreement) to issue the Plaintiff the satisfaction of the note and the releases for the note, mortgage and guarantor.

10) The Plaintiff alleges that  the First Defendant and VP Aaron Twersky  allegedly knew that provision # 4 of the escrow agreement allegedly violated public policy and that the Courts have generally refused to enforce provisions in contracts that violate public policy, and provisions in contracts that restrict a person's Constitutional Right to file bankruptcy in whole or in part, or that matter, a restriction of a person's right to due process, by restricting that person from its right to petition the government for redress and grievances, by filing a law suit.

11) The Plaintiff alleges that  the First Defendant and  VP Aaron Twersky knew that provision # 4 allegedly violated public policy and was allegedly unenforceable.

12) The Plaintiff alleges that  the First Defendant  and VP Aaron Twersky, also had to know that it had an obligation and a duty pursuant to the escrow agreement to issue to the Plaintiff the satisfaction of the note, the releases of the note, mortgage and guarantor, if he filed the DEED in escrow before March 22, 2017.

13) The Plaintiff alleges that the First Defendant and VP Aaron Twersky, knowingly failed to issue the satisfaction of the note, the releases of the note, mortgage and guarantor, and he admitted that he failed to do so.

14) The Plaintiff alleges that the First Defendant and VP Aaron Twersky also failed to compensate the Plaintiff for his alleged lost of equity in his properties. The Value of the subject properties was allegedly at least $672,300, which exceeded $272,751.07. There was a second mortgage lien of $100,000 on the subject properties. Therefore, the net value was at least $572,300 and the Plaintiff alleges that the note was satisfied in full, as a result of the March 21, 2017 filing of the DEED held in Escrow and the Plaintiff alleges that the First Defendant owed him at least $299,548.93, which is the difference between the net value of the properties ($572,300) and the ($272,751.07) amount to satisfy the note in full.

15) The Plaintiff alleges that the First Defendant and VP Aaron Twersky had motive and opportunity to not issue the releases and to include provision # 4 in the escrow agreement.

16) The Plaintiff alleges that  the First Defendant and VP Aaron Twersky had motive and opportunity to try to keep the Plaintiff out of Court, therefore he allegedly wrongfully included provision # 4 in the escrow agreement.

17) VP Aaron Twersky told the NY Court (in a law suit filed in March 2015, against its former vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and **impossible** to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss.

18) The Plaintiff alleges that the First Defendant and VP Aaron Twersky after his aforementioned supra representations to the NY Court, allegedly with motive and opportunity to commit fraud, consciously behaved recklessly, to gain the DEED from the Plaintiff and then failed to issue the satisfaction of the note and the aforementioned supra releases, after filing the DEED which allegedly satisfied the note in full. All because Aaron Twersky VP of the First Defendant, allegedly felt that he couldn't recoup the First Defendant's money from foreclosure or from selling the DEED.  Therefore he had motive and created an

93

opportunity to get the DEED placed in escrow, file the DEED before March 22, 2017, try to sell the properties.

19) The Plaintiff alleges that the First Defendant and VP Aaron Twersky's  Motive for his failure to issue the releases, was to create an opportunity for the First Defendant to try to recoup additional monies from the Plaintiff. VP Aaron Twersky knew that had he not failed to issue the satisfaction of the note and the releases of the note and mortgage, the First Defendant could not  have filed a counterclaim against the Defendant for $842,000 +.

The Plaintiff makes his allegations in all counts and causes of action a part of the Cause of action.

---

## AS TO THE FIRST DEFENDANT

## THE PLAINTIFF ALLEGES THE FOLLOWING

## COUNT II

## BREACH OF CONTRACT

I.

The Plaintiff alleges the following,

1) The parties entered into an escrow agreement dated February 2, 2017.

2) The Plaintiff performed under the escrow agreement in so far as the Plaintiff put the DEED in escrow, as the escrow agreement required him to do, to secure the $272,751.07 amount to satisfy the note in full on or before March 22, 2017.

3) The Defendant filed the DEED in escrow, before the March 22, 2017 expiration date of the escrow agreement.

4) The First Defendant agreed to accept $272,751.07 on or before March 22, 2017 to satisfy the note in full.

5) The Deed in escrow provided security for the note.

6) The First Defendant filed the DEED, on March 21, 2017, which was during the period of the escrow agreement.

7) The Plaintiff alleges that the language is unambiguous and the Plaintiff expectation was that the $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full.

8) The Plaintiff alleges that the value of the DEED was at least $672,300. The value of the properties was at least $672,300, evidenced by the City of Meriden 2016 appraisal value shown on its property cards.  At the time of the filing of the DEED in escrow, there was a $100,000 second position mortgage lien on the subject properties. Therefore the value of the property less the second position mortgage lien was $572,300, which exceeded the agreed upon amount of $272,751.07 to satisfied the note in full.

9) The agreed upon amount to satisfy the note in full during the escrow agreement period was $272,751.07.

10) The First Defendant allegedly filed the DEED on March 21, 2017, then allegedly breached the escrow agreement as the First Defendant failed to issue the Plaintiff the satisfaction of note and to issue the mortgage and guarantor releases.

11) The Defendant also failed to issue the Plaintiff $299,548.93, which is the difference between the $272,751.07 and the net value of the properties ($572,300).  The net value of the properties is alleged to be at least $572,300.

12) The Plaintiff has also alleged that provision # 4 violates his constitutional rights, public policy, and therefore this provision is allegedly unenforceable, as Courts have generally refused to enforce a provisions in a contract that violates public policy, prohibits and restrict in whole or in part a person Constitutional right to file Bankruptcy or Constitute right to petition the government for redress of grievances by filing a action in Court.

13) The Plaintiff alleges that provision # 4 allegedly violates Public Policy, his constitutional rights and the courts have generally refused to enforce provisions in contracts where said provisions prohibits and restrict a party from filing bankruptcy in whole or in part. Courts have also refused to enforce any provisions (not just provisions that prohibits and restrict a party from filing bankruptcy in whole or in part) in a contract that violates Public Policy, prohibits and or restrict in whole or in part a person Constitutional right to file

Bankruptcy or Constitute right to petition the government for redress of grievances by filing a action in Court.

14) The Plaintiff also alleges provision # 4 of a contract that prohibits and restricts the Plaintiff from any court filing also violates public policy.

15) Courts have held that a provision of a contract which violates Public Policy will not be enforced, however, the remainder of the provisions that are not in violation of public policy (General Statutes & or common law) are enforced.

16) The Plaintiff alleges that provision # 4 is allegedly unenforceable. The Plaintiff alleges that there was no breach of the Escrow Agreement on March 21, 2017, (as provision #4 is allegedly unenforceable) prior to the Defendant filing the DEED in escrow and then refusing and failing to issue the releases.

17) On March 21, 2017, (which was during the period of the escrow agreement) the Defendant acted upon provision #4 of the escrow agreement (said provision allegedly violates Public Policy) and filed the Deed before March 22, 2017. The Defendant took title to the subject mortgage properties (that allegedly secured the note and allegedly secured the $272,751.07 that they agreed to accept to satisfy the note) which was allegedly valued at least $672,300, when they filed the DEED on March 21, 2017.

5) The Defendant stated in the escrow agreement that they agreed to accept (on or before March 22, 2017) $272,751.07 from the Plaintiff to satisfy the note in full and as additional security for the $272,751.07 (which would satisfy the note in full) the Plaintiff would place the DEED in escrow, which could be filed by the Defendant, as the DEED secured the amount to satisfy the note in full. The value of the subject properties allegedly exceeded $272,751.07. The Defendant has allegedly caused injury to the Plaintiff as the Defendant has filed the DEED AND has refused and failed to perform its duty to issue the releases.

18) The Defendant allegedly included at least one provisions that allegedly violated public policy, his constitutional rights in the escrow agreement. The escrow agreement stated in provision #4 that the "Mortgagor ( Plaintiff ) is hereby prohibited and restricted from filing any action in Bankruptcy Court or any other Court that would delay or stay the terms of this agreement, whether intended or not. Mortgagor consents and acknowledges that filing of any kind by Mortgagor, or any agent, shall be treated as an

immediate unwaivable breach of this agreement and Mortgagor authorizes Twersky to release, record and file the Deed accordingly". This provision allegedly violates Public Policy, and the courts have refused to enforce provisions in contracts where said provisions restrict a party from filing bankruptcy in whole or in part. Courts have also refused to enforce any provisions (not just provisions that restrict a party from filing bankruptcy in whole or in part) in a contract that violates Public Policy. The Plaintiff also alleges provision # 4  of a contract that restricts the Plaintiff from any court filing also violates public policy.

19) The Plaintiff alleges that provision #4 violates Public Policy, his constitutional rights and alleges that this provision is unenforceable. If this court finds that this provision violates public policy and is unenforceable, then the Plaintiff alleges that as of March 21, 2017, there was no breach of the Escrow Agreement until the Defendant filed the DEED on March 21, 2017, then failed and refused to issue the aforementioned supra releases.

20) The Plaintiff alleges that he suffered injury as a result of the First Defendants aforementioned supra actions. The Defendant failed to issue the releases for the note, mortgage and guarantor as they were allegedly obligated to issue (pursuant to the escrow agreement) if they filed the DEED on or before March 22, 2017, because the note was allegedly satisfied in full as a result of the filing of the DEED by the Defendant. As a result of this failure to issue the releases Plaintiff has suffered injury which includes compensatory damages of at least the Plaintiff lost equity of $299,548.93.

23) The Plaintiff alleges that he suffered injury as a result of the First Defendants aforementioned supra actions.The Defendant has filed a counterclaim to collect $842,000+ plus from the Plaintiff. The Plaintiff alleges that had the Defendant not allegedly breached the escrow agreement and issued the releases of the note, mortgage and guarantor, he could not had a basis to  filed a counterclaim to collect $842,000 + under the aforementioned note.

24) The Plaintiff alleges that he suffered injury as a result of the First Defendants aforementioned supra actions. The Plaintiff must suffer the emotional stress of defending the Defendants counterclaims and the stress of litigating his law suit against the Defendants, to get proper relief.

## AS TO THE FIRST DEFENDANT

## THE PLAINTIFF ALLEGES THE FOLLOWING

## COUNT III

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**I.**

**1)** The Plaintiff alleges that the first Defendant intended to Inflict Emotional Distress and  they knew or should have known was a likely result of their conduct and that the Defendants conduct was outrageous.

2) The Plaintiff alleges that Aaron Twersky, had motive and opportunity to commit fraud and to wrongfully and unlawfully circumvent the foreclosure process and he had conscious behavior of recklessness. VP Aaron Twersky told the NY Court (in a law suit filed in March 2015, against its former vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and **impossible** to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss.

2) The Plaintiff alleges that Aaron Twersky (acting in his capacity of Vice President of the First Defendant) then plotted to allegedly wrongfully and unlawfully circumvent the foreclosure process, in order to get the Plaintiff's  DEED to his properties, without going through the foreclosure process, which included alleged Intentional Infliction of Emotional Distress on the Plaintiff.

3) The Plaintiff alleges that The first Defendant abused his position of power, had superior knowledge over the Plaintiff.

4) The Plaintiff alleges that The first Defendant Made January 25, 2017 representations, promises and written misstatement of material facts and omissions, and omitted to condition said representations, promises and written misstatement of material facts, on the Plaintiff executing an escrow agreement.

5) The Defendant allegedly Intentionally and Negligently Misrepresented by Nondisclosure. On January 30, 2017, the Defendant conditioned his acting upon its representations, promises and written misstatement of

material facts on the Plaintiff executing an escrow agreement. Even after knowing that the Plaintiff told him on January 24, 2017, no to executing any escrow agreement, he induced the Plaintiff to rely upon his January 25, 2017 representations, promises and written misstatement of material facts and even after knowing that the Plaintiff so acted and relied upon the Defendant's January representations, promises and written misstatement of material facts.

