# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PAUL EDWARDS,
Plaintiff,

v.

CBD & SONS, and
TWERSKY PLLC,
Defendants.

No. 3:17-cv-00466 (SRU)

## RULING ON MOTION FOR SUMMARY JUDGMENT

Paul Edwards sued CBD & Sons ("CBD") and its attorney, Twersky PLLC ("Twersky"),

in connection with a loan issued to Edwards by CBD and secured by a mortgage on two

properties in Meriden, Connecticut. The defendants have moved for summary judgment against

all of Edwards's claims and in favor of their two counterclaims. Edwards has moved to amend

his complaint. I grant the defendants' motion with respect to all of Edwards's claims and CBD's

counterclaim for breach of contract. I deny the defendants' motion with respect to Twersky's

counterclaim for indemnification, and I deny Edwards's motion to amend his complaint.

## I.      Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). When ruling on a summary judgment motion, the court must "view the evidence in

the light most favorable to the non-moving party and draw all reasonable inferences in its favor."

*Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000); *Aldrich v. Randolph Ctrl. Sch.

Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all

inferences in favor of the nonmoving party"). "The burden of showing that no genuine factual

dispute exists rests upon the moving party." *Carlton v. Mystic Transp.*, 202 F.3d 129, 133 (2d Cir. 2000). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but must present sufficient evidence supporting its position "to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"The trial court's function at this stage is to identify issues to be tried, not decide them," *Graham v. Long Island R.R. Co.*, 230 F.3d 34, 38 (2d Cir. 2000), and so "[o]nly when no reasonable trier of fact could find in favor of the non-moving party should summary judgment be granted." *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000). Summary judgment therefore is improper "[w]hen reasonable persons, applying the proper legal standards, could differ . . . on the basis of the evidence presented." *Sologub*, 202 F.3d at 178. Nevertheless,

> the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

*Anderson*, 477 U.S. at 247–48.

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and in such circumstances, there is "no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim). To present a "genuine" issue of material fact and avoid summary judgment, the record must contain contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

## II.    Background[1]

On June 6, 2012, Edwards obtained a commercial promissory note from CBD in the amount of $750,000, due and payable June 1, 2013. The note was secured by an open-end commercial mortgage deed on two properties located on Colony Street in Meriden, Connecticut.

On May 31, 2013, Edwards and CBD entered into a modification agreement that extended the maturity date of the June 6, 2012 note and mortgage from June 1, 2013 to May 31, 2014. On April 4, 2014, Edwards and CBD entered into a forbearance agreement with respect to interest payments. Edwards has been in default of the note since May 31, 2014.

In May 2016, Edwards and CBD received notice of a City of Meriden tax sale to be conducted on August 3, 2016. They also were informed that following the tax sale, Edwards had a six-month right of redemption and could void the tax sale by paying his property tax delinquency by February 3, 2017.

Edwards applied for financing with Riverdale Funding ("Riverdale") in December 2016. On January 4, 2017, Edwards informed CBD that Riverdale had approved his loan request, and asked that CBD accept a discounted payoff of the amounts due on its note. CBD agreed to accept the discounted payoff. As a condition of accepting the discounted payoff, CBD required Edwards to enter into an Escrow Agreement that required Edwards to place the deed to the properties in escrow.[2] The agreement also provided that if either (a) the Riverdale loan was not made, or (b) the loan was not made in an amount sufficient to satisfy the discounted payoff amount of

---

[1] Except where indicated, the facts are taken from the defendants' Local Rule 56(a)1 Statement, Doc. No. 64-1, insofar as admitted by Edwards' Local Rule 56(a)2 Statement, Doc. No. 74-1.

[2] Edwards alleges that CBD did not tell him about the escrow condition when it initially agreed to accept the discounted payoff. *See* Local Rule 56(a)2 Statement, Doc. No. 74-1, at 7–8.

$180,000 and the $92,751.07 tax lien on the properties, then CBD would have the right to record the deed and take the properties.

On February 2, 2017, Edwards and CBD entered into an Escrow Agreement in accordance with the above terms. *See id.* In relevant part, the agreement provides as follows:

> *WHEREAS*, Mortgagor and Mortgagee executed and entered into an Open End Commercial Mortgage Deed (the "Mortgage") and Commercial Promissory Note (the "Note") on or about June 6, 2012, in the principal amount of Seven Hundred and Fifty Thousand Dollars ($750,000.00), which after Mortgagor's default, has accrued interest and fees that now totals over One Million Dollars ($1,000,000.00);
>
> * * *
>
> *WHEREAS*, Mortgagor has not made any payments towards the Note and has completely defaulted;
>
> * * *
>
> *WHEREAS*, Mortgagee was forced to pay off a tax lien on the Properties in the amount of approximately Ninety Two Thousand, Seven Hundred and Fifty One Dollars and Seven Cents ($92,751.07) because Mortgagor did not pay any taxes on the Properties;
>
> *WHEREAS*, Mortgagor has sought refinancing to satisfy the Note, albeit at a steep discount, and has received a soft-offer from Riverdale Funding, LLC ("Riverdale") in the amount of One Hundred and Eighty Thousand Dollars ($180,000.00), plus reimbursement for the delinquent taxes Mortgagee paid, in the amount of approximately Ninety Two Thousand, Seven Hundred and Fifty One Dollars and Seven Cents ($92,751.07), totaling a refinance amount of approximately Two Hundred and Seventy Two Thousand, Seven Hundred and Fifty One Dollars and Seven Cents ($272,751.7) (the "Riverdale Refinance");
>
> *WHEREAS*, the Riverdale Refinance has not yet closed or materialized yet but Mortgagor anticipates it will close imminently;
>
> *WHEREAS*, in order to facilitate Mortgagor in having additional time to close the Riverdale Refinance, and to provide additional security to Mortgagee relating to the Properties, and the Note and Mortgage they secure, the Parties have caused or will cause a certain deed to the Properties to be deposited in escrow with AARON TWERSKY, ESQ. ("Twersky") in accordance with the terms and provisions of this Escrow Agreement.

*NOW THEREFORE*, in consideration of the mutual covenants and promises contained herein, and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the undersigned agree as follows:

\* \* \*

2. *Escrow Terms*:

a. This Escrow Agreement provides for Mortgagor to execute and sign a deed to the properties, conveying full and ownership of the noted Properties from Mortgagor to Mortgagee (the "Deed").

b. Aaron Twersky, Esq., of Twersky PLLC, agrees to be the Escrow Agent.

c. The Deed shall be held in Escrow by Twersky pursuant to the following terms:

i. Mortgagor has until March 22, 2017, time being of the essence, to secure, finalize and close on the Riverdale Refinance, subject to Mortgagee's exclusive and complete consent and approval to its terms and conditions.

ii. If by March 22, 2017, the Riverdale Refinance has not yet closed, completely, or the terms of the Riverdale Refinance are not satisfactory to Mortgagee in its sole discretion, Twersky, as Escrow Agent for Mortgagee, has the full right and authority to release the Deed being held in Escrow for filing and recording with the city of Meriden, Connecticut's property Register and/or Clerk's office.

iii. Mortgagor is hereby prohibited from conveying or changing the individual or entity that retains title to the noted Properties during the term of this Agreement in any way.

3. *Tenancy Rights Release*: If the Riverdale Refinance does not materialize for any reason and the Deed relating to the Properties is filed and recorded, Mortgagor agrees to fully give up, disclaim and release any tenancy rights he, or any of his agents, may have to the Properties and agrees to vacate the Properties within Fifteen (15) days after notice to the Mortgagor by Mortgagee. Notice to Mortgagor may be effected in oral or written form. If Mortgagor does not vacate the Properties within the noted Fifteen (15) days, Mortgagor hereby consents and authorizes Mortgagee to physically

remove Mortgagor's property and personal belongings from the Properties and to dispose of [them] as it wishes. Mortgagor hereby further consents and authorizes Mortgagee to seek the assistance of the Marshal or Sheriff to evict Mortgagor immediately from the Properties, at the full cost and reimbursement of Mortgagor.