6) The Plaintiff alleges that the Defendant abused his position as the lender and lien holder of the Plaintiff's subject properties 9-11 & 13-17 Colony St., Meriden CT 06451, by making representations, promises and written misstatements of material fact and omissions on January 25, 2017, said representation, promises and written misstatements of material facts and omissions were not conditioned on the Plaintiff executing any escrow agreement. The Defendant issued his representation, promises and written misstatement of material facts and omissions to the Defendant (free of any escrow agreement condition) one day after the Plaintiff told the Defendant that he would not put the DEED in escrow. The Plaintiff relied upon the Defendant's promise to pay the arrears /delinquent taxes and redeem the properties on or before February 3, 2017. As a result the Plaintiff, instead of seeking funds (from other sources) to pay the arrears/delinquent taxes and redeem the properties before February 3, 2017, or seeking current and immediate Bankruptcy counseling and then filing for Bankruptcy protection (which could stop the filing of the tax sale deed), the Plaintiff continued to work on the refinancing to pay the Defendant the $180,000 settlement amount and the $92,684.09 to reimburse the Defendant for the redemption of the properties, as per the Plaintiff's January 25, 2017 representations, promises, written misstatement of material facts and omission, ,made by the defendant to the Plaintiff.

7) The Plaintiff alleges that The first Defendant on January 30, 2017 days before the end of the tax sale redemption period, the Defendant conditioned its acting upon its representations, promises and written misstatement of material facts, upon the Plaintiff executing an escrow agreement, knowing that the Plaintiff would be put under Emotional distress out of fear of losing his properties, if the Defendant failed to act upon its January 25, 2017 representations, promises and written misstatement of material facts.

8) The Plaintiff alleges, that on or around January 30, 2017 (four days before the end of the redemption period which is February 3, 2017 and after the Defendant in its January 25, 2017 payoff/demand letter agreed to pay the arrears/delinquent taxes in the amount of $92,684.09) the Defendant told the Plaintiff by email that the only way he would now consider paying the arrears/delinquent taxes, thereby redeeming the properties, is if the Plaintiff agreed to put the DEED in escrow and if the Plaintiff doesn't agree with these terms they will not redeem the properties by paying the arrears/delinquent taxes. Therefore, the Plaintiff would lose the properties, as the tax DEED would be filed. Defendant also told the Plaintiff that he must give him an answer by January 31, 2017. The Plaintiff alleges that these representations and conditions were not made by Defendant to the Plaintiff in his January 25, 2017 aforementioned representations, promises and written misstatement of material facts and omissions.

9) The Plaintiff alleges that he told the Defendant that he didn't want to give the Defendant the DEED and that the Defendant should act upon their (on January 25, 2017) representations, promises and written misstatement of material facts and omissions, they made to the Plaintiff and pay the arrears/delinquent taxes, as they represented to the Plaintiff (on January 25, 2017) that they would pay the arrears/delinquent taxes in order to redeem the properties on or before February 3, 2017 and said tax payment was not conditioned on an escrow agreement or new and additional conditions.

10) The Plaintiff alleges that Defendant told the Plaintiff to sign the documents or lose your properties. This is your last chance. The Defendant then told the Plaintiff that he was not going to change a word in the escrow agreement and the new DEED.

11) The Plaintiff felt under extreme emotional distress and felt that his choices were limited, therefore the Plaintiff executed the escrow agreement and the Deed and suffered injury, as the Defendant has filed the DEED and the Plaintiff has lost his properties to the Defendant. The Defendant has also failed to issue the releases, and the Plaintiff alleges the escrow agreement obligates the Defendant to issue said releases. The Plaintiff alleges the DEED secured the amount to satisfy the note in full. The Plaintiff alleges that the Defendant inflicted emotional distress on the Plaintiff by its alleged failure to issue the acknowledgement of the satisfaction of the note and the releases, of the note, mortgage and guarantor.

12) The Plaintiff alleges that the Defendant allegedly further Intentionally Inflicted Emotional Distress on the Plaintiff by its failure to issue the releases of the note, mortgage and guarantor, after filing the DEED which allegedly satisfied the note in full, pursuant to the escrow agreement, that the Defendant freely entered into.

13) The Defendant allegedly further Intentionally Inflicted Emotional Distress on the Plaintiff by its filling of a counterclaim (in the amount of $842,000 +) to collect on a note that is allegedly already satisfied in full.

14) The Defendant allegedly further Intentionally Inflicted Emotional Distress on the Plaintiff by its failure to issue the Plaintiff the satisfaction of the note and the releases of the note, mortgage and guarantor and to compensate the Plaintiff for his lost equity. The First Defendant's aforementioned supra failure, is in large part the subject of this law suit.

15) The Plaintiff alleges that the Defendant's conduct was the cause of his Emotional distress and the Emotional distress sustained by the Plaintiff was severe.

16) The Plaintiff alleges that collecting creditors have been held liable for their abuse of their position. Thus, even lesser offensive behavior, when perpetrated by a person in a position of power, may rise to a level of outrageous conduct.

17) The Plaintiff alleges that the Defendant is the lender, note & mortgage holder and has the power to affect the Plaintiff's interest in his properties and its conduct was outrageous.

18) The Plaintiff alleges that the Defendant's actions exceeds all bounds tolerated by decent society.

19) The Plaintiff alleges that the Defendant intended to inflict Emotional distress.

20) The Plaintiff alleges that the Defendant knew or should have known that Emotional distress was a likely result of the Defendant's aforementioned supra conduct in its lender borrower relationship with the Plaintiff.

21) The Plaintiff alleges Defendant's conduct was extreme and outrageous and this outrageous conduct was a direct cause of the Plaintiff's Emotional distress.

22)  The alleged Emotional distress sustained by the Plaintiff (as a direct result of the Defendant's actions) was severe.

23) The Plaintiff alleges that he suffered injury as the Plaintiff was forced and felt no meaningful choice, as a result of the Defendant's (aforementioned supra) conduct, to sign an escrow agreement and a DEED to his properties, that was put in escrow which resulted in the Plaintiff losing title to his properties.

24) The Plaintiff alleges that the Defendant's aforementioned actions supra (in this complaint) caused Emotional distress to the Plaintiff. The Plaintiff suffered Emotional injury which manifested in physical injury. The Plaintiff has trouble sleeping, and is very stressed, because of the Emotional distress (that resulted in physical symptoms) as a direct result of the extreme and outrageous conduct.

25) The Defendant allegedly put the Plaintiff under additional emotional distress.  In an effort to prevent the Plaintiff from bringing an action in a court of law the escrow agreement (allegedly violated public policy, his constitutional rights) when it stated that the Mortgagor (Plaintiff) is hereby prohibited and restricted from filing any action in Bankruptcy Court or any other Court that would delay or stay the terms of this agreement, whether intended or not. It further states Mortgagor consents and acknowledges that filing of any kind by Mortgagor, or any agent, shall be treated as an immediate unwaivable breach of this agreement and Mortgagor authorizes Twersky to release, record and file the Deed accordingly. The Defendant allegedly sought to take away the Plaintiff's constitutional rights.

26) The Plaintiff alleges that instead of the Defendant exercising the right that a bona fide mortgage holder of real property has at law, which is foreclosure, the Defendant allegedly chose to inflict emotional distress on the Plaintiff.

27) The Plaintiff is not an attorney and the Defendant is an attorney. The Defendant had superior knowledge over the Plaintiff and there was a great imbalance of power in the relationship, which favored the Defendant.

28) The Plaintiff alleges that the Defendant further abused his power as an attorney over of the Plaintiff, (who is a non attorney) by drafting an unconscionable, harsh, one sided escrow agreement, without giving the Plaintiff more than a few minutes to possibly call an attorney in order to have an attorney review the escrow agreement and DEED before signing them both.

The Plaintiff makes his allegations in all counts and causes of action a part of the Cause of action.

**AS TO THE FIRST DEFENDANT**

**THE PLAINTIFF ALLEGES THE FOLLOWING**

**COUNT IV**

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

I.

1) The Plaintiff alleges that the Defendant's conduct in its lender borrower relationship with the Plaintiff created an unreasonable risk of causing the Plaintiff Emotional distress.

2) The Plaintiff alleges distress was foreseeable by the Defendant as the Defendant should have known that his alleged aforementioned conduct, supra, in all the Count I, II, III (CUTPA, BREACH OF CONTRACT, IIED) and all counts of this complaint would cause the Plaintiff Emotional Distress and injury.

3) The Plaintiff alleges that the alleged injury to the Plaintiff was foreseeable by the Defendant. The Plaintiff alleges that it was foreseeable to the Defendant that the alleged injury to the Plaintiff would have occurred as a result of the Defendant The Plaintiff's allegations in Count I, II, III (CUTPA, BREACH OF CONTRACT, IIED) and all counts of this complaint would cause the Plaintiff Emotional Distress and injury.

4) The Plaintiff alleges Emotional distress was severe enough that it might result in illness or bodily harm and did result in illness and bodily harm to the Plaintiff.

5) The Plaintiff alleges that it is foreseeable that the Defendant's failure to issue the release of the note, mortgage and guarantor, after filing the DEED (was allegedly valued at least $672,300 & which was before the expiration of the escrow agreement) which secured the note and the $272,751.07 that the Defendant agreed to accept to satisfy the note in full, then failing and refusing to issue the releases of the note, mortgage and guarantor could cause injury to the Plaintiff.

6) The Plaintiff restates its allegations that are contained in Count I, II & III and all of the counts of this complaint and make them a part of Count IV.

**AS TO THE FIRST DEFENDANT**

**THE PLAINTIFF ALLEGES THE FOLLOWING**

**COUNT V**

**NEGLIGENCE**

I.

1) The Plaintiff alleges that the Defendant had a cognizable duty of Care owed to the Plaintiff and Breached it.

2) The Plaintiff alleges that Aaron Twersky, had motive and opportunity to commit fraud and to wrongfully and or unlawfully circumvent the foreclosure process and he had conscious behavior of recklessness.

3) VP Aaron Twersky told the NY Court (in a law suit filed in March 2015, against its former vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and **impossible** to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss.

4) The Plaintiff alleges that Aaron Twersky ( acting in his capacity of vice President of the First Defendant) then plotted to allegedly wrongfully and unlawfully circumvent the foreclosure process, in order to get the Plaintiff's DEED to his properties, without going through the foreclosure process.

5) The Plaintiff alleges that the First Defendant had a duty to use reasonable care and breached that duty by its failure to act upon its January 25, 2017 representations, promises and written misstatement of material facts and omission, without adding new preconditions at the eleventh hour on January 30, 2017.

6) The Plaintiff alleges that the First Defendant knew that the Plaintiff relied upon the First Defendant's representations, promises and written misstatement of material facts and omissions and the First Defendant also knew that its failure to act on its January 25, 2017 representations, promises and written misstatement of material facts and omission, without adding new preconditions at the eleventh hour on January 30, 2017 could and would cause injury to the Defendant.

7) The Plaintiff alleges that the Plaintiff suffered injury as he felt that he had no meaning choice but to escrow his DEED, he did so and lost his properties, as a result of the Defendant's alleged breach.

8) The Plaintiff alleges that the Plaintiff's injury was foreseeable by the First Defendant.

9)  The first Defendant knew or should have known that the Plaintiff could lose his properties as a result of the first defendant alleged aforementioned supra breach of its duty to use reasonable care.

10) The Plaintiff alleges that the First Defendant had a duty to use reasonable care and breached that duty by its failure to use reasonable care and issue the satisfaction of the note, and the releases for the note, mortgage and guarantor, pursuant to the escrow agreement and it was foreseeable that its failure could and would cause injury to the Defendant.

11) The Plaintiff alleges that the Plaintiff suffered injury as a result of the First Defendant's alleged breach of it Duty. The First Defendant's failure to issue the aforementioned satisfaction of the note and the releases of the note, mortgage and guarantor would have barred the First Defendant from filing a counterclaim to collect $842,000+ on a note that is allegedly already satisfied.