4. _Bankruptcy Court Restriction_: Mortgagor is hereby prohibited and restricted from filing any action in Bankruptcy Court or any other Court that would delay or stay the terms of this Agreement, whether intended on or not. Mortgagor consents and acknowledges that any filing of any kind by Mortgagor, or any agent, shall be treated as an immediate unwaivable breach of this Agreement and Mortgagor authorizes Twersky to release, record and file the Deed accordingly.

\* \* \*

6. _No Duress_: The undersigned state and acknowledge that the Parties are signing this Agreement freely, willfully, not under duress and not under any undue influence, by any other party, person, or for any other reason, when signing and executing this Agreement.

\* \* \*

9. _Representation_ by Counsel: The Parties hereby acknowledge and state that they have read this Agreement in its entirety, that they understand the contents thereof, that their execution of this Agreement is voluntary, that this Agreement is intended to resolve disputed claims and the consideration provided herein is fair and reasonable, and that the Parties have relied upon and/or had the opportunity to seek the legal advice of the attorneys of their own choice and such other persons as they may have deemed appropriate, prior to executing this Agreement.

10. _Governing Law and Interpretation_: This Agreement shall be governed and conformed in accordance with the laws of the State of New York without regard to its conflict of laws provision. In the event of a breach of any provision of this Agreement, either Party may institute an action specifically to enforce any term or terms of this Agreement and/or to seek any damages for breach in the State or Federal courts of the State of New York.

Escrow Agreement, Ex. B to Local Rule 56(a)1 Statement, Doc. No. 64-6, at 2–5.

Edwards also signed a Quitclaim Deed that "d[id] remise, release and forever QUITCLAIM . . . all the right, title, interest, claim and demand" to the Colony Street properties to CBD. Quitclaim Deed, Ex. A to Am. Mot. for TRO, Doc. No. 16-1, at 10. CBD placed the Quitclaim Deed in escrow pending the deadline in the Escrow Agreement. After the agreement was executed, CBD redeemed the properties from the tax sale by paying the $92,751.07 tax lien.

Edwards never obtained financing from Riverdale. Instead, on March 13, 2017, he commenced this lawsuit against CBD and Twersky in Connecticut Superior Court. Edwards alleged that both defendants (1) violated the Connecticut Unfair Trade Practices Act ("CUTPA"); (2) breached a contract with Edwards; (3) intentionally inflicted emotional distress; (4) negligently inflicted emotional distress; (5) were negligent; (6) fraudulently misrepresented; (7) fraudulently concealed; and (8) breached the implied covenant of good faith and fair dealing.

The defendants served on March 20, 2017, and—considering the filing of the lawsuit an immediate breach of the Escrow Agreement—CBD filed the deed to the properties in the Meriden Land Records on March 21, 2017. That same day, the defendants removed the case from Superior Court to this court.

## III.    Discussion

In response to the defendants' motion for summary judgment, Edwards filed a 225-page opposition memorandum accompanied by an additional 129 pages of supporting documents. Noting that "Local Rule 7(a)(5) provides that . . . 'memoranda . . . shall be no more than forty (40) . . . pages,'" *see* Order, Doc. No. 76, at 1 (quoting D. Conn. Local R. Civ. P. 7(a)(5)), I concluded that Edwards's opposition brief was "excessive" and "threaten[ed] to impose significant burdens on the defendants and the court." *Id.* Therefore, I ordered Edwards to file a corrected opposition within two weeks. Bearing in mind that "*pro se* plaintiffs should be granted

special leniency regarding procedural matters," *LeSane v. Hall's Sec. Analyst*, 239 F.3d 206, 209 (2d Cir. 2001), I granted Edwards leave to file "a maximum of ten excess pages, for a memorandum of no more than 50 double-spaced pages." Order, Doc. No. 76, at 1.

Edwards responded with a 64-page document that includes nine single-spaced pages of legal arguments and block quotes (characterized as a "table of authorities") as well as a four-page introduction. *See generally* Corr'd Mem. Opp'n Mot. Summ. J., Doc. No. 77. In addition, Edwards's corrected brief further attempts to evade the 50-page limit by liberally cross-referencing other documents in the record.[3] The result is that I (and the defendants) continue to be faced with an unnecessarily prolix memorandum that "grossly exceeds" the length permitted under the Local Rules. *See* Order, Doc. No. 76.

"[A]ll litigants, including pro ses, have an obligation to comply with court orders," *McDonald v. Head Crim. Ct. Supervisor Officer*, 850 F.2d 121, 124 (2d Cir. 1988), and "the indulgence afforded to a *pro se* litigant should not extend to the disregard of a judge's plain directives." *Lucas*, 84 F.3d at 538. Edwards arguably has not complied with the letter of my earlier order and certainly has not complied with its spirit. Because "courts are . . . to construe a *pro se* litigant's pleadings and motions liberally," *In re Sims*, 534 F.3d 117, 133 (2d Cir. 2008), I will do my best to reconstruct Edwards's arguments. But I cannot litigate his case for him, and when all that Edwards offers in opposition to summary judgment is a paragraph-long string cite, I will not scour the record in search of any hint of a coherent argument.

---

[3] *See, e.g.*, Corr'd Mem. Opp'n Mot. Summ. J., Doc. No. 77, at 34 ("The Plaintiff alleged the following, in his Claim of (Breach of Contract) in his [34] Amended Complaint and his [63] Motion for Leave to Amend Complaint, which includes the Plaintiff['s] proposed 2nd Amended Complaint. See Pg. 13,17,18 at t ¶ B xiii, B xv of this Memorandum of Law in Opposition to [64] Motion for Summary Judgment. See [63] Motion for Leave to Amend Complaint, which includes the Plaintiff['s] proposed 2nd Amended Complaint (facts) p.78-79 ¶ 144-158. p. 94-97 ¶1. 1-24. See [34] Amended Complaint (facts) pg. 24 ¶ 165-169. pg. 37 ¶ 22, 23, 24.").

The defendants' motion for summary judgment is directed at Edwards's Amended Complaint, which Edwards moved to amend on October 2, 2017. Doc. No. 63. I first consider whether the defendants' arguments establish the legal insufficiency of the claims in Amended Complaint.[4] Because I conclude that all of Edwards's claims in the Amended Complaint fail as a matter of law, I then consider Edwards's motion to amend. Finally, I address the defendants' two counterclaims, for indemnification and for breach of contract.

A. Edwards's Claims

Edwards's Amended Complaint raises eight claims: violation of CUTPA, breach of contract, fraudulent misrepresentation, fraudulent non-disclosure, and breach of the implied covenant of good faith and fair dealing (against both defendants); as well as intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence (against CBD alone). I conclude that all of Edwards's claims fail as a matter of law. Accordingly, I grant the defendants' motion for summary judgment with respect to all of the claims.

_____

[4] The defendants also assert that Edwards released all of the claims brought in this action by signing the Forbearance Agreement on April 4, 2014, which provides in pertinent part that Edwards "release[d] and forever discharge[d] [CBD] and its . . . attorneys . . . from any and all claims . . . , known and unknown, . . . whether or not related to the subject matter of this Agreement, the Loan Documents and/or any of the obligations under the Loan Documents, which Borrower and/or Guarantor now has or at any time may hold, by reason of any matter, cause or thing occurred, done, omitted or suffered to be done prior to the date of this Agreement." *See* Forbearance Agreement, Ex. G to Local Rule 56(a)1 Statement, Doc. No. 64-11, at 8. But "[e]xcept in very rare instances, . . . [the] release of a claim does not cover claims based on events that have not yet occurred." *Muldoon v. Homestead Insulation Co.*, 231 Conn. 469, 481 (1994). Even "language covering 'future claims' and 'unknown claims' in releases is ordinarily construed to cover only inchoate claims that are in being at the time of release." *Id.* at 481–82. Here, the release in the Forbearance Agreement plainly applies to claims deriving from "any matter, cause or thing occurred, done, omitted or suffered to be done *prior to the date of this Agreement*." *See* Forbearance Agreement, Doc. No. 64-11, at 8 (emphasis added). Because most of Edwards's claims derive from alleged conduct done *after* the date of the Forbearance Agreement, I will not award the defendants summary judgment on the basis of the release.