12)  The First Defendant had a duty to use reasonable care and breached that duty by its failure to disclose the commissions paid to its Vice President Escandon, in any of the loan closing documents or any related documents, and such failure cased foreseeable injury to the Plaintiff, as the Plaintiff should have only paid $89,500 in interest, instead of $112,500.

13) The Plaintiff alleges that if it knew that the $23,000 difference was a commission paid to Escandon from the loan proceeds, he would not have agreed to it.

14) The Plaintiff alleges that the First Defendant  had a duty to use reasonable care and breached that duty by its failure to issue the releases and satisfaction of the note and mortgage and release of guarantor.

15) The Plaintiff alleges that the Plaintiff suffered injury ( that was foreseeable by the first Defendant)  as a result of the Defendant's failure to issue the satisfaction of the note and the releases.

16) The Plaintiff alleges that as a result of the Defendant's failure, the Plaintiff suffered injury that was foreseeable by the Defendant. The Plaintiff now has to defend a counterclaim to collect $842,00+ on a note that is already allegedly satisfied.

17) The Plaintiff alleges that the First Defendant  had a duty to use reasonable care and breached that duty by including at least one or more provisions in the escrow agreement that allegedly violates public policy, Statutory and or Common Law.

18) The Defendant included provision #4 which prohibits and restrict Bankruptcy filing and it was foreseeable by the Defendant that the inclusion of provisions in #4 could and did cause injury to the Plaintiff.

19) The Plaintiff alleges that the First Defendant admitted that it filed the DEED pursuant to provision #4, which a provision that the Plaintiff alleges violates public policy.

20) The Plaintiff suffered injury as a result of the Defendant's action, as he lost his Properties, lost his equity in his properties, received no satisfaction of note, and the aforementioned releases of the note, mortgage and guarantor. Now the Plaintiff has to defend a counterclaim filed by the Defendant.

21) The Plaintiff alleges that the First Defendant had a duty to use reasonable care and breached that duty by its failure to refrain from interfering with the Plaintiff's ability to perform his obligations under the one year term of the note. After the execution by the parties of the note, mortgage and loan documents, the First Defendant made new demands upon the Plaintiff, during the term of the note and said new demands were not included in the express terms of the note and or mortgage.

22) The Plaintiff alleges the formation of the note and mortgage agreements on or around June 6, 2012.

23) The Plaintiff has alleged that the First Defendant former VP Gary Escandon allegedly interfered with and hindered  his ability to perform under the term of the note. VP Escandon demanded that the Plaintiff not open the first floor of this property without opening the second floor at the same time, which was not a condition of the note or mortgage. VP Escandon's new demands interfered with and hindered the Plaintiff's ability to open his restaurant and generate enough income to pay back the loan within one year or refinance within one year and payoff the loan.

24) The Plaintiff alleges that to open the second floor a sprinkler system is required by The City of Meriden building and fire Code.

25) The Plaintiff alleges that he discovered after the loan closing that there was no fire protection water main coming into the properties from the street. Therefore he could not install a sprinkler system, which was a City of Meriden Building and Fire Department condition to opening the second floor.

26) The Plaintiff alleges that after the Plaintiff discovered this he told VP Escandon that (in light of the fact that the loan term was one year) the Plaintiff would move forward and open the first floor.

27) The Plaintiff alleges that the First Defendant (VP Escandon) told the Plaintiff no and if the Plaintiff opened the First floor without opening the second floor he would call the note and sue him for the money back.

28) The Plaintiff alleges that he followed VP Escandon instructions of not to open the 1st floor without opening the second floor at the same time instruction and suffered injury, as he could not open and generate any income from his restaurant within one year as a result of the VP Escandon new demands and as a result the Plaintiff defaulted on the loan.

29) The Plaintiff alleges that a determination ordinary person in the Defendant's position, knowing what the Defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely.

30) The Plaintiff alleges that on the basis of public policy analysis, of whether the Defendant's responsibility for its negligent conduct should extend to the particular consequences or particular Plaintiff in the case" such analysis shows that the Defendant's responsibility for its negligent conduct should extend to the particular consequences or particular Plaintiff in the case"

31) The Plaintiff alleges that every contract contains an implied Covenant of Good Faith and Fair Dealings. The Defendant had a duty to exercise reasonable care of Good Faith and Fair Dealings and allegedly failed to do so. The Defendant allegedly acted in Bad Faith.

32) The Plaintiff alleges that the Defendant acted in Bad Faith and with sinister motive, as the first Defendant entirely failed to disclose the $23,000 commission it paid to Escandon.

33) The Plaintiff alleges that the Defendant acted in Bad Faith and with sinister motive, as the first interfered with the Plaintiff ability to perform under the note, by his aforementioned alleged new demand place upon the Plaintiff by the first Defendant. Don't open the first floor without opening the second floor at the same time.

34) The Plaintiff alleges that the Defendant acted in Bad Faith and with sinister motive, as the first Defendant allegedly wrongfully and unlawfully plotted and conspired with the Second Defendant to circumvent the foreclosure process.

35) The Plaintiff alleges that the Defendant acted in Bad Faith and with sinister motive, as the first and second conspired with the second Defendant to alleges violate the tax sale rules and communicate with the winning tax sale bidder during the tax sale redemption period, in an effort to avoid the foreclosure process by selling the note to The winning tax sale bidder.

36) and the Defendant also is suing the plaintiff to collect money on the subject note after it has allegedly been satisfied in full, before the Court rules on Provision #4 of the escrow agreement.

37) The Plaintiff alleges that the Defendant acted in Bad Faith not Good Faith and with sinister motive, as the Defendant allegedly breached that duty by its failure to act upon its January 25, 2017 representations, promises and written misstatement of material facts and omission, without adding new preconditions at the eleventh hour on January 30, 2017.

38) The Plaintiff alleges that the Defendant acted in Bad Faith, not Good Faith and with sinister motive, as the Plaintiff alleges that the First Defendant knew that the Plaintiff relied upon the First Defendant's representations, promises and written misstatement of material facts and omissions and the First Defendant also knew that its failure to act on its January 25, 2017 representations, promises and written misstatement of material facts and omission, without adding new preconditions at the eleventh hour on January 30, 2017 could and would cause injury to the Plaintiff.

39) The Plaintiff alleges that the Defendant acted in Bad Faith not Good faith and with sinister motive, as the Defendant The Plaintiff alleges that the First Defendant allegedly breached that duty by its failure to use reasonable care and issue the satisfaction of the note, and the releases for the note, mortgage and guarantor, pursuant to the escrow agreement and it was foreseeable that its failure could and would cause injury to the Defendant.

40) The Plaintiff alleges that the Defendant acted in Bad Faith not Good Faith and with sinister motive, as the Defendant The Plaintiff alleges that the Plaintiff suffered injury as a result of the First Defendant's alleged breach of it Duty. The First Defendant's failure to issue the aforementioned satisfaction of the note and the releases of the note, mortgage and guarantor would have barred the First Defendant from filing a counterclaim to collect $842,000+ on a note that is allegedly already satisfied.

41) The Plaintiff alleges that the Defendant acted in Bad Faith not good Faith and with sinister motive, as the Defendant included provision #4 which prohibits and restricts Bankruptcy filing and it was foreseeable by the Defendant that the inclusion of provisions in #4 could and did cause injury to the Plaintiff.

42) The Plaintiff alleges that the First Defendant admitted that it filed the DEED pursuant to provision #4, which a provision that the Plaintiff alleges violates public policy.

43) The Plaintiff alleges that the Defendant's Extreme and outrageous character of conduct arise from an abuse of his position and relation with the Plaintiff, that gave the Defendant an actual or apparent authority over the Plaintiff (in their borrower lender relationship) and or power to affect his interests in the Plaintiff's property.

44) The Plaintiff is not an attorney and the Defendant is an attorney. The Defendant had superior knowledge over the Plaintiff and there was a great imbalance of power in the relationship, which favored the Defendant.

45) The Plaintiff alleges distress was foreseeable by the Defendant as the Defendant should have known that his alleged aforementioned conduct, supra, in all the counts of this complaint would cause the Plaintiff Emotional Distress and injury. The Plaintiff alleges that the alleged injury to the Plaintiff was foreseeable by the Defendant.

46) The Plaintiff alleges Emotional distress was severe enough that it might result in illness or bodily harm and did result in illness and bodily harm to the Plaintiff.


The Plaintiff makes his allegations in all counts and causes of action a part of the Cause of action. (Count V)

**AS TO THE FIRST DEFENDANT**

**THE PLAINTIFF ALLEGES THE FOLLOWING**

**COUNT VI**

**FRAUDULENT MISREPRESENTATION**

I.

The Plaintiff alleges that Aaron Twersky and Gary Escandon (acting in their capacity as VP of the First Defendant) had motive and opportunity to commit fraud and both had conscious behavior of recklessness.

1) The Plaintiff, alleges that Gary Escandon on or around June 6, 2012 (acting in his capacity as Vice President of the First Defendant) Intentionally made written misstatement of material facts and omission in the loan closing documents, where he correctly stated that the loan origination fee, which was the mortgage brokers commission, was $37,500 and made a written misstatement of material facts and omission by stating the interest payments that the Plaintiff had to pay during the one year term of the note was $112,500.

2) They Plaintiff alleges On or around January 2016 that he discovered that these statements were known to be untrue by the First Defendants VP Gary Escandon and he made these written misstatements of material fact to induce the Plaintiff to execute the loan documents.

3) The Plaintiff alleges that the Plaintiff did so execute the loan documents and suffered injury, as he paid $112,500 in interest and the Plaintiff alleges that he discovered that the actual amount that went to interest was interest was $89,500.

4) The Plaintiff alleges that the First Defendant disclosed to him and in the loan documents that he would have to pay $112,000 in interest payment over the one year term of the note and that the loan origination fee which was the mortgage brokers commission was $37,500.

5) The Plaintiff alleges that the Plaintiff discovered that the First Defendant paid a $23,000 commission to its VP Escandon and the Plaintiff alleges rational minds could reasonably and logically draw the necessary inferences to determine that the $23,000, of the $112,500 that was disguised as interest payments was in fact allegedly a commission paid by the First Defendant to Escandon. Therefore the actual amount of interest that the Plaintiff should have paid was $89,500 and not $112,500.

6) The Plaintiff has alleged that he would not have agreed to the VP Escandon commission.

7) The Plaintiff alleges that he suffered  injury of at least $25,000.

8) The Plaintiff has alleges with particularity. The Plaintiff alleges that the Defendant's representative and Vice President Aaron Twersky (acting in his capacity of Vice President of the First Defendant) Intentionally made the aforementioned supra January 25, 2017 verbal and written representations, promises and written misstatement of material facts and omission to the Plaintiff by phone on January 25, 2017 and in the Defendants January 25, 2017 payoff/demand letter, executed by VP Aaron Twersky on January 25, 2017.

9) The Plaintiff alleges that VP Aaron Twersky had motive, means and opportunity to commit fraud and to wrongfully and or unlawfully circumvent the foreclosure process and he had conscious behavior of recklessness.

10) The Plaintiff alleges that VP Aaron Twersky told the NY Court (in a law suit filed in March 2015, against its former vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and **impossible** to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss.

11)  The  Plaintiff  alleges  that  the  Defendant's  Vice  President  Aaron  Twersky  Intentional   made representations, promises, written misstatement of material fact and omissions on January 25, 2017 by phone to the Plaintiff and in the January 25, 2017 payoff /demand letter addressed to Riverdale Funding and sent to the Plaintiff (which is just one day after January 24, 2017, which is the day that the Aaron Twersky asked the Plaintiff to put the DEED in escrow and the Defendant said no) said Intentional representations, promises and written misstatement of material facts and omission, made by Aaron Twersky on January 25, 2017 was made by Aaron Twersky because he had motive, means and opportunity to allegedly wrongfully and unlawfully circumvent the foreclosure process.