1. *CUTPA*

CUTPA provides in pertinent part: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). In order to determine what constitutes an "unfair or deceptive act[] or practice[]," Connecticut has adopted the Federal Trade Commission's "cigarette rule." *see Fink v. Golenbeck*, 238 Conn. 183, 215 (1996). That test inquires:

> 1. whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness;
>
> 2. whether it is immoral, unethical, oppressive, or unscrupulous;
>
> 3. whether it causes substantial injury to consumers (or competitors or other businessmen).

*See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972).

Edwards alleges three bases for his CUTPA claims against CBD and Twersky. First, he attacks certain actions by CBD's former vice president, Gary Escandon, who was terminated by CBD for gross misconduct. Most of those actions occurred in July and August 2012, well outside CUTPA's three-year statute of limitations. Am. Compl., Doc. No. 34, at 25–26; *see Avon Meadow Condo. Ass'n v. Bank of Bos. Conn.*, 50 Conn. App. 688, 699–700 (1998). Edwards also asserts, however, that within the limitations period, he discovered that Escandon "took a $23,000 commission for brokering the loan on behalf of [CBD], never disclosing that he . . . took this commission." Am. Compl., Doc. No. 34, at 27. Edwards alleges that CBD violated CUTPA by "[f]raudulently [c]onceal[ing] . . . Escandon's $23,000 commission." *Id.* at 31.

The defendants persuasively respond that Escandon's purported failure to disclose "does not . . . form a legally cognizable claim against CBD," because "one does not have a legal duty

to disclose a commission taken for brokering a private loan." Mem. Supp. Mot. Summ. J., Doc. No. 64-2, at 9; *see Glazer v. Dress Barn*, 274 Conn. 33, 84 (2005) ("A failure to disclose can be deceptive only if, in light of all the circumstances, there is a duty to disclose."). Edwards has not identified "any statute, regulation, or special relationship" that would have given rise to a duty to disclose Escandon's commission. *See* Mem. Supp. Mot. Summ. J., Doc. No. 64-2, at 10. Nor has he indicated how the commission—"[a] fee paid" by CBD to Escandon "as a percentage of the money received from the transaction," *see Black's Law Dictionary* (10th ed. 2014)—caused Edwards to "suffer[] an ascertainable loss." *See Marinos v. Poirot*, 308 Conn. 706, 713–14 (2013). Thus, the undisclosed commission cannot support Edwards's CUTPA claim.

In addition, Edwards alleges that CBD and Twersky "engaged in unfair methods of competition and unfair or deceptive acts or practices in the context of the lender[-]borrower relationship," specifically, by "put[ting] [Edwards] under [d]uress" and "forc[ing] [him] . . . to sign [the Escrow Agreement] or else lose his properties." Am. Compl., Doc. No. 34, at 27, 29. I already held in ruling on Edwards's motion for a temporary restraining order that "duress does not exist where consent to an agreement is secured because of hard bargaining or the pressure of financial circumstances."[5] *See* Am. Mot. TRO Hr'g Tr., Doc. No. 36, at 5; *cf. Warnaco, Inc. v. Farkas*, 872 F.2d 539, 546 (2d Cir. 1989) (under the law of New York—consistent with that of Connecticut—"hard bargaining positions . . . d[o] not constitute illegal duress"). Here, the terms

---

[5] In order to demonstrate duress sufficient to void an agreement, the defendant in a breach of contract action "must prove [1] a wrongful act or threat [2] that left the victim no reasonable alternative, and [3] to which the victim in fact acceded, and that [4] the resulting transaction was unfair to the victim." *Ace Equip. Sales v. H.O. Penn Machinery Co.*, 88 Conn. App. 687, 696 (2005). "The wrongful conduct . . . must induce a fearful state of mind in the other party, which makes it impossible for [the party] to exercise his own free will." *Id.* "[D]uress does not exist,'" however, merely because "consent to an agreement is secured . . . [by] hard bargaining or the pressure of financial circumstances." *United Rentals v. Bastanzi*, 2005 WL 5543590, at *5 (D. Conn. Dec. 22, 2005) (internal quotation marks omitted).

of the Escrow Agreement may have been "harsh," but they "d[id] not violate public policy," and conditioning the refinancing on Edwards entering into the Escrow Agreement "legally d[id] not constitute duress." Am. Mot. TRO Hr'g Tr., Doc. No. 36, at 4. Thus, the purported duress to which Edwards was subjected cannot support Edwards's CUTPA claim, either.[6]

As a matter of law, Edwards has not pointed to evidence sufficient to persuade a reasonable trier of fact that the defendants violated CUTPA. Therefore, I grant the defendants' motion for summary judgment with respect to Edwards's CUTPA claims.

### 2. *Breach of contract*

The essence of Edwards's breach of contract claim is that the defendants "breached the January 25, 2017 oral agreement . . . which was reduced to writing . . . in the form of the payoff letter dated January 25, 2017." Am. Compl., Doc. No. 34, at 33. According to Edwards, the defendants "agreed to accept . . . $180,000 to satisfy the note and release the mortgage plus $92,380.09 as reimbursement for the . . . tax payment, if paid by February 22, 2017." *Id.* Edwards alleges that the defendants "breach[ed] [the] agreement," however, by "requiring that [Edwards] sign an escrow agreement and sign a new deed conveying the properties to the Defendant[s]." *Id.* Edwards asserts that he acted "under severe duress" and "felt that he had no choice but to execute the escrow agreement and deed" lest he "lose his properties as a result of the Defendant[s'] failure to perform." *Id.* at 33–34.

---

[6] Even if the defendants subsequently violated the terms of the agreement with Edwards—as Edwards suggests—that also would not support Edwards's CUTPA claim, because "a simple breach of contract does not amount to a violation of CUTPA in the absence of substantial aggravating circumstances." *IN Energy Sols. v. Realgy, LLC*, 114 Conn. App. 262, 274 (2009); *see Naples v. Keystone Bldg. & Dev. Corp.*, 295 Conn. 214, 228 (2010) ("[N]ot every contractual breach rises to the level of a CUTPA violation."); *Emlee Equip. Leasing Corp. v. Waterbury Transmission*, 41 Conn. Supp. 575, 580 (1991) ("[A] simple breach of contract, even if intentional, does not amount to a violation of [CUTPA].").

In order to establish a prima facie case of breach of contract, Edwards must introduce evidence sufficient to persuade a reasonable trier of fact that there was (1) an agreement, (2) performance by one party, (3) breach by the other party, and (4) damages suffered or incurred as a direct result of that breach.[7] *See FCM Grp. v. Miller*, 300 Conn. 774, 798 (2011). The "agreement must be definite and certain as to its terms and requirements," *Perricone v. Perricone*, 292 Conn. 187, 223 (2009), for "[s]o long as any essential matters are left open for further consideration, the contract is not complete." *L&R Realty v. Conn. Nat'l Bank*, 53 Conn. App. 524, 535 (1999). Finally, the parties' "offer and acceptance . . . must be found to have been based on an identical understanding" of the contract. *L&R Realty*, 53 Conn. App. at 534. "If the minds of the parties have not truly met, no enforceable contract exists." *Id.* at 535.