12) The Plaintiff alleges that Aaron Twersky Told the NY Court that the First Defendant it would be **impossible**  for the first Defendant to recoup their money by foreclosure and foreclosure would be unfulfilling.

13) The Plaintiff alleges that Aaron Twersky had motive and opportunity to wrongfully and unlawfully get the DEED to the Plaintiff properties without foreclosing. On January 25, 2017, the Defendant made representations, promises, written misstatement of material fact and omissions in the January 25, 2017 payoff /demand letter addressed to Riverdale Funding and sent to the Plaintiff when the Defendant stated that he would pay the arrears/delinquent taxes. Said payment was not conditioned on the Plaintiff signing an escrow agreement and signing a new DEED conveying the properties to the Defendant.

14) The Plaintiff alleges that the Defendant made these representations, promises, written misstatements of material fact and omissions in order to allegedly induce the Plaintiff to rely upon the Defendant's representations, promises, written misstatement of material fact and omissions, which stated that the Defendant would make the aforementioned payment thereby redeeming the subject properties from the tax sale.

15) On January 25, 2017, the Defendant omitted to condition the tax payment on the Plaintiff executing any escrow agreement and or convey the DEED to the subject properties to the Defendant.

16) The Plaintiff alleges that he would not have acted upon and relied upon the Defendant's January 25, 2017 written representations, promises, misstatement of material fact and omissions, if the Defendant had conditioned the January 25, 2017 representations, promises, written misstatements of material fact and omission, on the condition that the Plaintiff execute the escrow agreement and or convey the DEED to the subject properties to the Defendant.

17) The Plaintiff alleges that the Plaintiff so acted on Defendant's January 25, 2017 representations, promises, written misstatement of material fact and omission and the Plaintiff suffered injury as a result.

18) The Plaintiff relied upon the Defendant's representations, promises, written misstatement of material fact and omissions to pay the arrears/delinquent taxes free and clear of any condition to sign any escrow agreement and any condition to convey of the title to the subject properties, by signing the DEED and the Plaintiff suffered injury.

19) The Plaintiff alleges that he acted upon those January 25, 2017 representations, promises and written misstatement of fact and omissions and suffered injury. The Plaintiff relied upon the Defendant's promise to

pay the arrears /delinquent taxes and redeem the properties on or before February 3, 2017. The Plaintiff alleges that he relied upon and acted upon the Defendant's January 25, 2017 representations, promises, written misstatement of material fact and omission. As a result of such reliance the Plaintiff, instead of seeking funds (from other sources) to pay the arrears/delinquent taxes and redeem the properties before February 3, 2017, or seeking current and immediate Bankruptcy counseling  and then filing for Bankruptcy protection (which could stop the filing of the tax sale deed), the Plaintiff continued to work on the refinancing to pay the Defendant the $180,000 settlement amount and the $92,684.09 to reimburse the Defendant for the redeeming of the properties as per the Plaintiff's January 25, 2017 representations to the Plaintiff.

20) The Plaintiff alleges that the Defendant motive and opportunity to commitment fraud, as he wanted to stall the Plaintiff from seeking funds to redeem the properties or from filing for bankruptcy, by agreeing to pay the arrears tax before the end of the redemption period without any escrow agreement condition.

21) The Plaintiff alleges that The Defendant knew at the eleventh hour the Plaintiff wouldn't have time to secure funds to pay the arrears taxes or seek bankruptcy counseling. The Defendant allegedly had motive and opportunity to allegedly wrongfully and unlawfully circumvent the foreclosure process and get the DEED to the subject properties.

22) Even after the Defendant allegedly knowing that the Plaintiff relied upon his representations, promises, written misstatements of material fact and omissions, to pay the arrears /delinquent taxes to redeem the properties ( free and clear of any escrow agreement condition and any signing of a new DEED), on or around January 30, 2017 (four days before the end of the redemption period, which is February 3, 2017 and after the Defendant in its January 25, 2017 payoff/demand letter represented that it would pay the arrears/delinquent taxes in the amount of $92,684.09) the Defendant told the Plaintiff by email that the only way he would now consider paying the arrears/delinquent taxes, thereby redeeming the properties, is if the Plaintiff agreed to put the DEED in escrow and if the Plaintiff  doesn't agree with these terms, they will not redeem the properties by paying the arrears/delinquent taxes. Therefore, the Plaintiff would lose his properties, as the tax DEED would be filed.

23) The Plaintiff alleges that Defendant also told the Plaintiff that he must give him an answer by January 31, 2017.

24) The Plaintiff alleges that these representations and conditions were not made to the by the Defendant to the Plaintiff in his January 25, 2017 aforementioned representations, promises, written misstatement of material facts and omissions.

25) The Plaintiff alleges that the Plaintiff told the Defendant that he didn't want to give the Defendant the DEED and that the Defendant should act upon its (January 25, 2017) representations, promises, written misstatement of material facts and omissions, made to the Plaintiff and pay the arrears/delinquent taxes, as they represented to the Plaintiff (on January 25, 2017) that they would pay the arrears/delinquent taxes in order to redeem the properties on or before February 3, 2017 and said tax payment was not conditioned on an escrow agreement or new and additional conditions.

26) The Plaintiff alleges that the Defendant told the Plaintiff to sign the documents or lose your properties. This is your last chance. The Defendant then told the Plaintiff that he was not going to change a word in the escrow agreement and the new DEED.

27) The Plaintiff felt under extreme emotional distress and felt that his choices were limited, therefore the Plaintiff executed the escrow agreement and the Deed. and suffered injury, as the Defendant has filed the DEED and the Plaintiff has lost his properties to the Defendant.

28) The Plaintiff alleges that The Defendant has also failed to issue the releases that the Plaintiff alleges the escrow agreement allegedly obligates the Defendant to issue said releases.

29) The Plaintiff alleges the DEED secured the $272,751.07 amount to satisfy the note in full during the escrow agreement period.

30) The Plaintiff alleges that the Defendant wanted to stall the Plaintiff from seeking funds to redeem the properties and or from filing for bankruptcy. Therefore the Defendant agreed to pay the arrears tax before the end of the redemption period and failed to do so, without new conditions. The Defendant knew at the eleventh hour the Plaintiff wouldn't have time to secure funds to pay the arrears taxes or seek bankruptcy

counseling. The Defendant allegedly had motive and opportunity to commit fraud and allegedly wrongfully and unlawfully circumvent the foreclosure process.

31) The Plaintiff relied upon the Defendant's representations, promises, written misstatement of material fact and the omission, which stated that the Defendant would pay the arrears taxes. The Defendant failed to act upon its January 25, 2017 representations, promises, written misstatement of material fact and the omission and added new conditions, resulting in injury to the Plaintiff.

32) The Plaintiff felt under extreme emotional distress and felt that his choices were limited, therefore the Plaintiff executed the escrow agreement and the Deed and lost his properties. To make matters worse the Defendant has failed to issue the releases for the note, mortgage and guarantor.

33) The Plaintiff alleges that VP Aaron Twersky knew that he was not going to act upon his January 25, 2017 representations, promises and written misstatement of material facts and omission, which didn't include an escrow agreement precondition to the Defendant paying the arrears tax before the end of the tax sale redemption period.

34) The Plaintiff alleges that Vice President Aaron Twersky intentionally waited until days before the end of the redemption period to disclose this precondition to his January 25, 2017 representations, promises and written misstatement of material facts omission.

35) The Plaintiff alleged that VP Aaron Twersky Intentionally made those January 25, 2017, representations, promises and written misstatement of material facts omission to induce the Plaintiff to rely upon his representations, promises and written misstatement of material facts omission, without an escrow agreement precondition.

36) The Plaintiff alleges that The Plaintiff did so act upon that false representation to his injury.

37) The Plaintiff alleges he relied upon Aaron Twersky's (VP of the First Defendant) January 25, 2017 representations, promises and written misstatement of material facts omission, and as a result of such reliance, the Plaintiff lost valuable time to seek money to pay the tax and or to seek immediate bankruptcy counseling and alternative funding source for the arrears tax payment.

38) The Plaintiff alleges that as a result of VP Aaron Twersky alleged actions, the Plaintiff felt he had no choice but to put the DEED in escrow pursuant to an escrow agreement, and suffered injury as he lost his properties and the equity in his properties.

39) The Plaintiff also alleged that Aaron Twersky Vice President of the First Defendant made representations, written misstatement of material facts in the escrow agreement on February 2, 2017.

40) The Plaintiff alleges that Aaron Twersky (acting in his capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness.

41) The Plaintiff alleges that VP Aaron Twersky on February 2, 2017 Intentionally made a written misstatement of material fact in the escrow agreement.

42) The Plaintiff alleges that the Defendant made these Intentional written misstatements of material fact in order to allegedly Intentionally induce the Plaintiff to rely upon the Defendant's written misstatement of material fact.

43) The Plaintiff alleges that The Defendant Intentional written misstatements of material fact in the escrow agreement states that they agreed to accept (on or before March 22, 2017) $272,751.07 from the Plaintiff to satisfy the note in full and as additional security for the note the Plaintiff would place the DEED in escrow. The Plaintiff alleges that $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full.

44) The Plaintiff alleges that the language is unambiguous and the Plaintiff expectation was that the $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full.

45) The Plaintiff alleges that The Value of the subject properties was allegedly at least $672,300, (evidenced by the City of Meriden 2016 appraisal value shown on its property cards) which exceeded $272,751.07. There was a second mortgage lien of $100,000 on the subject properties. Therefore, the net value was at least $572,300 and the Plaintiff alleges that the note was satisfied in full, as a result of the March 21, 2017 filing of the DEED held in Escrow.

46) The Plaintiff alleges that The Defendant has failed to issue the releases of the note, mortgage, and guarantor.

47) The Plaintiff alleges that the Plaintiff so acted on Defendant's alleged Intentional written misstatement of material fact by executing the escrow agreement and the Defendant alleges that he would not have executed the escrow agreement had the Defendant not agree to accept $272,751.07 to satisfy the note in full, and not agree that the DEED secured the note. The Plaintiff alleges that the value of the DEED (collateral) was worth more than the $272,715.07 to satisfy the note in full.

48) The Plaintiff alleges that as a result of the aforementioned written misstatement of material fact, the Plaintiff so acted and the Plaintiff suffered injury as a result of his reliance on the Defendants written misstatement of material fact.

49) The Plaintiff alleges that Aaron Twersky ( Acting in his capacity as Vice President of the First Defendant) knew on February 2, 2017, that his aforementioned supra written misstatement of material fact in the escrow agreement were false.

50) The Plaintiff alleges that VP Twersky also knew that if his February 2, 2017, aforementioned supra written misrepresentations of fact in the escrow agreement were true, he had an obligation and a Duty ( pursuant to the escrow agreement) to issue the Plaintiff the satisfaction of the note and the releases for the note, mortgage and guarantor.

51) The Plaintiff alleges that VP Twersky allegedly knew that provision # 4 of the escrow agreement allegedly violated public policy and that the Courts have refused to enforce provisions in contracts that violate public policy, and provisions in contracts that restrict a person's Constitutional Right to file bankruptcy in whole or in part, or that matter, a restriction of a person's right to due process, by restricting that person from its right to petition the government for redress and grievances, by filing a law suit.

52) The Plaintiff alleges that if VP Aaron Twersky knew that provision # 4 allegedly violated public policy and was allegedly unenforceable, he also had to know that he had an obligation and a duty pursuant to the escrow agreement to issue to the Plaintiff the satisfaction of the note, the releases of the note, mortgage and guarantor, if he filed the DEED in escrow before March 22, 2017.

53) The Plaintiff alleges that VP Aaron Twersky, knowingly failed to do so and he admitted that he failed to do issue the aforementioned releases, acknowledgement of satisfaction of the note and compensate the Plaintiff for his lost equity.