As I previously held during the hearing on Edwards's amended motion for a temporary restraining order, "as a matter of law, . . . Edwards does not have an enforceable contractual claim" against either defendant. *See* Am. Mot. TRO Hr'g Tr., Doc. No. 36, at 3. First, the January 25, 2017 payoff letter does not constitute an enforceable contract between Edwards and CBD. Although a "payoff letter" may provide "documentary evidence of [an] agreement," *see Credit Mgmt. Corp. v. Henderson*, 2007 WL 155178, at *2 (Conn. Super. Ct. Jan. 4, 2007), none of the elements of a binding contract is present here.[8]

---

[7] I note that the Escrow Agreement expressly provides that it "shall be governed and conformed in accordance with the laws of the State of New York without regard to its conflict of laws provision." Doc. No. 64-6, at 5. Notwithstanding that provision, however, both sides' briefs cite to Connecticut cases, and that "implied consent is . . . sufficient to establish" that Connecticut law controls. *See Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 (2d Cir. 2001).

[8] The payoff letter represents an attempt to resolve Edwards's debt by means of "[a]ccord and satisfaction," which is "a method of discharging a claim whereby the parties agree to give and accept something other than that which is due in settlement of the claim and to perform the agreement." *Strang v. Witkowski*, 138 Conn. 94, 99 (1951). Because "[a]n accord is contractual in nature . . . , the essentials to a valid contract must be present, including proper subject matter,

Most notably, no consideration from Edwards is evident in the payoff letter. In the letter, Twersky agrees to "deliver a satisfaction of the Mortgage" for nearly $500,000 less than the principal of the original loan, and to pay "the delinquent taxes on the Propert[ies]." *See* Payoff Letter, Ex. H to Local Rule 56(a)1 Statement, Doc. No. 64-12, at 2. Edwards agreed to pay the amount, but he already was obligated to pay under the original loan agreement, and "a promise to do that which one is already bound by his contract to do is not sufficient consideration to support an additional promise by the other party to the contract." *New Eng. Rock Servs. v. Empire Paving*, 53 Conn. App. 771, 776 (1999). Even though Edwards may be construed to have additionally agreed to pay the amount of the delinquent taxes in the payoff letter, the total amount—approximately $270,000—was well below the $1,000,000 he owed CBD in interest and principal, and did not "require[] [Edwards] to do . . . something further than, or different from, that which he [was] already bound to do." *Thermoglaze, Inc. v. Morningside Gardens Co.*, 23 Conn. App. 741, 745 (1991); *see* Payoff Letter, Doc. No. 64-12, at 2. "[I]n the absence of consideration an executory promise is unenforceable," and so Edwards has not shown that the payoff letter entailed a binding contract.[9] *Conn. Nat'l Bank v. Voog*, 233 Conn. 352, 366 (1995).

Second, even if the January 25, 2017 letter were a binding contract, Edwards has not shown that CBD breached it. The letter purports to bind CBD to "deliver[ing] a satisfaction of the Mortgage provided" that Edwards paid $270,000 on or before February 22, 2017, and also

---

competent parties, a meeting of the minds of the parties, and consideration." *Troj v. Lane*, 1998 WL 175947, at *1 (Conn. Super. Ct. Apr. 3, 1998) (quoting 1 Am. Jur. 2d, Accord & Satisfaction § 5); *see W.H. McCune, Inc. v. Revzon*, 151 Conn. 107 (1963).

[9] Edwards also suggests that he entered into an oral agreement with CBD that constitutes a binding contract. But any such oral agreement would not be enforceable, not only because there was no consideration, but also because "[a] modification of a written agreement [for a loan exceeding $50,000] must be in writing to satisfy the statute of frauds." *See Deutsche Bank Tr. Co. Ams. v. DeGennaro*, 149 Conn. App. 784, 788 (2014).

stated that CBD "will be paying" Edwards's delinquent taxes. *See* Payoff Letter, Doc. No. 64-12, at 2. CBD did, in fact, redeem the Colony Street properties. But Edwards did not provide $270,000 by February 22, 2017, which—by the agreement's own terms—rendered the "letter . . . null and void." *See* Payoff Letter, Doc. No. 64-12, at 2. Therefore, Edwards has not shown that CBD breached the terms of the January 25, 2017 payoff letter.[10]

Edwards did have until March 22, 2017 to refinance under the terms of the Escrow Agreement, *see* Doc. No. 64-6, at 3, but that agreement did not purport to extend the deadline of the January 25, 2017 payoff letter. Furthermore, CBD persuasively asserts that it did not breach the Escrow Agreement, either. Although CBD filed the deed one day before the March 22, 2017 deadline, Local Rule 56(a)1 Statement, Doc. No. 64-1, at 5, the Escrow Agreement allowed CBD to do so if Edwards breached his promise not to "fil[e] any action in Bankruptcy Court or any other Court that would delay or stay the terms of this Agreement, whether intended on or not." Escrow Agreement, Doc. No. 64-6, at 5. Edwards filed the present lawsuit on March 13, 2017 and sought a temporary restraining order directing the defendants to "un-record the deed." *See* Am. Mot. TRO, Doc. No. 18, at 6. That filing constituted an attempt to "delay or stay the terms of th[e] [Escrow] Agreement." *See* Escrow Agreement, Doc. No. 64-6, at 5. Thus, CBD did not breach the agreement by filing it one day before the March 22, 2017 deadline.

As indicated above, Edwards has suggested that the Escrow Agreement is unenforceable because he only executed it "under extreme duress" while "fe[eling] that he had no choice." *See* Am. Compl., Doc. No. 34, at 19. Again, though, "conduct . . . must be manifestly tainted with

---

[10] Edwards invokes the "doctrine of prevention," which imposes a duty "to refrain from actions that would prevent or hinder the performance of another party to the contract." *Blumberg Assocs. Worldwide v. Brown & Brown of Conn.*, 132 Conn. App. 85, 95 (2011). That doctrine has no application here because Edwards has not shown that the escrow agreement at all impeded his ability to refinance the properties during the period set by the January 25, 2017 payoff letter.

some degree of fraud or wrongdoing in order to invalidate an agreement on the basis of duress." *Capuno v. Brown*, 1998 WL 437350, at *3 (Conn. Super. Ct. July 22, 1998) (quoting *Carlile v. Snap-On Tools*, 271 Ill. App. 3d 833, 648 N.E.2d 317, 322 (1995)). "[H]ard bargaining positions" are not enough. *See Farkas*, 872 F.2d at 546. Here, the defendants' insistence on harsh terms in the Escrow Agreement "may have presented [Edwards] with difficult choices," but that conduct "hardly r[o]se to the level of duress." *See FDIC v. Menendez*, 1992 WL 394461, at *2 (Conn. Super. Ct. Dec. 17, 1992); *accord Warnaco, Inc.*, 872 F.2d at 546 ("The threat of economic losses . . . hardly deprived [the defendant] of his free will, and he therefore cannot prevail on a duress defense."); *Ace Equip. Sales*, 88 Conn. App. at 696 (no duress because "[t]he plaintiff did not have to enter into the agreement, but chose to do so for economic reasons").

As a matter of law, I hold that the defendants did not breach any enforceable contract with Edwards. Therefore, I grant the defendants' motion for summary judgment with respect to Edwards's breach of contract claim.

### 3. *Fraudulent misrepresentation*

Edwards claims that CBD and Twersky "made a written misstatement of fact" when they wrote the January 25, 2017 payoff letter to Riverdale, saying that CBD "would pay the arrears/delinquent taxes" without "condition[ing] [that payment] on [Edwards] signing an escrow agreement." Am. Compl., Doc. No. 34, at 52. Edwards asserts that the misstatement was "made . . . [to] induce [Edwards] to rely upon . . . the Defendant[s] . . . mak[ing] the aforementioned payment," and that he suffered harm from the defendants' failure to fulfill their promise. *Id.* The defendants respond that they "did not make any false statement to induce [Edwards] to do anything and . . . did in fact pay the arrears tax." Mem. Supp. Mot. Summ. J., Doc. No. 64-2, at 21–22. Rather, they assert that, after Edwards "did not follow through with many repeated

promises of refinancing his loan," they "changed [their] mind[s] and felt [they] had to protect [themselves] before paying the arrears tax." *Id.* at 21.