54) The Plaintiff alleges that the First Defendant also failed to compensate the Plaintiff for his alleged lost of equity in his properties.

55) The Plaintiff alleges that The Value of the subject properties was allegedly at least $672,300, which exceeded $272,751.07. There was a second mortgage lien of $100,000 on the subject properties. Therefore, the net value was at least $572,300.

56) The Plaintiff alleges that the note was satisfied in full, as a result of the March 21, 2017 filing of the DEED held in Escrow and the Plaintiff alleges that the First Defendant owed him at least $299,548.93, which is the difference between the net value of the properties ($572,300) and the ($272,751.07) amount to satisfy the note in full.

57) The Plaintiff alleges that Aaron Twersky VP of the First Defendant had motive and opportunity to not issue the releases and to include provision # 4 in the escrow agreement.

58) The Plaintiff alleges that VP Aaron Twersky had motive, means and opportunity to try to keep the Plaintiff out of Court, therefore he allegedly wrongfully and unlawfully included provision # 4 in the escrow agreement.

59) The Plaintiff alleges that VP Aaron Twersky told the NY Court (in a law suit filed in March 2015, against its former vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and **impossible** to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss. Then allegedly with motive and opportunity to commit fraud, consciously behaved recklessly, to gain the DEED from the Plaintiff and then failed to issue the satisfaction of the note and the aforementioned supra releases, after filing the DEED which allegedly satisfied the note in full. All because Aaron Twersky

VP of the First Defendant, allegedly felt it was **impossible** for the First Defendant to recoup its money from foreclosure or from selling the DEED.

60) The Plaintiff alleges that VP Aaron Twersky had motive, means and created an opportunity to get the DEED placed in escrow, filed the DEED before March 22, 2017, try to sell the properties.

61) The Plaintiff alleges that His Motive for his failure to issue the releases, was to create an opportunity for the First Defendant to try to recoup additional monies from the Plaintiff. VP Aaron Twersky knew that had he not failed to issued the satisfaction of the note and the releases of the note and mortgage, the First Defendant would have no basis to file a counterclaim against the Defendant for $842,000 +.

The Plaintiff makes his allegations in all counts and causes of action a part of the Cause of action.

  (COUNT VI)

## AS TO THE FIRST DEFENDANT

## THE PLAINTIFF ALLEGES THE FOLLOWING

## COUNT VII

## INTENTIONAL MISREPRESENTATION

I.

The Plaintiff alleges that Aaron Twersky and Gary Escandon (acting in their capacity as VP of the First Defendant) had motive and opportunity to commit fraud and both had conscious behavior of recklessness.

1) The Plaintiff alleges that Gary Escandon On or around June 6, 2012 (acting in his capacity as Vice President of the First Defendant) Intentionally made written misstatement of material facts and omission in the loan closing documents, where he correctly stated that the loan origination fee, which was the mortgage brokers commission, was $37,500 and made a written misstatement of material facts and omission by stating that the interest payments that the Plaintiff had to pay during the one year term of the note was $112,500. They Plaintiff alleged that On or around January 2016, he discovered that these statements were known to be untrue by the First Defendant's VP Gary Escandon and he made these written misstatements of material fact to induce the Plaintiff to execute the loan documents. The Plaintiff did so execute the loan

documents and suffered injury, as he paid $112,500 in interest and the Plaintiff alleges that he discovered that the amount of interest was allegedly $89,500.

2) The Plaintiff alleges that the First Defendant disclosed to him and in the loan documents that he would have to pay $112,000 in interest payments over the one year term of the note and that the loan origination fee which was the mortgage broker's commission was $37,500.

3) The Plaintiff alleges that he discovered that the First Defendant paid a $23,000 commission to its VP Escandon and the Plaintiff alleges rational minds could reasonably and logically draw the necessary inferences to determine that the $23,000, of the $112,500 that was disguised as interest payments was in fact allegedly a commission paid by the First Defendant to Escandon. Therefore the actual amount of interest that the Plaintiff should have paid was $89,500 and not $112,500.

4) The Plaintiff has alleged that he would not have agreed to the VP Escandon commission.  The Plaintiff alleges that he suffered  injury of at least $23,000.

5) The Plaintiff alleges the first Defendant's VP Gary Escandon had motive, means, opportunity and intent to pay Escandon a commission from the subject loan made to Plaintiff's by the first Defendant, without disclosing the commission to the Plaintiff and or in the loan documents.

5) The Plaintiff restates his allegation in Fraudulent Misrepresentations.

6) The Plaintiff alleges that Aaron Twersky  (acting in his capacity as VP of the First Defendant) had motive , means and opportunity to commit fraud and he had conscious behavior of recklessness.  Aaron Twersky (acting in his capacity of Vice President of the First Defendant) made Intentional written misstatements of material fact to the Plaintiff. These alleged Intentional written misstatements of material fact were made on January 25, 2017 verbally and in the January 25, 2017 payoff/demand letter, and on February 2, 2017 in the escrow agreement, in order to allegedly Intentionally induce the Plaintiff to rely upon the said written misstatement of material fact.

7) The Plaintiff restates his allegation in Fraudulent Misrepresentations.

8) The Plaintiff alleges that Aaron Twersky (acting in his capacity as VP of the First Defendant) had motive, means and opportunity to commit fraud and he had conscious behavior of recklessness.  Aaron Twersky on

February 2, 2017Intentionally made a written misstatement of material fact and in the escrow agreement. The Defendant made these Intentional written misstatements of material fact in order to allegedly Intentionally induce the Plaintiff to rely upon the Defendant's written misstatement of material fact, the Plaintiff did so act to his injury. VP Aaron filed the DEED to the subject properties on March 21, 2017. The filing of the DEED on March 21, 2017, pursuant to the escrow agreement, allegedly satisfied the note. VP Aaron Twersky failed to issue the satisfaction of the note and the releases of the note, mortgage and guarantor and has now filed a counterclaim to collect $842,000+ from the Plaintiff, on a note that is allegedly already satisfied.

The Plaintiff makes his allegations in all counts and causes of action a part of the Cause of action.

## AS TO THE FIRST DEFENDANT

## THE PLAINTIFF ALLEGES THE FOLLOWING

## COUNT VIII

## NELIGENT MISREPRESENTATION BY NONDISCLOSURE

I.

The Plaintiff alleges that Aaron Twersky and Gary Escandon (acting in their capacity as VP of the First Defendant) had motive and opportunity to commit fraud and both had conscious behavior of recklessness.

1) The Plaintiff, alleges that Gary Escandon On or around June 6, 2012 acting in his capacity as Vice President of the First Defendant made written misstatement of material facts and omission in the loan closing documents, where he correctly stated that the loan origination fee, which was the mortgage broker's commission, was $37,500 and he made a written misstatement of material facts and omission by stating that the interest payments that the Plaintiff had to pay during the one year term of the note was $112,500.

2) The Plaintiff alleged that he discovered on or around January 2016 that these statements were known to be untrue by the First Defendant's VP Gary Escandon and he made these written misstatements of material fact to induce the Plaintiff to execute the loan documents. The Plaintiff did so execute the loan documents and suffered injury, as he paid $112,500 in interest and the Plaintiff alleges that he discovered that the amount of interest was allegedly $89,500.

3) The Plaintiff alleges that the Plaintiff reasonably relied upon VP Gary Escandon's aforementioned supra, written misstatements of material facts and omission. The Plaintiff alleges that the First Defendant disclosed to him and in the loan documents that he would have to pay $112,000 in interest payment over the one year term of the note and that the loan origination fee which was the mortgage broker's commission was $37,500.

4) The Plaintiff alleges that the Plaintiff discovered that the First Defendant paid a $23,000 commission to its VP Escandon and the Plaintiff alleges rational minds could reasonably and logically draw the necessary inferences to determine that the $23,000, of the $112,500 that was disguised as interest payments was in fact allegedly a commission paid by the First Defendant to Escandon. Therefore the actual amount of interest that the Plaintiff should have paid was allegedly $89,500 and not $112,500.

5) The Plaintiff has alleges that he would not have agreed to the VP Escandon commission.

6) The Plaintiff alleges that he suffered injury of at least $23,000.

7) The Plaintiff alleges that the First Defendant owed the Plaintiff a Duty of Care to make full disclosure to the Plaintiff of the $23,000 commission it paid to its VP Gary Escandon and failed to do so.

8) The Plaintiff restates his allegation in Fraudulent Misrepresentations.

9) The Plaintiff alleges that Aaron Twersky (acting in his capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness. Aaron Twersky (acting in his capacity of Vice President of the First Defendant) made written misstatements of material facts to the Plaintiff. These alleged written misstatements of material fact were made on January 25, 2017 verbally and in the January 25, 2017 payoff/demand letter.

10) Aaron Twersky ( acting in his capacity of VP of the First Defendant) represented that the First Defendant would pay the arrears tax before the end of the tax sale redemption period, but failed to disclose to the Plaintiff ( in his January 25, 2017 verbal representation to the Plaintiff by phone and also failed to disclose in his written misstatement of material fact in the January 25, 2017 payoff/demand letter) that he would only pay the arrears tax if the Plaintiff executed an escrow agreement and put the DEED to the subject properties in escrow.

11) On January 25, 2017 VP Aaron Twersky knew or should have known that he was only going to pay the arrears taxes if the Plaintiff executed the escrow agreement and placed the DEED in escrow and failed to disclose that fact to the Plaintiff on January 25, 2017.

12) The Plaintiff alleges that Aaron Twersky owed the Plaintiff a Duty to use reasonable care during their contractual relations (loan documents/agreements), during the term of the escrow agreement, when making its January 25, 2017, promise, representation, written misstatements of material fact and omissions and failed to do so.

13) The Plaintiff reasonably relied upon VP Aaron Twersky's aforementioned supra, written

misstatements of material facts and verbal phone representations made by VP  Aaron Twersky to the Plaintiff on January 25, 2017. The Plaintiff stopped seeking funds to pay the arrears tax from other sources, and solely focused on the Riverdale Funding Refinancing. The Plaintiff also opted not to seek immediate Bankruptcy counseling as a result of VP Aaron Twersky's January 25, 2017 verbal representations and promises by phone and his January 25, 2017 written misstatement of material fact , in the payoff/demand letter.

14) The Plaintiff alleges that the First Defendant owed the Plaintiff a Duty of Care to make full disclosure to the Plaintiff, by making the Plaintiff know on January 25, 2017, along with Aaron Twersky's January 25, 2017 verbal representations and promises made by phone and his written misstatement of material fact in his January 25, 0217 payoff/demand letter, that the First Defendant would require the Plaintiff  put his DEED to his properties in escrow and execute an escrow agreement.

15) The Plaintiff alleges that VP Aaron Twersky allegedly knew of this condition and failed to disclose it to the Plaintiff on January 25, 2017, which was 1 day after the Plaintiff told the  Defendant no to any escrow agreement.

16) The Plaintiff alleges that the VP Aaron Twersky induced the Plaintiff to believe that he would pay the arrears tax free of any escrow agreement condition.

17) The Plaintiff told Aaron Twersky no to any escrow agreement on January 24, 2017 and on January 25, 2017 Aaron Twersky made no mention of any escrow agreement requirement in his verbal representation by phone or in his written misstatement of material fact in his January 25, 2017 payoff/demand letter.

18) As a result, the Plaintiff suffered damages. On January 30, 2017 (not on January 25, 2017)

VP Aaron Twersky told the Defendant by email, that the only way that the First Defendant would consider paying the tax is if the Plaintiff executed an escrow agreement and placed the DEED in escrow.

19) The Plaintiff alleges that the Plaintiff refused, but on February 2, 2017, The Plaintiff felt under extreme emotional distress and felt that his choices were limited, therefore the Plaintiff executed the escrow agreement and the Deed because the tax sale redemption period ended on February 3, 2017, therefore he executed the escrow agreement, which resulted in the Plaintiff losing his properties, losing the equity in his properties and now the Plaintiff has to defend a counterclaim by the Defendant, as the Defendant is attempting to collect $842, 000+ on a note that is allegedly already satisfied.