A cause of fraudulent misrepresentation requires Edwards to show that:

      (1) a false representation was made as a statement of fact;

      (2) it was untrue and known to be untrue by the party making it;

      (3) it was made to induce the other party to act upon it; and

      (4) the other party did so act upon that false representation to his injury.

*Anastasia v. Beautiful You Hair Designs*, 61 Conn. App. 471, 477 (2001). "[T]he absence of any one of th[ose] [elements] is fatal to a recovery." *Id.* Moreover, the first three elements must be proved by "clear, precise[,] and unequivocal" evidence. *Id.*

Edwards clearly has not satisfied the requirements of a cause of action for fraudulent misrepresentation, particularly not by the "higher standard" of "clear, precise[,] and unequivocal" evidence. *See id.* For one thing, the January 25, 2017 payoff letter does not contain any false representations of fact: Twersky wrote that CBD "w[ould] be paying" the "delinquent taxes on the [p]roperty," which it proceeded to do. *See* Payoff Letter, Doc. No. 64-12, at 2. The letter expressly "reserves all rights [CBD] may have against" Edwards, and does not make any representations with regard to the deed to the properties. *See id.* For another thing, the payoff letter was addressed to Riverdale, not to Edwards, *see* Payoff Letter, Doc. No. 64-12, at 2 and Edwards does not allege that Riverdale was "induce[d]" to do anything. *Cf Anastasia*, 61 Conn. App. at 477. Nor, obviously, would Edwards have standing to bring any fraudulent misrepresentation claim on Riverdale's behalf.

Finally, Edwards cannot show (even by the lower standard of a preponderance of the evidence) that he "act[ed] upon [Twersky's] false representation to his injury." *See id.* Edwards's theory appears to be that he was injured because he "stopped seeking sources to pay the arrears

tax before the end of the redemption period because the Defendant[s] agreed to pay the arrears taxes before the end of the redemption period." *See* Am. Compl., Doc. No. 34, at 53. But Edwards has offered no evidence whatsoever that had any other viable "sources to pay the arrears tax." *Cf. id.* So far as appears from the record, before Twersky agreed to pay the delinquency, Edwards was sure to lose the properties to the tax sale. Even assuming, *arguendo*, that Twersky misled Edwards, no reasonable jury could find that Edwards was "injured" when he received an extra month to attempt to repay his debt.

As a matter of law, Edwards has not made a prima facie case of fraudulent misrepresentation. Therefore, I grant the defendants' motion with respect to that claim.

### 4. *Fraudulent non-disclosure*

Edwards also brings an entirely meritless claim for fraudulent non-disclosure (which he incorrectly calls "fraudulent concealment"). "Usually, mere non-disclosure does not amount to fraud. Non-disclosure may, however, amount to fraud when there is a failure to disclose known facts under circumstances that impose a duty to speak." *Dockter v. Slowik*, 91 Conn. App. 448, 458 (2005). I already have held that CBD was not under a duty to tell Edwards either that Escandon took a commission on Edwards's loan or that CBD later filed a lawsuit against Escandon. Edwards also was not harmed in any way by Escandon's actions. Although Edwards seems to imagine that CBD's uncollected judgment against Escandon should be applied to satisfy Edwards's loan, Edwards is the one who owes the debt. CBD's apparent (and correct) prediction that "foreclosure on [Edwards's] properties . . . would be costly [and] unfulfilling," *cf.* Am. Compl., Doc. No. 34, at 57, does not free Edwards of the obligation to pay his debt.

Edwards's fraudulent non-disclosure claim fails as a matter of law. I grant the defendants' motion for summary judgment with respect to that claim.

### 5. *Breach of the implied covenant of good faith and fair dealing*

Edwards further alleges that the defendants' conduct breached the implied covenant of good faith and fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Warner v. Konover*, 210 Conn. 150, 154 (1989). In order to prove a breach of the implied covenant of good faith and fair dealing, a plaintiff must show that the defendant "act[ed] . . . in bad faith" to "impede[] the plaintiff's right to receive benefits . . . under the contract." *De La Concha of Hartford v. Aetna Life Ins. Co.*, 269 Conn. 424, 433 (2004)). "[B]ecause the covenant of good faith and fair dealing only requires that neither party to a contract do anything that will injure the right of the other to receive the benefits of the agreement, it is not implicated by conduct that does not impair contractual rights." *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 795 (2013) (internal quotation marks and alterations omitted). "Whether a party has acted in bad faith is a question of fact . . . ." *Renaissance Mgmt. Co. v. Conn. Hous. Fin. Auth.*, 281 Conn. 227, 240 (2007).

I already have concluded that the defendants have not breached any contract with Edwards or "impair[ed] [Edwards's] contractual rights." *See Capstone Bldg. Corp.*, 308 Conn. at 795. Edwards has not identified any way in which the defendants impaired his ability to receive the benefits of the parties' agreement. Therefore, Edwards's bad faith claim fails as a matter of law. I grant the defendants' motion for summary judgment with respect to that claim.

### 6. *Intentional infliction of emotional distress*

Edwards claims that CBD is liable for intentional infliction of emotional distress because it committed "extreme and outrageous conduct . . . exceed[ing] all bounds tolerated by decent society," as a result of which Edwards has "ha[d] trouble sleeping, and is very stressed." Am. Compl., Doc. No. 34, at 38–39. Specifically, Edwards asserts that CBD "forced [him] under

duress to sign an escrow agreement and a deed to his properties," and then "breach[ed] . . . [the] agreement," causing Edwards to "los[e] title to his properties." *Id.* at 39. Edwards also complains that CBD "failed to notify [Edwards] of th[e] law suit" filed against its former vice president, Gary Escandon, and reiterates that CBD "failed to make [Edwards] aware that Gary Escandon took a $23,000 commission on [Edwards's] $750,000 loan. *Id.* at 41–42.

In order to prevail on his claim of intentional infliction of emotional distress, Edwards must show:

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct;
>
> (2) that the conduct was extreme and outrageous;
>
> (3) that the defendant's conduct was the cause of the plaintiff's distress; and
>
> (4) that the emotional distress sustained by the plaintiff was severe.

*Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 442–43 (2003). The conduct at issue must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 443. "Conduct . . . that is merely insulting or displays bad manners or results in hurt feelings is insufficient" to establish a claim for intentional infliction of emotional distress. *Id.*

I already held that Edwards was not subject to duress in signing the Escrow Agreement and that CBD did not breach the agreement. Thus, neither the purported duress nor the claimed breach can support Edwards's claim for intentional infliction of emotional distress. As for CBD's failure to inform Edwards about the lawsuit against Escandon or Escandon's commission, Edwards has not shown that CBD was under a legal obligation to disclose any such information. Hence, the failure to disclose cannot support Edwards's claim, either.

Moreover, CBD's alleged conduct does not remotely approach behavior "so outrageous in character, and so extreme in degree, as to . . . be regarded as . . . utterly intolerable in a civilized community." *Carrol*, 262 Conn. at 443. Edwards has alleged nothing more than hard bargaining and—at the absolute most—impatience on the part of CBD's agents. That cannot be considered conduct "of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Muniz v. Kravis*, 59 Conn. App. 704, 708 (2000).

As a matter of law, I hold that Edwards cannot prove the elements of intentional infliction of emotional distress. Therefore, I grant CBD's motion for summary judgment on that claim.

7. *Negligent infliction of emotional distress*

Edwards also claims that CBD is liable for negligent infliction of emotional distress. Edwards's allegations with respect to that claim are essentially identical to those made with respect to his claim of intentional infliction of emotional distress.