20) The Plaintiff restates his allegation in Fraudulent Misrepresentations.

21) The Plaintiff alleges that Aaron Twersky (acting in his capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness.

22) Aaron Twersky on February 2, 2017 made Intentional written misstatement of material fact in the escrow agreement. The Defendant made these Intentional written misstatements of material fact in order to allegedly induce the Plaintiff to rely upon the Defendant's written misstatement of material fact. The Plaintiff did so act to his injury.

23) The Plaintiff alleges that VP Aaron filed the DEED to the subject properties on March 21, 2017. The filing of the DEED on March 21, 2017, pursuant to the escrow agreement, allegedly satisfied the note.

24) The Plaintiff alleges that VP Aaron Twersky failed to issue the satisfaction of the note and the releases of the note, mortgage and guarantor and has now filed a counterclaim to collect $842,000+ from the Plaintiff, on a note that is allegedly already satisfied.

25) The Plaintiff alleges that the First Defendant owed the Plaintiff a Duty of Care to make full disclosure to the Plaintiff, by disclosing to the that provision # 4 allegedly violates Public Policy, his constitutional rights and the courts have generally refused to enforce provisions in contracts where said provisions prohibits or restricts a party from filing bankruptcy in whole or in part. Courts have also refused to enforce any provisions (not just provisions that prohibits or restrict a party from filing bankruptcy in whole or in part) in a contract that violates Public Policy, prohibits or restrict in whole or in part a person Constitutional right to file Bankruptcy or Constitute right to petition the government for redress of grievances by filing a action in Court.

26) The Plaintiff alleges that the First Defendant owed the Plaintiff a Duty of Care to make full disclosure to the Plaintiff, by disclosing to the Plaintiff the fact that VP Aaron Twersky allegedly knew on February 2, 2017 that the First Defendant would not issue the satisfaction of note and issue the releases of the note mortgage and guarantor, if he filed the DEED before march 22, 2017 and he failed to disclose to the Plaintiff.

The Plaintiff makes his allegations in all counts and causes of action a part of this Cause of action.

(COUNT VIII)

125

## AS TO THE FIRST DEFENDANT

## THE PLAINTIFF ALLEGES THE FOLLOWING

## COUNT IX

## INTENTIONAL MISREPRESENTATION BY NONDISCLOSURE

**I.**

The Plaintiff alleges that Aaron Twersky and Gary Escandon (acting in their capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness.

1) The Plaintiff alleges that Gary Escandon on or around June 6, 2012 (acting in his capacity as Vice President of the First Defendant) Intentionally made written misstatements of material facts and omission in the loan closing documents, where he correctly stated that the loan origination fee, which was the mortgage broker's commission, was $37,500 and he made a written misstatement of material facts and omission by stating that the interest payments that the Plaintiff had to pay during the one year term of the note was $112,500.

2) They Plaintiff alleged that he discovered that these statements were known to be untrue by the First Defendants VP Gary Escandon and he made these written misstatements of material fact to induce the Plaintiff to execute the loan documents.

3) The Plaintiff alleged that he did so execute the loan documents and suffered injury, as he paid $112,500 in interest and the Plaintiff alleges that he discovered on or around January 2016 that the amount of interest was allegedly $89,500.

4) The Plaintiff reasonably relied upon VP Gary Escandon's aforementioned supra, written misstatements of material facts and omission.

5) The Plaintiff alleges that the First Defendant disclosed to him and in the loan documents that he would have to pay $112,000 in interest payments over the one year term of the note and that the loan origination fee which was the mortgage broker's commission was $37,500.

6) The Plaintiff alleges that the Plaintiff discovered that the First Defendant paid a $23,000 commission to its VP Escandon and the Plaintiff alleges rational minds could reasonably and logically draw the necessary inferences to determine that the $23,000, of the $112,500 that was disguised as interest payments was in fact allegedly a commission paid by the First Defendant to Escandon. Therefore the actual amount of interest that the Plaintiff should have paid was $89,500 and not $112,500.

7) The Plaintiff alleges that he would not have agreed to the VP Escandon commission.

8) The Plaintiff alleges that he suffered  injury of at least $23,000.

9) The Plaintiff alleges that the First Defendant and VP Gary Escandon owed the Plaintiff a Duty of Care to make full disclosure to the Plaintiff of the $23,000 commission it paid to its VP Gary Escandon.

10) The Plaintiff alleges that Aaron Twersky  (acting in his capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness.  Aaron Twersky (acting in his capacity as Vice President of the First Defendant) made Intentional written misstatements of material fact to the Plaintiff.

11) The Plaintiff alleges that these aforementioned supra alleged Intentional written misstatements of material fact were made on January 25, 2017 verbally and in the January 25, 2017 payoff/demand letter and on February 2, 2017 in the escrow agreement, in order to allegedly Intentionally induce the Plaintiff to rely upon the said written misstatement of material fact. The Plaintiff so relied and suffered injury.

12) The Plaintiff alleges that VP Gary Escandon had a  Duty to use reasonable care and  disclose a known fact that the $23,000 of what VP Escandon disclosed a $112,500 of interest was allegedly in fact a commission paid to VP Gary Escandon.

13) The Plaintiff alleges that VP Gary Escandon assumed to speak in the loan document and to the Plaintiff verbally, and failed to make a full and  fair disclosure as to the $23,000 commission and the actual interest amount. These the matters about which VP Escandon  assumes to speak.

14) The Plaintiff alleges that VP Aaron  Twersky had a  Duty use reasonable care and disclose to the Plaintiff that on January 25, 2017 that he was going to condition his January 25, 2017 promises, representation, written misstatements of material fact and omission on a known fact which he did not

disclose to the Plaintiff on January 25, 2017. Escondon knew that he had a duty to disclosure the known fact that he intended to add a condition of the escrow agreement to his January 25, 2017 promises, representation, written misstatements of material fact and omission.

15) The Plaintiff alleges that VP Aaron Twersky assumed to speak in his January 25, 2017 promises, representation, written misstatements of material fact and omission and failed to make full and fair disclosure as to the escrow agreement. These the matters about which VP Aaron Twersky assumes to speak.

16) The Plaintiff alleges that VP Aaron Twersky had a  Duty to use reasonable care and disclose a known fact that he was not going to issue the satisfaction of the note, and releases of mortgage, despite filing the DEED during the period of the escrow agreement, despite allegedly knowing that the value of the DEED exceeded the $272,751.07, which was the amount to satisfy the note in full during the escrow agreement period.

17) The Plaintiff alleges that VP Aaron Twersky assumed to speak in the escrow agreement and failed to make a full and  fair disclosure of this fact. These the matters about which VP Aaron Twersky  assumes to speak.

18)  The Plaintiff alleges that The VP Aaron Twersky knew on January 25, 2017 that he would later condition his acting upon his January 25, 2017 verbal promises made by phone to the Plaintiff and in his written misstatement of material fact made on January 25, 2017 in his Payoff/demand letter, on the Plaintiff placing the DEED in escrow and executing the escrow agreement and the VP Aaron Twersky Intentionally failed to disclose this information to the Plaintiff on January 25, 2017.

19) The Plaintiff alleges that VP Aaron Twersky Intentionally failed to disclose the escrow agreement condition to the Plaintiff on January 25, 2017, to induce the Plaintiff to rely upon his January  25, 2017 verbal promises made by phone to the Plaintiff and in his written misstatement of material fact made on January 25, 2017 in his Payoff/demand letter.

20) The Plaintiff alleges that The Plaintiff so relied. The Plaintiff stopped seeking funds from other sources to pay the tax and focused on the Riverdale funding refinancing and he opted not to seek immediate bankruptcy counseling.

21) The Plaintiff alleges that The Plaintiff relied upon Aaron Twersky's January 25, 2017 verbal promises by phone and his January 25, 2017 written misstatement of material fact, where-in he failed to disclose the escrow agreement condition. The Plaintiff relied upon the fact that VP Aaron Twersky would pay the arrears taxes, without an escrow agreement condition.

22) The Plaintiff alleges that The Plaintiff has been damaged as a result of VP Aaron Twersky's concealment and knowing misrepresentations. The Plaintiff pursuant to the escrow agreement, placed his DEED in escrow, lost his properties, lost the equity in his properties, the First Defendant failed to issue the satisfaction of the note and the releases of the note, mortgage and guarantor. The Defendant has filed a counterclaim to collect $842,000 + on a note that is allegedly already satisfied.

23) The Plaintiff alleges that the First Defendant owed the Plaintiff a Duty of Care to make full disclosure to the Plaintiff, by making the Plaintiff know on January 25, 2017, along with Aaron Twersky's January 25, 2017 verbal representations and promises made by phone and his written misstatement of material fact in his January 25, 0217 payoff/demand letter, that the First Defendant would require the Plaintiff to put his DEED to his properties in escrow and execute an escrow agreement.

24) The Plaintiff alleges that VP Aaron Twersky allegedly knew of this condition and allegedly breached their Duty to use reason care by his failure disclose it to the Plaintiff on January 25, 2017, which was 1 day after the Plaintiff told the  Defendant no to any escrow agreement.

25) The Plaintiff alleges that the VP Aaron Twersky induced the Plaintiff to believe that he would pay the arrears tax free of any escrow agreement condition.

26) The Plaintiff alleges that The Plaintiff told Aaron Twersky no to any escrow agreement on January 24, 2017 and on January 25, 2017 Aaron Twersky made no mentioned of any escrow agreement requirement in his verbal representation by phone or in his written misstatement of material fact in his January 25, 2017 payoff/demand letter.

27) The Plaintiff alleges that Aaron Twersky (acting in his capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness.  Aaron Twersky on February 2, 2017 Intentionally made a written misstatement of material fact in the escrow agreement. The

Defendant made these Intentional written misstatements of material fact in order to allegedly Intentionally induce the Plaintiff to rely upon the Defendant's written misstatement of material fact. The Plaintiff did so act to his injury. VP Aaron filed the DEED to the subject properties on March 21, 2017. The filing of the DEED on March 21, 2017, pursuant to the escrow agreement, allegedly satisfied the note. The Plaintiff alleges that the language is unambiguous and the Plaintiff expectation was that the $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full. VP Aaron Twersky failed to issue the satisfaction of the note and the releases of the note, mortgage and guarantor and has now filed a counterclaim to collect $842,000+ from the Plaintiff, on a note that is allegedly already satisfied.

28) The Plaintiff alleges that the First Defendant owed the Plaintiff a Duty of Care to make full disclosure to the Plaintiff, by disclosing to the Plaintiff the fact that VP Aaron Twersky allegedly knew on February 2, 2017 that the First Defendant would not issue the satisfaction of note and issue the releases of the note mortgage and guarantor, if he filed the DEED before march 22, 2017 and he failed to disclose this to the Plaintiff.

29) VP Aaron Twersky allegedly knew on February 2, 2017 that the First Defendant would not issue the satisfaction of note and issue the releases of the note mortgage and guarantor, if he filed the DEED before march 22, 2017 and he failed to disclose this to the Plaintiff.

The Plaintiff restates his allegation in Fraudulent Misrepresentations.

The Plaintiff makes his allegations in all counts and causes of action a part of this Cause of action.

(COUNT IX).

**AS TO THE FIRST DEFENDANT**

**THE PLAINTIFF ALLEGES THE FOLLOWING**

**COUNT X**

**NEGLIGENT MISREPRESENTATION**

**I.**

1) The Plaintiff, alleges that Gary Escandon On or around June 6, 2012 (acting in his capacity as Vice President of the First Defendant Intentionally made written misstatements of material facts and omission in the loan closing documents, where he correctly stated that the loan origination fee, which was the mortgage broker's commission, was $37,500 and he made a written misstatement of material facts and omission by stating that the interest payments that the Plaintiff had to pay during the one year term of the note was $112,500.