"[I]n order to prevail on a claim of negligent infliction of emotional distress, the plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." *Scanlon v. Conn. Light & Power Co.*, 258 Conn. 436, 446 (2001) (internal quotation marks omitted). As the Connecticut Supreme Court has held, that test:

> essentially requires that the fear or distress experienced by the plaintiffs be *reasonable* in light of the conduct of the defendants. If such a fear were reasonable in light of the defendants' conduct, the defendants should have realized that their conduct created an unreasonable risk of causing distress, and they, therefore, properly would be held liable. Conversely, if the fear were unreasonable in light of the defendants' conduct, the defendants would not have recognized that their conduct could cause this distress and, therefore, they would not be liable.

*Carrol*, 262 Conn. at 447 (emphasis added).

Here, CBD's conduct was "like that of any regular business." Mem. Supp. Mot. Summ. J., Doc. No. 64-2, at 18. Notwithstanding CBD's hard bargaining, it would not have been "reasonable" or foreseeable for Edwards to suffer distress sufficient to cause "illness or bodily harm" as a result of the negotiations. *See Scanlon*, 258 Conn. at 446. The facts in this case do not even come close to those in which courts have held that a plaintiff reasonably suffered severe emotional distress. *See, e.g.*, *Carrol*, 262 Conn. at 447–48 (plaintiff "could not sleep, had frequent nightmares, had a loss of appetite, and experienced depression and a sense of isolation from his community" after defendant conducted a "shoddy" arson investigation "influenced by racial stereotypes").

As a matter of law I hold that Edwards has not established the elements of a claim for negligent infliction of emotional distress, and therefore, I grant CBD's motion for summary judgment with respect to that claim.

8. *Negligence*

Finally, Edwards alleges that CBD was "[n]egligen[t] in its contractual relationship]" with Edwards. Am. Compl., Doc. No. 34, at 46. In order to prove negligence, Edwards must show that (i) CBD owed him a duty; (ii) CBD breached that duty; (iii) CBD's breach caused Edwards injury; and (iv) Edwards suffered an actual injury. *See Jagger v. Mohawk Mountain Ski Area*, 269 Conn. 672, 687 n.13 (2004). "Duty is a legal conclusion about relationships between individuals, made after the fact . . . . The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual." *Jaworski v. Kiernan*, 241 Conn. 399, 405 (1997). The "threshold inquiry . . . [is] whether the specific harm alleged by the plaintiff was foreseeable to the defendant," i.e., "whether a

reasonable person in the defendant's position, knowing what [it] knew or should have known, would have anticipated the harm that resulted from [its] actions." *Id.*

Edwards claims that CBD breached its duty by "fail[ing] to use reasonable care and issue the satisfaction of the note, and the releases for the note [and] mortgage, . . . pursuant to the escrow agreement." *See* Corr'd Mem. Opp'n Mot. Summ. J., Doc. No. 77, at 36. But CBD was not under any duty to issue a satisfaction and release under the Escrow Agreement because Edwards did not fulfill the terms of the agreement. Furthermore, under Connecticut law, the lender "is not bound to . . . offer a release of the mortgage until the debt is satisfied," which occurs "when the mortgagee has appropriated to it the property mortgaged, *and the value of that property exceeds the mortgage debt*." *Hartford Fed. Savs. & Loan Ass'n v. Tucker*, 196 Conn. 172, 181 (1985); *Desiderio v. Iadonisi*, 115 Conn. 652, 652 (1932) (emphasis added). After Edwards failed to fulfill the conditions for CBD's acceptance of the discounted payoff, CBD did not breach any duty to Edwards by "fail[ing] to release [his] mortgage for substantially less than it was owed." *See Lind-Larsen v. Fleet Nat'l Bank of Conn.*, 84 Conn. App. 1, 13 (2004).

Because I conclude that CBD did not owe Edwards a duty as a matter of law, I need not consider whether CBD violated any such duty. *See Jawoski*, 241 Conn. at 404. Therefore, I grant the defendants' motion for summary judgment with respect to Edwards's negligence claim.

### B. Edwards' Motion to Amend

On September 25, 2017, Edwards moved to amend the Amended Complaint. Doc. No. 63. The defendants opposed on October 16, 2017. Doc. No. 67.

Federal Rule of Civil Procedure 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave." Although the rule adds that "[t]he court should freely give leave when justice so requires," *id.*, "it is within the sound

discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Id.* (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Leave to amend also "should generally be denied" when a party has "repeated[ly] fail[ed] to cure deficiencies by amendments previously allowed." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (quoting *Foman*, 371 U.S. at 182). "If the party opposing amendment demonstrates the presence of one or more of the negative factors listed in *Foman*," then "the amendment will not be allowed." *Nwachukwu v. Liberty Bank*, 257 F. Supp. 3d 280, 285 (D. Conn. 2017).

Edwards argues that he should be permitted to amend his complaint again "in order to facilitate a proper decisions on the merits." Second Mot. Am. Compl., Doc. No. 63, at 1. Edwards asserts that "[t]he proposed amendment would . . . properly state legal[ly] cognizable claims or causes of action" and would "clarify [Edward]'s underlying claims and circumstances alleged against the Defendants." *Id.* The defendants respond that "the proposed Second Amended Complaint does not add anything substantive" and is "entirely futile." Mem. Opp'n Second Mot. Am. Compl., Doc. No. 67, at 1–2. They therefore ask that I deny Edwards's motion to amend.

"[L]eave to amend need not be granted . . . where the proposed amendment would be futile," *Williams v. Citigrp.*, 659 F.3d 208, 214 (2d Cir. 2011), such as when "the amended pleading fails to state a claim." *Faryniarz v. Ramirez*, 62 F. Supp. 3d 240, 249 (D. Conn. 2014). In particular, "[w]hen [a] proposed amended complaint is in response to an otherwise meritorious motion for summary judgment, . . . leave to amend may be denied as futile if 'the factual foundations of [the] new allegations are insufficient, as a matter of law, to withstand the motion

for summary judgment.'" *Simmons v. Charter Commc'ns*, 222 F. Supp. 3d 121, 133 (D. Conn. 2016) (quoting *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001)).

Having examined the proposed Second Amended Complaint, I agree with the defendants that "the facts as plead[ed] in the proposed Second Amended Complaint contain the same infirmities as [those] in the Amended Complaint." *See* Mem. Opp'n Second Mot. Am. Compl., Doc. No. 67, at 6. The proposed amendment would not cure the fatal legal deficiencies that I have identified in all of Edwards's claims. Furthermore, amendment at this late stage of the litigation undoubtedly would prejudice the defendants. *See Simmons*, 222 F. Supp. 3d at 133 n.7 (holding that "permitting [plaintiff] to amend his complaint" after a motion for summary judgment "would be prejudicial to [defendant]," because plaintiff "already amended his complaint once and the parties have conducted extensive discovery").

This case has been pending for more than a year, and the parties have had ample opportunity for discovery (which apparently did not produce any evidentiary support for Edwards's claims). Edwards's proposed amendments are non-substantive and would not give rise to viable claims. Hence, I exercise my discretion to deny Edwards's motion to amend his complaint.

C. The Defendants' Counterclaims

The defendants also have moved for summary judgment on two counterclaims. The first counterclaim (pertaining to Twersky) seeks indemnification pursuant to the Escrow Agreement. *See* Am. Answer & Counterclaims, Doc. No. 56, at 40. The second counterclaim (pertaining to CBD) seeks to hold Edwards liable for breach of the promissory note. *Id.* I deny the defendants' motion for summary judgment with respect to the first counterclaim, and grant the motion with respect to the second.

1. *Indemnification*

The Escrow Agreement provides in pertinent part:

> *Indemnification of Escrow Agent*: The Parties to this Escrow Agreement
> (other than the Escrow Agent) hereby jointly and severally agree to
> indemnify and hold Escrow Agent, Twersky, his affiliates and his officers,
> employees, successors, assigns, attorneys and agents (each an
> '*Indemnified Party*') harmless from all losses, costs, claims, demands,
> expenses, damages, penalties and attorney's fees suffered or incurred
> because of any Indemnified Party or Escrow Agent, or by any Indemnified
> Party or Escrow Agent, as a result of anything which it may do or refrain
> from doing in connection with this Escrow Agreement or any litigation or
> cause of action arising from or in conjunction with this Escrow Agreement
> or involving the subject matter hereof or the Deed held hereunder . . . .[11]

Escrow Agreement, Doc. No. 64-6, at 4.