2) The Plaintiff alleges that on or around January 2016 he discovered that these statements were known to be untrue by the First Defendant's VP Gary Escandon and he made these written misstatements of material fact to induce the Plaintiff to execute the loan documents.

3) The Plaintiff alleges that The Plaintiff did so execute the loan documents and suffered injury, as he paid $112,500 in interest and the Plaintiff alleges that he discovered that the amount of interest was $89,500.

4) The Plaintiff alleges that the Plaintiff reasonably relied upon VP Gary Escandon's aforementioned supra, written misstatements of material facts and omission.

5) The Plaintiff alleges that the First Defendant disclosed to him and in the loan documents that he would have to pay $112,000 in interest payments over the one year term of the note and that the loan origination fee, which was the mortgage broker's commission, was $37,500.

6) The Plaintiff alleges that the Plaintiff discovered that the First Defendant paid a $23,000 commission to its VP Escandon and the Plaintiff alleges rational minds could reasonably and logically draw the necessary inferences to determine that the $23,000, of the $112,500 that was disguised as interest payments was in fact allegedly a commission paid by the First Defendant to Escandon. Therefore, the actual amount of interest that the Plaintiff should have paid was allegedly $89,500 and not $112,500.

7) The Plaintiff alleges that he would not have agreed to the VP Escandon commission. The Plaintiff alleges that he suffered injury of at least $23,000.

8) The Plaintiff alleges that the First Defendant owed the Plaintiff a Duty of reasonable Care to make full disclosure to the Plaintiff of the $23,000 commission it paid to its VP Gary Escandon.

9) The Plaintiff alleges that Aaron Twersky (acting in his capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness.

10) The Plaintiff alleges that Aaron Twersky on February 2, 2017 made a written misstatement of material fact and in the escrow agreement.

11) The Plaintiff alleges that The Defendant knew those written misstatements of material fact were untrue.

12) The Plaintiff alleges that The Defendant made these written misstatement of material fact in order to allegedly induce the Plaintiff to rely upon the Defendant's written misstatements of material fact.

13) The Plaintiff alleges that The Plaintiff so did rely and suffered injury.

14) The Plaintiff alleges that The Defendant stated in the escrow agreement that they agreed to accept (on or before March 22, 2017) $272,751.07 from the Plaintiff to satisfy the note in full and as additional security for the note the Plaintiff would place the DEED in escrow.

15) The Plaintiff alleges that the $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full.

16) The Plaintiff alleges that VP Aaron Twersky filed the DEED in escrow on March 21, 2017. The Defendant has failed to issue the releases of the note, mortgage, and guarantor.

17) The Plaintiff alleges that the language is unambiguous and the Plaintiff expectation was that the $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full.

18) The Plaintiff alleges that the Plaintiff so acted on Defendant's alleged written misstatement of material fact and he relied upon them. The Defendant alleges that he would not have executed the escrow agreement had the Defendant not agree to accept $272,751.07 to satisfy the note in full, and not agree that the DEED secured the note and $272,715.07 to satisfy the note in full. As a result of the aforementioned written

misstatement of material fact, the Plaintiff so acted and the Plaintiff suffered injury as a result of his reliance on the Defendants written misstatement of material fact.

19) The Plaintiff alleges that Aaron Twersky (Acting in his capacity as Vice President of the First Defendant) knew on February 2, 2017, that his aforementioned supra written misrepresentations of fact in the escrow agreement were false.

20) The Plaintiff alleges that VP Aaron Twersky also knew that if his February 2, 2017 aforementioned supra written misrepresentations of fact in the escrow agreement were true, he allegedly had an obligation and a Duty ( pursuant to the escrow agreement) to issue the Plaintiff the satisfaction of the note and the releases for the note, mortgage and guarantor and failed to do so.

21) The Plaintiff alleges that Instead of issuing the aforementioned satisfaction of the note and the releases of note, mortgage and guarantor, the First Defendant has filed a counterclaim to collect $842,000+ on the very same note that the Plaintiff alleges is satisfied. The Plaintiff has also suffered injury, as he has lost the equity in his properties.

The Plaintiff makes his allegations in all counts and causes of action a part of this Cause of action.

(COUNT X).

**AS TO THE FIRST DEFENDANT**

**THE PLAINTIFF ALLEGES THE FOLLOWING**

**COUNT XI**

**FRAUDULENT CONCEALMENT:**

**I.**

1) On or around January 2016 the Plaintiff discovered (after recently reading the Defendant's in this case complaint in a Court of Law against its own former Vice President Gary Escandon) that the Defendant CBD & SONS LTD paid its  former vice President Gary Escandon  a $23,000 commission from the loan proceeds of the subject loan (which was made to the Plaintiff by the Defendant on or around June, 2012) without disclosing to the Plaintiff and or disclosing in the loan closing documents and or the loan closing statement, that the Defendant paid Vice President Gary Escandon a commission from the loan proceeds.

2)The Plaintiff alleges that the Defendant Fraudulently Concealed a cause of action from the Plaintiff, therefore the action will not accrue until the Plaintiff discovers the existence of the cause of action.

3) The Plaintiff alleges that the statute of limitations has been tolled in this cause of action and being to run for 3 years from January 2016. The Plaintiff alleges that "If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of action, such cause of action shall be determined to accrue against such person so liable therefore at the time when the person entitled to sue thereon first discovers its existence."

4) In this Case, the Plaintiff alleges that on or around January 2016 the Plaintiff discovered that the First Defendant filed a law suit in March of 2015, against its former Vice President Gary Escandon. Upon the Plaintiff's reading the First Defendant's complaint in a Court of Law against its own former Vice President Gary Escandon) the Plaintiff in this case discovered that the First Defendant CBD & SONS LTD paid its former Vice President Gary Escandon  a $23,000 commission in connection with the subject loan (which was made to the Plaintiff by the Defendant on or around June, 2012) without disclosing to the Plaintiff and or disclosing in the loan closing documents and or the loan closing statement, that the First Defendant paid Vice President Gary Escandon a $23,000 commission in connection with the loan to the Plaintiff.

5) The Plaintiff alleges that he was ignorant of the facts that the First Defendant paid a $23,000 to its former Vice President Gary Escandon from the Plaintiff loan proceeds.

6) The First Defendant disclosed  a loan origination fee in the loan documents which was a commission in the amount of $37,500 which was paid to the broker.

7) The Plaintiff alleges that  Pursuant to industry standar practice and law, the commission that was to be paid to the broker, from the Plaintiff loan proceeds was disclosed to the Plaintiff before and at the closing. This commission was referred to in the loan closing documents as a loan origination fee.

8) The Plaintiff alleges that the first Defendant and its VP Gary Escandon failed to disclose the commission that the First Defendant paid to VP Escandon, in connection with the loan made to the Plaintiff at or before the loan closing and failed to disclose the $23,000 commission paid to its VP Escandon anywhere in the loan closing documents.

9) The Plaintiff alleges that these actions (the aforementioned supra failure to disclose) by the First Defendant and its VP Escandon allegedly precluded the Plaintiff's possibility of the Plaintiff discovering the $23,000 commission paid to VP Escandon from the Plaintiff's loan proceeds.

10) The Plaintiff alleges that: i) the First Defendant and its VP Gary Escandon had actual awareness, rather than imputed knowledge, of the facts, that the First Defendant and VP Escandon, concealed and did not disclose the $23,000 commission paid to VP Escandon to the Plaintiff or anywhere in the loan closing documents. ii) The First Defendant and its VP Escandon intentionally concealed the facts that it paid a $23,000 commission to its VP Escandon in connection with the loan to the Plaintiff. iii) The Plaintiff alleges that the First Defendant and its VP Escandon concealed the aforementioned facts concealed from the Plaintiff in order to prevent the Plaintiff from discovering the $23,000 commission payment to Escandon.

11) The Plaintiff alleges that he would not have agreed to the $23,000 commission paid to VP Escandon.

12) The Plaintiff alleges that the First Defendant and its VP Escandon didn't want to Plaintiff to find out about the $23,000 commission paid to Escandon, so therefore they allegedly concealed it from the Plaintiff, knowing that the Plaintiff could not object to the commission or file a law suit in connection with the $23,000 commission if he was ignorant to the fact of the $23,000.

13) The Plaintiff alleges that  the First Defendant concealed the $23,000 commission because they wanted to delay the Plaintiff from filing a complaint and cause of action regarding the alleged concealment of the $23,000 commission the First Defendant paid to its VP Escandon in connection with the Plaintiff's loan.

14) The Plaintiff alleges that he suffered injury as a result of the First Defendant's aforementioned alleged concealment of the Escandon $23,000 commission.

15) The Plaintiff alleges that the First Defendant disclosed to him and in the loan documents that he would have to pay $112,000 in interest payment over the one year term of the note.

16) The Plaintiff alleges that once the Plaintiff discovered that the First Defendant paid a $23,000 commission to its VP Escandon, the Plaintiff alleges rational minds could reasonably and logically draw the necessary inferences to determine that the $23,000, of the $112,500 that was disguised as interest payments was in fact allegedly a commission paid by the First Defendant to Escandon. Therefore the actual amount of interest that the Plaintiff should have paid was allegedly $89,500 and not $112,500.

17) The Plaintiff has alleged that he would not have agreed to the VP Escandon commission.  The Plaintiff alleges that he suffered injury of at least $23,000.

18) The Defendant's above mentioned alleged concealment gives rise to causes of actions. The Defendant's alleged actions are unfair, deceptive, dishonest, fraudulent and was done in bad Faith, didn't denote Good Faith, was done with sinister motive (to conceal from the Plaintiff the material fact that the Defendant paid its Vice President a commission) and was meant to cause injury to the Plaintiff.

19) The Defendant allegedly had actual awareness, rather than imputed knowledge, of the fact that the Defendant fraudulently concealed the fact that he paid is Vice President Escandon a $23,000 commission from the June, 2012 loan proceeds to the Plaintiff, without disclosing said commission to the Plaintiff or disclosing said commission in the loan documents and or loan closing statement.

20) The Defendant allegedly intentionally concealed the $23,000 commission to the Plaintiff.

21)The Defendant allegedly concealed the above mentioned $23,000 commission from the Plaintiff, for the purpose of obtaining delay on the part of the Plaintiff in filing a cause of action against the Defendant.

## AS TO THE FIRST DEFENDANT

## THE PLAINTIFF ALLEGES THE FOLLOWING

## COUNT XII

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALINGS

**I.**

1) The Plaintiff alleges that the first Defendant failed to exercise Good Faith, acted in BAD Faith and with sinister motive in the lender borrower relationship with the Plaintiff. The Defendant engaged in conduct designed to mislead or deceive as he made written misstatement of material facts in the escrow agreement and neglected or refused to fulfill some duty or contractual obligation not prompted by an honest mistake as to its rights or duties, as he failed to issue the acknowledgement of the satisfaction of the note and the releases of the note, mortgage and guarantor.

2) The Plaintiff alleges that the first The Defendant didn't exercise Good faith performance or enforcement of a contract nor did the Defendant emphasize faithfulness to an agreed common purpose and consistency with the justified expectations of the other (the Plaintiff), as the Plaintiff alleges that the Defendant filed the DEED in escrow during the escrow period, which allegedly satisfied the note pursuant to the escrow agreement. The Plaintiff expected the acknowledgement of note satisfaction and the aforementioned releases and the Defendant failed to issue them.

3) The Plaintiff alleges that Pursuant to the escrow agreement the DEED in escrow secured the note. The amount to pay off the note was $272,751.07. The DEED was valued at least $672,300 (evidenced by the City of Meriden 2016 appraisal value shown on its property cards) and a net value of $572,300, which exceeds the $272,751.07. The Defendant filed the DEED during the period of the escrow agreement, allegedly satisfying the note and the Defendant failed to issue the satisfaction of the note and the aforementioned supra releases.