Twersky claims that, "pursuant to the doctrine of contractual indemnification," the

Escrow Agreement entitles him to "attorneys' fees, costs, expenses[,] and disbursements incurred

in the defense of this action." Mem. Supp. Mot. Summ. J., Doc. No. 64-2, at 30. Twersky also

asserts that Edwards "is bound to fully indemnify and hold Twersky . . . harmless." *See* Mot.

Summ. J., Doc. No. 64-2, at 30. Twersky need not be indemnified for any damages, however,

because I have granted summary judgment against Edwards's claims. Therefore, the only issue

to be decided is whether Twersky is entitled to an award of attorneys' fees and costs.

"[A]n action for indemnification is one in which one party seeks reimbursement from

another party for losses," most commonly those "incurred in connection with the first party's

---

[11] By its terms, the Escrow Agreement requires indemnification from both Edwards and CBD.
The Forbearance Agreement, however, separately provides that Edwards shall "indemnify
[CBD] . . . [for] any and all losses, debts, damages, obligations, claims, demands, actions, causes
of action, lawsuits, penalties, judgments, costs and expenses (including, without limitation,
attorneys' fees), of every nature and description, which [CBD] may sustain or incur, based upon,
arising out of, or in any way relating to this Agreement and/or any of the Loan Documents." *See*
Forbearance Agreement, Doc. No. 64-11, at 8. Thus, CBD would itself be entitled to
indemnification from Edwards for any attorneys' fees expended by CBD. In any event, Twersky
has sought indemnification only from Edwards, not from CBD.

liability to a third party." *Amoco Oil Co. v. Liberty Auto & Elec. Co.*, 262 Conn. 142, 148 (2002). "[T]he concept of indemnity usually involves an indemnitor, *A*, and an indemnitee, *B*, who enter into a contract whereby *A* agrees to indemnify *B* for any money *B* becomes legally obligated to pay to a third party." *Amoco Oil Co.*, 262 Conn. at 149. To be sure, "the term 'indemnity' . . . is not limited to reimbursement of a third party claim," and parties may contract to "use the term 'indemnity' to include direct liability as well as third party liability." 41 Am. Jur. 2d, *Indemnity* § 1; *cf. Black's Law Dictionary* (10th ed. 2014) (defining "indemnify" as the act of "reimburs[ing] (another) for a loss suffered because of a third party's or one's own act or default"). But in the absence of evidence to the contrary, courts presume that an indemnification agreement only "protect[s] the indemnitee against claims asserted by third parties against the indemnitee." *Amoco Oil Co.*, 262 Conn. at 148.

In order to prevail on a contractual indemnification claim, the indemnitee "must show either an express or implied contractual right to indemnification." *Fifield v. S. Hill Ltd. P'ship*, 20 F. Supp. 2d 366, 370 (D. Conn. 1998). The claim "must be supported by the terms of the contract," *Danbury Bldgs. v. Union Carbide Corp.*, 963 F. Supp. 2d 96, 103 (D. Conn. 2013) (quoting *DeCarlo & Doll v. Town of Chester*, 2008 WL 4416073, at *2 (Conn. Super. Ct. Sept. 17, 2008)), as interpreted "in light of the situation of the parties and the circumstances connected with the transaction." *Conn. Light & Power Co. v. Lighthouse Landings*, 279 Conn. 90, 109 (2006). "The unambiguous language of an indemnity clause should be given effect as expressing the parties' intention," *Laudano v. Gen. Motors Corp.*, 34 Conn. Supp. 684, 686 (1977), and should "be construed to cover such losses which appear to have been intended by the parties." *Leonard Concrete Pipe Co. v. C.W. Blakeslee & Sons*, 178 Conn. 594, 599 (1979).

Here, the indemnification clause on which Twersky relies does not expressly state whether it "include[s] direct liability as well as third party liability." *Cf.* 41 Am. Jur. 2d, *Indemnity* § 1. "[L]ooking at the contract as a whole," *C&H Elec. v. Town of Bethel*, 312 Conn. 843, 853 (2014), I see persuasive evidence that direct liability was not contemplated. The Escrow Agreement provides that it "shall be governed and conformed in accordance with the laws of the State of New York."[12] Doc. No. 64-6, at 5. New York courts consistently have "refused to read an attorney's fees provision as including claims between the parties themselves, as opposed to third-party claims, where the provision did not 'exclusively or unequivocally' refer to such claims or otherwise 'support an inference'" that such claims were included. *Mid-Hudson Catskill Rural Migrant Ministry v. Fine Host Corp.*, 418 F.3d 168, 177 (2d Cir. 2005) (Sotomayor, J.) (quoting *Hooper Assocs. v. AGS Computers*, 74 N.Y.2d 487, 492 (1989)). "Where a general indemnification provision does not explicitly provide for indemnification for suits *between* the parties to the contract," New York courts have held that "a claim for such indemnification must fail." *See Abakan, Inc. v. Uptick Capital*, 943 F. Supp. 2d 410, 415 (S.D.N.Y. 2013).

Twersky is based in New York and all of its attorneys are admitted to practice in that state. I presume that the lawyers would have been aware of the aforementioned line of cases and that, by failing to "clearly" and "unmistakably" provide that suits between the parties were included, Twersky intended to indicate that the parties did not "contract to indemnify [each] other for attorney[s'] fees incurred in litigation between them." *Cf. Hooper*, 74 N.Y.2d at 492. Therefore, Twersky is not entitled to indemnification of its attorneys' fees under the Escrow

---

[12] I consider the Escrow Agreement's choice of law provision as evidence of the parties' intent at the time of contracting, even though in this litigation the defendants have consented by their conduct to the choice of Connecticut law. *Cf. supra* note 7.

Agreement. I deny the defendants' motion for summary judgment on the indemnification

counterclaim, and *sua sponte* dismiss that counterclaim for failure to state a claim.[13]

### 2.  *Breach of the promissory note*

CBD moves for summary judgment on its counterclaim that Edwards breached the

promissory note. Edwards responds that CBD's breach of contract counterclaim is barred under

the doctrine of "unclean hands" because CBD's former vice president, Gary Escandon, "hindered

[Edwards's] ability to perform under . . . the note." Corr'd Mem. Opp'n Mot. Summ. J., Doc. No.

77, at 57. He also argues that "the note is already satisfied in full" because CBD now holds legal

title to the properties. *See id.* Finally, Edwards contends that CBD is barred from seeking

damages for breach of contract under the doctrine of equitable estoppel. *See id.* at 77.

Edwards does not meaningfully contest that CBD has made a prima facie showing of

breach of contract, namely, that Edwards and CBD formed an agreement (the promissory note);

CBD performed by loaning Edwards $750,000; Edwards breached by failing to repay the loan;

and CBD suffered damages from Edwards's default. *See FCM Grp.*, 300 Conn. at 798.

Accordingly, I will focus on Edwards's three affirmative defenses.

First, Edwards argues that CBD's breach of contract counterclaim is barred because CBD

had unclean hands. "[T]he equitable defense of unclean hands bars only equitable relief." *Weiss*

*v. Smulders*, 313 Conn. 227, 265 n.19 (2014). Although "foreclosure is an equitable action,"

---

[13] I also note that Twersky's motion could be denied on the separate ground that it has not shown
that it "has suffered a loss, i.e., made a payment." *See Sompo Japan Ins. Co. of Am. v. Norfolk S.
Ry. Co.*, 762 F.3d 165, 188 (2d Cir. 2014). "A party is not entitled to recover costs when no costs
have been incurred," *Schneider v. Nat'l R.R. Passenger Corp.*, 987 F.2d 132, 139 (2d Cir. 1993)
and Twersky has not introduced any evidence that it—as opposed to its insurer—has actually
paid attorneys' fees and costs in the course of defending against Edwards's claims. *Cf. id.* at 138
(holding that defendant could not recover attorneys' fees "because its insurer had paid those
expenses," and "[a] party must sustain a loss in order to assert an indemnification claim") (citing
*First New Haven Nat'l Bank v. Rosenberg*, 33 Conn. Supp. 1, 4 (1975)).