4) The Plaintiff alleges that the language is unambiguous and the Plaintiff's expectation was that the $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full.

5) The Plaintiff alleges that Good faith and fair dealing means an attitude or state of mind denoting honesty of purpose and freedom from intention to defraud. The first Defendant allegedly didn't exercise faithfulness to one's duty and obligation under the contract. The Plaintiff alleges that the Defendant had a state of mind to defraud. The Plaintiff alleges that the Defendant filed the DEED allegedly satisfying the note in full and the Defendant allegedly failed to issue the satisfaction of the note and the aforementioned releases.

6) The Plaintiff alleges that the first defendant acted in Bad Faith and not Good Faith. The first Defendant allegedly had sinister motive. The first Defendant allegedly plotted to file a legal claim against the Plaintiff to collect $842,000+ on a note that is allegedly already satisfied in full. As a result of the first Defendant's alleged wrongful and unlawful actions, the Plaintiff suffered injury.

7) The Plaintiff alleges that he has lost his properties, lost at least $299,548.93 in equity in his properties and now the Plaintiff has to suffer the Emotional distress of defending the Defendant's counterclaim against him and the emotion distress of litigating the Plaintiff's causes of action against the first Defendant, in part to get the acknowledgement of the satisfaction of the note and the releases of the note, mortgage and guarantor and to recoup the lost equity in his properties.

8) The Plaintiff alleges that Aaron Twersky (acting in his capacity as VP of the First Defendant) had motive and opportunity to commit fraud and he had conscious behavior of recklessness. Aaron Twersky on February 2, 2017 made a written misstatement of material fact and in the escrow agreement. The Defendant knew those written misstatement of material fact were untrue. The Defendant made these written misstatements of material fact in order to allegedly induce the Plaintiff to rely upon the Defendant's written misstatement of material fact. The Plaintiff so did rely and suffered injury.

9) The Plaintiff alleges that the first Defendant stated in the escrow agreement that they agreed to accept (on or before March 22, 2017) $272,751.07 from the Plaintiff to satisfy the note in full and as additional security for the note the Plaintiff would place the DEED in escrow.

10) The Plaintiff alleges he expected that the $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full.

11) The Plaintiff alleges that the language is unambiguous and the Plaintiff expectation was that the $272,751.07 or the filing of the DEED in Escrow (which secured the note) before March 22, 2017, would satisfy the note in full.

12) The Plaintiff alleges that the first Defendant filed the DEED in escrow on March 21, 2017.

13) The Plaintiff alleges that the first Defendant has failed to issue the releases of the note, mortgage, and guarantor.

14) The Plaintiff alleges that the Plaintiff so acted on Defendant's alleged written misstatement of material fact and he relied upon them. The Defendant alleges that he would not have executed the escrow agreement had the Defendant not agree to accept $272,751.07 to satisfy the note in full, and not agree that the DEED secured the note and $272,715.07 to satisfy the note in full. As a result of the aforementioned written misstatement of material fact, the Plaintiff so acted and the Plaintiff suffered injury as a result of his reliance on the Defendant's written misstatement of material fact.

15) The Plaintiff alleges that Aaron Twersky ( Acting in his capacity as Vice President of the First Defendant) knew on February 2, 2017, that his aforementioned supra written misrepresentations of fact representation in the escrow agreement were false. He also knew that if his February 2, 2017, aforementioned supra written misrepresentations of fact in the escrow agreement were true, he had an obligation and a Duty ( pursuant to the escrow agreement) to issue the Plaintiff the satisfaction of the note and the releases for the note, mortgage and guarantor and failed to do so.

16) The Plaintiff alleges that the first Defendant Instead of issuing the aforementioned satisfaction of the note and the releases of note, mortgage and guarantor, the First Defendant has filed a counterclaim to collect $842,000+ on the very same note that the Plaintiff alleges is satisfied.

17) The Plaintiff has also suffered injury, as he has lost the equity in his properties.

The Plaintiff makes his allegations all of his causes of action a part of this cause of action. (COUNT XII)

## AS TO THE SECOND DEFENDANT

## COUNT I

## CONNECTICUT UNFAIR TRADE PRACTICE

**I.**

1)   The Plaintiff's alleges that the Second Defendant allegedly conspired with the First Defendant in wrongfully and unlawfully circumventing the foreclosure process and to violate The Connecticut Unfair Trade Practices Act (CUTPA).

2) The Plaintiff alleges that The First and Second Defendants "entered into a combination, agreement or conspiracy" to allegedly wrongfully and unlawfully circumvent the foreclosure process and to Violated Connecticut Unfair Trade Practices Act (CUTPA).

3) The Plaintiff alleges that Second defendant had knowledge that the first Defendant was attempting to wrongfully and unlawfully avoid the foreclosure process.

4) The Plaintiff alleges that Aaron Twersky ( Principal of Twersky PLLC) knew that the first defendant (through Twersky PLLC, who provided legal representation to the first Defendant in their NY law suit against its former VP Gary Escandon) alleged in that NY  law suit, that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss.

5) The Plaintiff alleges  Aaron Twersky ( Principal of Twersky PLLC) knew that the first Defendant allegedly wanted to  attempt to avoid the foreclosure process. He knew this because Aaron Twersky ( Principal of Twersky PLLC) is also the Vice President of the first Defendant and Aaron Twersky Vice President of the first Defendant was the one attempting to collect on the loan made to the Plaintiff by the Defendant. Aaron Twersky (Vice President of the first Defendant) communicated with the Plaintiff on behalf of the first Defendant and on behalf of Twersky PLLC.

6) The Plaintiff alleges  that the Aforementioned alleged conspiracy, was the Second Defendant's motive (he had means and opportunity) to communicate with the winning tax sale bidder during the tax redemption period, in an effort to sell him the note to the subject properties.

7) The Plaintiff alleges  that aforementioned communication with the Winning tax sale bidder allegedly violates public policy.

8) The Plaintiff alleges that he discovered on or around January 2016 that the First Defendant and VP Aaron Twersky (through their attorney Twersky PLLC who represented the First Defendant in their law suit against their former Vice President Gary Escandon) told the NY Court (in a law suit filed in March 2015, against its former vice President Gary Escandon) that foreclosure on the subject properties would be costly and unfulfilling and **impossible** to recoup their money. They alleged in that law suit that the properties that secure the loan to the Plaintiff are now worth much less than originally appraised, at the time the loan was made, making the foreclosure process costly, unfulfilling and **impossible** for the first Defendant to recoup their loss. They alleged in that law suit that the properties' values decreased, and they could not recoup the money loaned to the Plaintiff in this case through foreclosure.

9) The Plaintiff has alleged that the First Defendant had motive and means to plot to wrongfully and unlawfully avoid the foreclosure process and the Plaintiff alleges that in at least one instance the Second Defendant who allegedly conspired with the First Defendant to allegedly wrongfully and unlawfully circumvent the foreclosure process allegedly conspired with the First Defendant in an allegedly wrongfully and unlawfully attempt to avoid the foreclosure process. In that instance the Second Defendant on or around January 25, 2017  allegedly violated public policy when he allegedly assisted the First Defendant in their efforts to allegedly wrongfully and allegedly unlawfully circumvent the foreclosure process, by allegedly wrongfully and allegedly in violation of public policy, and allegedly committing an immoral, unethical, oppressive, or unscrupulous act  by communicated with the winning tax sale bidder of the aforementioned supra properties during the tax sales redemption period, asked the Plaintiff to give the winning tax sale bidder full access to the Plaintiff's property, all while allegedly knowing that such acts are allegedly directly in violation of the rules of the tax sale.

10) The Second Defendant also allegedly in violation of public policy, told the Plaintiff in this case to give the winning tax sale bidder Ross Gulino full access to the properties. All of this was allegedly done (by the Second Defendant) during the tax sale redemption period (which allegedly violates public policy) and on behalf of the First Defendant, in an effort to sell the winning tax sale bidder the Plaintiff's note in an attempt to wrongfully and unlawfully avoid the foreclosure process.

11) The Plaintiff alleges that when he told the Second Defendant that his aforementioned act, allegedly violated the rules of the tax sale and public policy, Aaron Twersky of the Second Defendant, responded by saying to the Plaintiff, let he worry about that.

12) The Plaintiff alleges that an attempt to sell a note doesn't constitute a violation of public policy, but communicating with the winning tax sales bidder on the subject properties during the tax sale redemption period in an effort to sell the note to the winning tax sale bidder, and allegedly attempting to allow the winner tax sale bidder access to the properties during the tax sales redemption period and allegedly allowing the winning tax sale bidder to interfere with the Plaintiff's ownership and contractual relationship with the First Defendant of his properties, during the tax sale redemption period, allegedly does violate Public Policy, Connecticut General Statute, the rules of the property tax sale and is allegedly is immoral, unethical, oppressive, or unscrupulous.

13) The Plaintiff alleges in this CUTPA cause of Action against the Second Defendant, that the Second Defendant is not indemnified from this claim, made against it.

14) The Plaintiff alleges that as a result of this alleged conspiracy he suffered injury. After the aforementioned communication with the winning tax sale bidder, during the tax sale redemption period, the first Defendant intensified his attempt to unlawfully and wrongfully avoid the foreclosure process, by refusing to honor its aforementioned January 25, 2017 promises, representations, written Misstatement of Material fact and omission and unless the Plaintiff put the DEED in escrow and execute the aforementioned supra escrow agreement.

15) The Plaintiff alleges that he suffered injury, as he so entered into the escrow agreement, placed his DEED in escrow and lost his properties.

16)  The Plaintiff alleges that he suffered injury, as he is suffering the emotional distress of having to file

and law against both defendants and defendant a counterclaim from the both Defendants as a pro se litigant.

## PRAYER FOR RELIEF

Wherefore, The Plaintiff respectfully requests,

1) The Court orders that the note is satisfied in full.

2) The Court orders the first Defendant to issue to the Plaintiff the acknowledgement of the satisfaction of the note in full and the releases of the note, mortgage and issue the release of the guarantor to the guarantor on the subject properties.

3) Compensatory damages. Judgment for money damages against the Defendants.

4) Judgment for Punitive Damages against the Defendants.

5) Legal and other costs.

6) Such other just relief that the court deems just and proper.

7) Statement regarding amount in demand. The damages are greater than $15,000.

PLAINTIFF:

BY: _____

PAUL EDWARDS

PRO SE

OFFICE

PO BOX 9

MERIDEN CT 06450

TEL: 203-715-2776

pedevelopmentonline@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2017, a copy of the foregoing Notice of 2nd Amended Complaint was electronically filed with the Court. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System. I also certify a copy will be served on Defendant's Attorney, who filed an appearance in this case as follows: Glenn A. DuhL  ct 03644 Zangari Cohn Cuthbertson Duhl & Grello P.C. 59 Elm Street, Suite 400, New Haven, CT 06510, gduhl@zcclawfirm.com, by email, or hand delivery,  or first class mail, postage prepaid.

**PLAINTIFF:**

**BY:** _____

**PAUL EDWARDS**

**PRO SE**

**OFFICE**

**PO BOX 9**

**MERIDEN CT 06451**

**TEL: 203-715-2776**

**pedevelopmentonline@gmail.com**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| PAUL EDWARDS | : | CASE NO. 3:17-cv-0466 (SRU) |
| PLAINTIFF | : | |
| V. | : | |
| CBD & SONS LTD AND TWERSKY PLLC, | : | |
| DEFENDANTS | : | SEPTEMBER 25, 2017 |
| | : | |

### STATEMENT REGARDING AMOUNT IN DEMAND

The damages are greater than $15,000.

PLAINTIFF:

BY: _____

PAUL EDWARDS

PRO SE

OFFICE

9-11 COLONY ST

MERIDEN CT 06451

TEL: 203-715-2776

pedevelopmentonline@gmail.com