*Monetary Funding Grp. v. Pluchino*, 87 Conn. App. 401, 407 (2005), "money damages for . . . breach of contract" is a "legal remedy." *Weiss*, 313 Conn. at 265 n.19. Thus, Edwards's unclean hands defense has no applicability to CBD's breach of contract claim.

Second, Edwards asserts that the note has been satisfied because CBD has the deed to the properties, which I interpret as an attempt to invoke the defense of accord and satisfaction. "An accord is a contract between creditor and debtor for the settlement of a claim by some performance other than that which is due. Satisfaction takes place when the accord is executed." *Herbert S. Newman & Partners v. CFC Constr. Ltd. P'ship*, 236 Conn. 750, 764 (1996). The Escrow Agreement does constitute a contract to settle Edwards's debt "by some performance other than that which [was] due." *See id.* But the debt was never satisfied because Edwards never performed: he did not pay CBD $180,000 (plus the amount of the tax delinquency) by March 22, 2017, as promised under the agreement. Upon Edwards's breach of the Escrow Agreement, he resumed his existing obligations under the loan documents. Because the value of the properties is indisputably less than the amount of Edwards's debt, CBD's possession of the deed to the properties did not satisfy the note. Edwards's defense fails.[14]

Third, Edwards attempts to rely on the doctrine of equitable estoppel. The doctrine of equitable estoppel holds that "where one, by his words or actions, intentionally causes another to believe in the existence of a certain state of things, and thereby induces him to act on that belief, so as injuriously to affect his previous position, he is [precluded] from averring a different state of things as existing at the time." *TD Bank v. M.J. Holdings*, 143 Conn. App. 322, 338 (2013). Equitable estoppel requires (i) that the party to be estopped "d[id] or sa[id] something" that was

---

[14] Edwards also could be construed to argue that CBD has not suffered any damages, an essential element of the breach of contract counterclaim. That argument would fail for the same reason: CBD suffered damages because the properties are worth less than the amount Edwards owes.

"intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief," and (ii) that "the other party, influenced thereby, . . . actually change[d] his position or d[id] something to his injury which he otherwise would not have done." *Id.* The conduct that Edwards claims should give rise to equitable estoppel is the same as formed the basis for his claim of fraudulent misrepresentation, and fails for the same reasons.

Most notably Edwards has not shown how he was remotely "prejudice[d]" by CBD's conduct. *See id.* CBD gave Edwards an opportunity to satisfy the note for far less than CBD was owed; Edwards failed to fulfill the conditions of the agreement. Edwards did not suffer any prejudice merely because CBD "fail[ed] to release [his] mortgage for substantially less than it was owed." *See Lind-Larsen*, 84 Conn. App. at 13.

Edwards's defenses to CBD's breach of contract counterclaim fail, and under the undisputed facts, CBD is entitled to judgment as a matter of law. Therefore, I grant the defendants' motion for summary judgment on the breach of contract counterclaim.

### D. Damages

The defendants seek damages in the amount of $1,301,769.22, which represents "the principal loan of $750,000.00, plus 15 [percent] annual interest totaling $454,818.15, plus the tax delinquency payment of $92,751.07, plus the Forbearance Fee of $4,200.00." Under the various loan documents—the promissory note, the modification agreement, and the forbearance agreement—CBD is entitled to damages to account for the $750,000 principal, interest at the 15 percent rate contractual rate (totaling $454,818.15), and the unpaid forbearance fee of $4,200.

The defendants have not shown, however, that they are entitled to contract damages to account for the tax payment of $92,751.07, for none of the agreements requires Edwards to pay CBD that amount. CBD likely has a basis in unjust enrichment to recoup the amount of the tax

payment, but the defendants did not bring a counterclaim for unjust enrichment. Therefore, I will deduct the amount of the tax payment, $92,751.07, from the defendants' damages claim.

In addition, the defendants already hold the deed to Edwards's properties, and the value of those properties should be deducted from the amount of the judgment. *Cf. Webster Bank v. Casella*, 2009 WL 1958740, at *1 (Conn. Super. Ct. June 2, 2009) ("Under [the foreclosure delinquency judgment] statute, the court is required to establish a value for the claim, a value for the mortgaged property, and render a judgment for the plaintiff for the difference, if any.") (citing Conn. Gen. Stat. § 49-14(a)). In a foreclosure proceeding, the value of the properties is measured as their "fair market value . . . as of the date title vests in the foreclosing plaintiff." *United of Omaha Life Ins. Co. v. Conn. Student Loan Found.*, 718 F. Supp. 2d 277, 289 (D. Conn. 2010) (citing *Eichman v. J&J Bldg. Co.*, 216 Conn. 443, 445 (1990)). This case is not exactly a foreclosure proceeding, but the same method of valuation appears appropriate.

The only "credible evidence" in the record concerning the value of the properties is the City of Meriden's 2016 tax appraisal. *See Eichman*, 216 Conn. at 451; *cf. Stamford Apartments Co. v. City of Stamford*, 203 Conn. 586, 589 (1987) (noting that "proper deference must be given to the judgment and experience of [tax] assessors") (emphasis omitted). For tax purposes, the City of Meriden assigned the building and land at 9-11 Colony Street a total fair market value of $324,800, and the building and land at 13-17 Colony Street a total fair market value of $347,500, for a combined total fair market value of $672,300.[15] *See* City of Meriden GIS Servs., http://gis.meridenct.gov/meriden/PropertySearch.aspx; *cf.* Ex. L to Mem. Opp'n Mot. Summ. J.,

---

[15] Connecticut requires municipalities to "assess all property for purposes of the local property tax at a uniform rate of seventy per cent of present true and actual value." Conn. Gen. Stat. § 12-62a(b). "Present true and actual value" is defined by statute as "fair market value." *Id.* at § 12-63(a). Accordingly, the City of Meriden's tax appraisal identifies both the properties' "Total" value (i.e., fair market value) and their "Assessed" value (i.e., 70 percent of fair market value).

Doc. No. 74-3, at 28–31 (printouts from City of Meriden GIS Services website). Edwards acknowledges that the properties were encumbered by a second mortgage of $100,000, *see* Corr'd Mem. Opp'n Mot. Summ. J., Doc. No. 77, at 62, which should be deducted from the value of the properties. *See Noggle v. Noggle*, 2001 WL 1231906, at *5 (Conn. Super. Ct. Sept. 25, 2001) (deducting amount of second mortgage from fair market value of residence). Thus, in the absence of any objection from the defendants or other evidence of the properties' value, I conclude that the properties' net value is $572,300. The defendants' award should be reduced by that amount to account for the perfection of their security interest in the properties.

Subtracting the net value of the properties and the tax payment, the defendants are entitled to judgment on the breach of contract counterclaim in the amount of $636,718.15.

## IV.    Conclusion

I grant in part the defendants' motion for summary judgment, Doc. No. 64, with respect to all of Edwards's claims and CBD's breach of contract counterclaim. I deny in part the motion with respect to Twersky's indemnification counterclaim, which I dismiss *sua sponte* for failure to state a claim. I also deny Edwards's motion to amend his complaint, Doc. No. 63.

The Clerk shall enter judgment for the defendants in the amount of $636,718.15, and close the case.


So ordered.

Dated at Bridgeport, Connecticut, this 21st day of May 2018.


/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
